**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEBRASKA**

John Doe,
Plaintiff,
v.
University of Nebraska,
Defendant.

**Civil Action No. 4:25CV3122**

FILED
U. S. DISTRICT COURT
DISTRICT OF NEBRASKA

2025 NOV -6 PM 3: 36

RECEIVED

NOV 0 6 2025

CLERK
U.S. DISTRICT COURT

## SECOND AMENDED COMPLAINT

Plaintiff John Doe respectfully submits this Second Amended Complaint pursuant to the Court's Memorandum and Order (Filing No. 19) granting leave to amend. Plaintiff seeks relief under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, for sex-based discrimination and retaliation by Defendant University of Nebraska.

Plaintiff filed his original complaint on May 30, 2025, and an amended complaint on July 16, 2025. Upon initial review under 28 U.S.C. § 1915(e)(2), the Court determined that the Amended Complaint did not contain sufficient factual detail to identify the individuals, actions, and context giving rise to each claim. The Court granted leave to amend so that Plaintiff could provide additional factual specificity necessary to render the allegations plausible and to give Defendant fair notice.

In accordance with the Court's Order, this Second Amended Complaint sets forth specific factual allegations identifying the relevant university officials, programs, and decisions, as well as the sequence of events underlying the alleged discrimination and retaliation. Plaintiff respectfully submits that these allegations, taken as true, establish plausible claims for relief under Title IX.

## JURISDICTION AND VENUE

This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.

Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred within this District of Nebraska.

## PARTIES

Plaintiff John Doe is a former graduate student and part-time research intern at the University of Nebraska. He was enrolled in and employed by the University during the period relevant to this Complaint.

Defendant University of Nebraska is a public institution of higher education headquartered in Lancaster County, Nebraska. The University receives federal financial assistance and is therefore subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.

1

**FACTUAL CHRONOLOGY**

<u>2023</u>

04/07 (1:39 p.m., i.e. 13:39): UNL CoA CRP Assistant Professor Abigail Cochran (Cochran) emailed UNL CoA Business Manager Robyn Goodwin (Goodwin) regarding logistics for hiring an hourly-paid research intern, (pseudonym: Milly) CRP Student Milly, who is a female. Cochran wrote that she was "thinking of paying $18/hour" and "including $432 of 'fringe benefits'". Cochran asked for clarification about the "feasibility of hiring her in [that] position". (13:47): Goodwin replied writing "[t]hat should be fine", and that the CoA would "reach out to her to get her set up".

04/20 (16:49): Cochran emailed Goodwin writing that it "[t]urns out [Milly] is not going to be able to work on this", but that (pseudonym: Lisa) CRP Student Lisa, who is a female, "will be able to take the position". Cochran went on to write that "the number of hours she is able to work each week may fluctuate", and asked Goodwin if she could "simply report variable hours each week". (17:03): Goodwin replied writing that "[t]he number of hours each week will not matter" because Cochran would "be approving the hours".

08/15 (16:44): Cochran emailed Goodwin writing that she "wanted to inquire about ways that [Lisa] might be able to continue contributing to this project", that Cochran "should still have budget on the [current] grant to pay her for more hourly work". Cochran went on to write that she was "in the process of negotiating a grant" that "includes a budget for a GRA position", i.e. a salaried research assistantship, and that could be "another avenue" of employment for Lisa. However, Cochran noted that the new grant was "not yet finalized". (17:16): Goodwin replied writing "[i]f [Lisa] is still a student, we can have the position continue on this project".

08/16 (12:22): Cochran emailed Goodwin writing that "[i]f [Lisa] continues her hourly work at $18/hr, it seems that she should be able to work at least 200 more hours ($3,600) and remain in budget - up to $6,221" for wages and "benefits". (12:26): Goodwin replied writing that she "submitted the request so [Lisa] can continue to work".

08/18 (12:09): Cochran emailed (pseudonym: Angie) then-prospective CRP Student Angie, who is a female, copying UNL CoA CRP Program Director Zhenghong Tang (Tang). Cochran wrote that she sent Ayan's "information along to our program director, [] Tang", and that "[h]e would be happy to talk with you, but says that you will need"; an "English Language exam", "[t]o discuss Visa needs", and "[t]o apply to the []CRP program", going on to note that "[i]t may not be possible for you to start this semester" but that she could "potentially find some alternative way for [Angie] to participate in a volunteer-type position with the research".

08/23 (~11:30): Doe met with Tang in his office to discuss Doe's thesis research and coordinate class registration for the CRP program. Doe showed Tang maps, charts, and tables related to Doe's research, and expressed that he was interested in pursuing a doctorate after earning his CRP master's degree. Doe also asked if there was paid research work available in the CRP program. Tang told Doe that Cochran might be managing an assistantship that could open up sometime that fall semester, but that Tang was unsure about exactly when it would become available. Tang also encouraged Doe to register for the client course that Cochran was teaching that semester, as Cochran's course was to furnish a topical report, which regarded the same topic as Doe's research, to decision makers of a locality in the state, of which course Doe did register for.

08/23 (12:12): Tang emailed Cochran writing that Doe would be joining CRP "this semester", that Tang had "mentioned the [client] project" and that "[Doe] could help a lot for the GIS analysis".

08/25 (12:35): Tang emailed Cochran writing "[i]f you have money to hire [Doe] for your research, he should be [a] good one. His career goal is for [an] academic area". (12:39): Cochran replied to Tang writing "[b]e careful using pronouns".

08/29 (~15:00): After Cochran's course ended Doe said to Cochran that Tang had told him she might have an assistantship to fill, and that Doe was interested in being considered. Cochran told Doe that at present she did not have any student employment to offer, but that might change.

08/30 (08:05): Doe emailed Cochran asking that she consider him for "any opportunities in the future". Doe attached his resume.

09/05 (11:00): Cochran emailed replying to Doe's 08/30 (08:05) email, asking "[w]hat kinds of methods/analyses" he had used in a prior research project about "risk behaviors" that Doe had listed on his resume. (16:51): Doe replied writing that the intent of that research was to see if "sense of community" had "an effect" on "risk behavior", that the "dependent variable was an index of ordinal variables related to behaviors", and that the "independent variables were ordinal variables related to one's sense of community", "as well as demographic controls". Doe noted that "if memory serves" there was a "significant and meaningful effect of one's sense of community on declining risk behaviors".

09/16 (20:01): Tang emailed Doe, copying Lisa and (pseudonym: Morgan) CRP Student Morgan, who is a male, informing Doe of the CRP RSO, suggesting that "[he] could work with the" RSO "to make some social events". Tang noted that there was a budget for activities and that Doe should "communicate with [Lisa] ([RSO] president) and [Morgan] (Vice [president] of [the RSO]) to make it work". (20:40): Morgan replied to Tang, copying Doe and Lisa, writing that he "had sent an email with a group me",

messaging app, "invite a couple of weeks ago", and that if Doe "didn't get that [to] let [Morgan] know and [he] can add [Doe] to the group".

09/19 (14:25): Toward the end of Cochran's in-class "[c]atch up" workday most of the Doe's classmates had left. Remaining were Cochran, Doe, (pseudonym: Gabe) CRP Student Gabe, who is a male, and (pseudonym: Freddie) CRP Student Freddie, who is a male. Cochran mentioned to Doe that she emailed him some links to scholarly pieces related to his research topic. Doe thanked Cochran and told her that he would take a look when he had a chance. (14:28): Then Cochran said that she had emailed him a piece about academic hiring in the CRP field, mentioning that she didn't mean to "terrify" Doe, but that it was pretty competitive. The piece was about "Academic Caste System Theory" in CRP; the theory, of which Doe was already aware, posits that institutional prestige largely dictates hiring. The abstract noted that "[n]early half of planning faculty graduated from" prestigious institutions, one of which Cochran had graduated, which she noted. Doe shifted his focused back to the course work he was doing on his laptop. Then Cochran said that she was surprised to recently learn that there were more women than men in graduate school, to which Doe said something to the effect of 'well yes, has that been the case for well over two decades(?)', to which Cochran quickly replied that she thought there should be more women faculty in their CRP program.

09/26 (~12:15-15:00): During Cochran's client course she placed classmates into two teams related to different elements of the pending client report. Cochran put Doe in a team with (pseudonym: Julie) CRP Student Julie, who is a female. Cochran did so in order for Doe and Julie to "balance each other out". Cochran informed the teams that the client locality was going to offer an online digital survey to area residents. The teams were tasked with identifying questions related to each team's elements, were instructed that "[t]he final survey should be relatively short and easy to complete" and "should take respondents no more than 10 minutes to finish", such that "each group will have approximately 5-minutes-worth of questions", and that the teams "may negotiate this". Doe's team reviewed a set of example questions related to the topic, selecting a potential shortened subset that related to the team's element. Doe suggested that the team construct a practice version of the survey to gauge the time it would take to complete the questions they selected. Julie though this met that Doe was suggesting that the team make a "rewritten version of the survey". Julie stated that "[w]e're not going to rewrite it". Julie prompted Cochran to confirm to Doe that the team was "not rewriting the entire survey", because "[Julie] was not going to spend time doing that".

09/27 (11:31): Cochran emailed Tang writing that "circumstances have come up, and [Lisa] is unable to assist me with some interview-based work this semester as anticipated", that Cochran was "looking for another student to help with some hourly work", that Cochran had "a few students from [her] [client] class who [had] expressed interest and may be qualified to help", going on to list two students "[Freddie]" and "[Doe]", asking if "there [were] any other students [Cochran] should consider based on qualifications", expressing that she "only [had] money for an hourly student worker", and expressing

"[h]onestly, I'm also concerned about how long it will take to hire someone, especially someone who hasn't been previously employed as a student worker". The resume that Doe previously provided to Cochran on 08/30 (08:05) denoted his undergraduate degree explicitly pertained to interview-based work, denoted examples of said work, and denoted that Doe had been employed as a student worker. (13:04): Tang emailed a reply to Cochran writing that "[f]inding qualified students to work on [a] project consistently remains a significant challenge", that he had "heard positive feedback about both students from" another CRP faculty member, and that Cochran had "the flexibility to select the best student or students from [her] [client] class". (16:11): Cochran replied to Tang writing that she would "let [Tang] know", claiming she "emailed [Freddie] to ask about his availability", that "if he's not available for the position, [she'd] reach out to [Doe]", and that "[t]his is, indeed, proving very challenging".

09/28 (14:38): Cochran emailed Doe writing that she "just had a position become available for a student to assist with [her] research", that the position "would be paid as hourly work", inquiring if Doe was "interested", noting that the work would involve "cleaning interview transcripts" as well as "conducting a literature review", that she "may ask [Doe] to perform some more quantitative analysis tasks with survey data", instructing that she would appreciate him replying "ASAP", asking if he had experience with a particular survey product managed by UNL, and asking if Doe had completed research compliance "training for previous research positions at UNL".

09/29 (08:00): Doe emailed Cochran accepting the position, writing that the "previous work" as a UNL student worker was with the survey product in question, and that attached to the email was a research compliance "completion report and certificate". (11:18): Cochran replied to Doe writing that was "[g]reat on multiple counts", but that Doe's "[b]asic" certification might not count, requesting that Doe complete a different course, and "send along [his] updated cert". Cochran went on to request that Doe "send [her] his cell number, if [he's] comfortable with [her] checking in that way", and then offered her cell number. Doe never sent Cochran his cell number, nor did Doe ever call Cochran's cell phone.

09/29 (11:28): Cochran emailed Goodwin writing that Lisa "has resigned" and Cochran had "identified another []CRP student", Doe, "who is eager to take on the role". Cochran noted that "[Lisa] did not use any of the committed budget this fall, so [Doe] should be able to work up to 200 hours" at "$18/hour and remain in budget" and asked to "arrange for [Doe] to be able to work up to 18 hours a week spanning [10/02]-[12/15], which would total 198 hours ($3,564 in wages)", though Cochran made no mention of benefits. Cochran went on to write; "I really appreciate your help with this, [Goodwin]!"

09/29 (14:01): Doe emailed Cochran replying to Cochran's email (11:18) asking when he would be "added to the HR system". (14:46): Cochran replied to Doe writing that "[t]he Business Manager for our college, [Goodwin], is out through next Monday", that "[s]he should be able to clarify the hiring timeline once she returns on Tuesday", and that "[i]t should be quicker if you've previously been

5

employed by the University, which I believe you have". (17:00): Doe emailed Cochran asking if they could "allocate one hour" of "work time to Zoom" so that they could "discuss the week's work and establish next week's tasks". (17:54): Cochran replied to Doe writing that was a "splendid idea" and "[w]ish[ed] [Doe] a good weekend".

10/03 (~15:00): At the end of Cochran's client course, she congratulated Doe in-person on his new position and asked for his cell phone number again, attempting to hand Doe her cell phone, present for the interaction was Cochran, Doe, and Milly. Doe told Cochran that he thought they would be to coordinate work on the project at their weekly Zoom work meetings.

10/03 (16:37): Goodwin emailed Cochran replying to Cochran's 09/29 (11:28) email, writing; "[t]hanks for the call, [Cochran]! I have sent this for processing".

10/04 (08:32): UNL Human Resources Specialist Darby Ellestad (Ellestad) emailed Doe, copied to the email was Goodwin, writing "I understand you have been hired for a Graduate Internship" with "the College of Architecture", that "[t]he next step" was "to complete [his] new hire paperwork", which included a "Voluntary Disability Form".

10/05 (08:00): Doe emailed Ellestad replying to Ellestad's 10/04 (08:32) email, writing "[h]ello [Goodwin]", and asking if they could complete the paperwork "today". (09:20): Ellestad replied stating that his name was "[Ellestad]" and that he was "not on campus", but rather "working remotely", and that they could Zoom later that day. (15:00): Doe filled out his hiring paperwork with Ellestad remotely, noting on the Voluntary Disability Form that Doe did "not have a disability and [had] not had one in the past".

10/05 (15:52): Ellestad emailed himself a form with a table that contained hiring information about Doe. It denoted Doe's "Job Title" as "Grad Internship - Student", denoted Doe's "Pay Grade" as "HOURLY", and the "Benefits" cell was denoted as "Not Eligible".

10/06 (~14:00): Doe Zoomed with Cochran regarding hourly-paid work on her research. Cochran explained that the project involved interviewing area elders with vision issues to see how low vision effected their ability to obtain transit to access healthcare. Cochran and Doe talked about Doe's background conducting interviews as an undergraduate, which Doe had previously noted on his resume. Cochran said an annotated bibliography of past work needed to be finished and that the interviews needed to be transcribed, which were the next steps, then the transcripts were to be coded and analyzed for recurring themes, then an academic journal article would be authored and submitted for publication. Cochran also noted that she might include a section in the article analyzing some quantitative data from a survey product managed by UNL, Doe and Cochran talked more about Doe's past work experience as a UNL research intern working with said survey product. Toward the end of the Zoom Doe inquired if

there might be an opportunity for Doe's work to lead to obtaining the salaried research assistantship that Tang had mentioned. Cochran said that the research grant to pay for a salaried research assistant was still being negotiated, and that she was unsure if, and when, she would be able to hire someone.

10/10 (~15:00): At the end of Cochran's client course, she approached Julie to ask "how things were going" in her team. Julie said that both she and Doe had "strong personalities" and that was causing Julie "difficulties". (17:43): Cochran emailed Julie writing that she "wanted to follow up" on their interaction and that they would "proceed in whatever way you feel most comfortable". Cochran wrote on offering Julie four options; one, "keep communicating", two, "[a]rrange a meeting to set ground rules" for Julie and Doe's team, three, "arrange a private meeting with [Doe] expressing" that Julie felt "uncomfortable", or, four, "arrange a meeting" with "[Cochran], [Julie], [Doe], [Tang]" to "explore other possible next steps". (18:02): Cochran forwarded the email to Tang writing; "[h]opefully we're able to resolve this" in "private meetings", and "I'll let you know if the issue would benefit from your intervention", claiming that "[t]he problem" was with "[Doe]". (21:03): Tang replied to Cochran writing that they could "discuss more tomorrow during the faculty meeting".

10/21 (10:29): Doe was not able to access entry to Architecture Hall with his UNL identification card. Doe went to do work with group members on a project for a different CRP course. Doe messaged his group saying that the building was "closed". (10:29): Gabe messaged Doe writing "[y]ou can use your NCARD". (10:30): Doe replied "[m]ine didn't work, oddly". (10:30): Gabe massaged Doe writing "[c]oming to get you".

10/23 (11:47): Cochran emailed Doe asking that he "provide an update" on his internship work. (12:52): Doe replied to Cochran emailing a link to the annotated bibliography, writing that Doe thought she would "be pleased" with the bibliography, and that he had uploaded the copies of the cited works to the project's digital cloud. (14:29): Cochran replied to Doe writing; "I am pleased with the bibliography! We can discuss potential minor modification after spending more time on interview" transcriptions.

10/24 (~13:00): During Cochran's client course Doe and Julie's team were discussing potential stakeholder outreach. Doe said that he thought they should make an effort to interview private developers because the client had mentioned some specific developers during a prior class on 09/12. Julie claimed that Cochran told her that the class was only to reach out to public-sector employees that worked for the locality. Julie asked Cochran to confirm this, Cochran said that stakeholder outreach should be focused on public sector employees. Doe reiterated that he though developers were an important group to interview, saying something to the effect of; 'because, you know, they're the ones that build it'. Cochran stated to Doe in front of his teammates that what Does said sounded "confrontational", and reaffirmed that the focus of stakeholder outreach should be on public sector employees.

10/24 (15:51): Doe emailed Cochran writing that it seemed to Doe that Cochran had "made reference to feeling as though [he] might have expressed a disagreement in a confrontational manner", that Doe "care[d] about [Cochran's] feeling as well as others['] perceptions of [Doe]", that "being perceived in such a manner" could "be a deeply and irreparably stigmatizing way" for a "male's presence to be framed", and that "perhaps [Cochran]" would "be willing to express" her concerns "privately".

10/24 (16:17): Tang emailed Doe asking Doe, "[h]ow have you been recently", and if Doe would "be available tomorrow" for a "coffee meeting".

10/24 (16:18): Cochran forwarded Tang the email from Doe (15:51) writing; "I drafted the following text, which I can send" or "I can wait until after you've been able to meet with [Doe]", going on to write "[f]eel free to pass along [Doe's] message to [UNL CoA Student Success Coordinator Stephanie Kuenning (Kuenning)]". (16:22): Tang forwarded Cochran's email to Kuenning, which was copied to Cochran, writing to Kuenning that "[a]ny advice is appreciated".

10/24 (16:53): Doe replied to Tang's email (16:17) writing; "I am well", and "I think I'm up to date on my steps to graduation as per what's been discussed with [Doe's faculty advisor]", but that "perhaps there was something else we needed to talk about", and that "[i]f so, do let me know". (16:55): Tang replied to Doe thanking Doe "for [his] quick response", offering other times that week to meet for coffee, and noting that Doe could "stop by anytime" Tang's "office is open". (17:05): Doe replied to Tang writing; "I get the impression you'd like to chat", but that Doe had planned on spending most of remaining week on internship work, however Doe wrote that "if it's a pressing matter, I can come by Friday". (17:07): Tang replied to Doe writing they should get together "Friday [10/27] at [09:00] in [the] City campus union Starbucks area", and that Tang would "but a coffee for [Doe]".

10/25 (08:00): Cochran replied to Doe's 10/24 (15:51) email writing that she "appreciate[d] [Doe] expressing this concern", that Cochran "did not intent to frame or pass judgement on [Doe] in front of [his] peers in a manner that could be stigmatizing", and that "[p]erhaps [they] could spend a bit of time in [their] [work] meeting on Friday talking through some ways in which [they] can more effectively communicate".

10/25 (10:29): Kuenning emailed Cochran, copying Tang, writing; "I'm glad we got to talk this morning", that Kuenning "wanted to share with [her] the information [she] provided in [their] meeting about how to file a report" with "Student Conduct and Community Standards", and that, "as [Kuenning] mentioned, it would be good for [Cochran], [] Tang and [Kuenning] to keep in contact about [Doe]". (10:31): Tang replied to Kuenning and Cochran, writing that Kuenning's "information is very helpful", and that that he "will have a talk with [Doe]".

10/25 (14:02): Doe replied to Cochran's email (08:00) writing; "that sounds good to me", that he "greatly apricated [Cochran's] willingness to dialogue", and that Doe was "[l]ooking forward to [their] meeting".

10/25 (15:40): Cochran emailed Tang and Kuenning replying to Tang's email (10:31) writing that she'd have her "regular research meeting with [Doe] on Friday", and that Cochran would "keep [them] both updated".

10/25 (15:42): Doe replied to Tang's 10/24 (17:07) email asking for "clarification regarding [their] meeting on Friday", asking if it was "a formal meeting", and asking if Tang "might offer [Doe] some insight as to its intended purpose". Doe wrote on addressing "[s]omething related to class registration, [as] [he] encountered issues when attempting to register last night [10/24]", asking if Tang was the right "person [he] should touch base with for [registration] permission codes".

10/25 (15:47): Tang emailed Kuenning, copying Doe, asking; "[w]ould you please give permission codes for [Doe]".

10/25 (15:52): Tang emailed Doe replying to Doe's email (15:42) writing that "[i]n terms of Friday['s] coffee meeing, we can just update each other", so that he "can hear [Doe's] progress in [his] courses, [his] challenges, and [his] suggestions", and that "[i]f [Doe] [had] specific question or concerns, [to] please let [him] know".

10/25 (17:06): Kuenning emailed Tang, copying Doe, replying to Tang's email (15:47) writing; "[Doe], [p]ermission codes are assigned to you as listed below", and that he should "register asap to secure [his] seats".

10/27 (~09:00): Tang and Doe met for coffee, the two shared a "friendly" conversation, Tang told Doe that "the faculty like him", they spent about an hour talking about various topics related to the CRP discipline. Tang talked a little bit about urban forestry, Doe noted that he had done some research regarding urban forestry. Tang talked about some previous client projects the programs had furnished, such as downtown revitalization plans for various localities in the state, Doe asked a few follow-up questions. Toward the end of their talk Tang began emphasizing the idea that everyone should feel welcome in the program. Doe agreed with Tang on that point. Tang also mentioned that everyone should feel welcome in Cochran's class. Then Doe expressed the concern to Tang that Julie's talkative personality seemed to make it hard for classmates who were non-native English speakers to participate equality in the client project. Tang listed to Doe's concern and reiterated the idea that everyone should feel welcome, including Doe.

10/27 (~14:00): Doe and Cochran had their remote work meeting. Toward the beginning of the Zoom, Doe noticed that the red emblem that denotes that the Zoom is being video recorded was blinkering. Cochran did not ask Doe to record their Zoom, nor did Cochran inform Doe that she was recording. Doe did not mention to Cochran that he noticed she was recording. Cochran claimed she did not mean to stigmatize Doe in front of his peers. Doe expressed appreciation for that sentiment. Cochran went on to expressed that she was concerned that Julie might not feel welcome in Doe and Julie's team due to disagreements between Doe and Julie about the project's direction. Doe told Cochran that Julie seemed comfortable expressing herself to the team, and that Doe was concerned that Julie's talkative personality made it hard for non-native English speakers to participate equally in their team's work. Cochran mentioned that there might be a 'gendered' dynamic. Doe mentioned that there are lots of dynamics at play, such as 'race' or 'class'. Cochran's said that it was important to consider people's feelings. Doe said that he did not perceive that Julie considered Doe's feelings, but that Doe would make an effort to think about feelings. Cochran seemed satisfied with their conversation regarding the concern of sex discrimination that Doe raised, 10/24 (15:51). Cochran and Doe went on to spend a meaningful amount of time talking about the research that Doe was working on as an hourly-paid intern, which seemed to Doe to be an amicable conversation. Toward the end of the meeting Doe inquired if Cochran had any new information regarding the grant for a salaried research assistant, and if so if Doe might be considered for the assistantship. Cochran said she filled the position, and that Angie would be Cochran's assistant on the project, she quickly added that Angie was from a foreign country, and that Cochran had been approached by Angie's husband at a professional conference, who had inquired about the position for his wife. Doe then inquired if his contributions to the research could lead to by-name attribution for Doe when Cochran submitted the research for publication. Cochran said that typically having one's name on an academic journal article was reserved for those that made a meaningful contribution to research. Doe asked if he might continue working on the research after fall semester. Cochran noted that she may not have funds for an hourly intern after Angie began work as her salaried assistant.

10/27 (16:30): Cochran forwarded Kuenning's 10/25 (10:29) email to another CRP faculty member, who graduated from the same institution that Cochran had, and, like Cochran, was recently hired to the CRP program. Cochran wrote that she "met with [Doe] over Zoom this afternoon and then rounded back with [Kuenning]", that the they should "continue to be in somewhat of a holding pattern, wait-and-see for now", that "[Kuenning] suggested [Cochran] forward [him] the" complaint filing "resources she sent [her] earlier in the week", and that "[Kuenning's] always available to support us as it relates to [Doe]".

10/30 (08:35): Cochran emailed Tang, Doe's faculty advisor, and the other CRP faculty member that had recently been hired to the CRP program. Cochran wrote that; "[Doe], who is serving as my hourly paid research assistant" has "assumed [he] would be a co-author on an eventual publication just by working, in some way, on the project", and that Cochran had "told [Doe] that this not the case". (08:38): Cochran emailed Tang a response to Cochran's email, writing that "I'm not going to be able to handle it if it's something new every week with [Doe]", going on to write "[i]t's just so frustrating, because [Doe's]

been doing decent work on the research project. If [he] just put [his] head down and continued working, [he] would, perhaps, have a chance of rehire next year and eventual co-authorship".

10/31 (~12:15): At the beginning of Cochran's client course Tang came to the class. He had purchased doughnuts and told the class that "being respectful to students and colleagues and being a collaborative team" was important. Tang "did not mention anyone's name". Tang subsequently came to the classroom to work on his laptop at various points during the class, the teams were working on their upcoming remote presentations for a local stakeholder. Toward the end of class, remaining in the room were Cochran, Tang, Gabe, Freddie, Milly, and (pseudonym: Mike) CRP Student Mike. Doe observed Freddie ask Cochran about filling her salaried research assistantship, to which Cochran replied that she was not sure if she would have funding for any student positions next semester, but that she would let Freddie know if she was able to work something out.

11/01 (12:52): Tang emailed Cochran, copying Angie, writing that Angie "may need to prepare a bank statement from [her] own side" to show her "financial resources", noting that; "we do not have [any] other better option at this point". (13:27): Cochran replied to just Tang writing that she had sent an email "which [she] didn't really want to do, about the possibility of pushing back" the "grant period to hire [Angie]", noting that "this is more of a headache than I potentially wanted to deal with", and that Angie "doesn't have enough resources to provide the bank statement-she's currently unemployed and her husband" is a doctorate "student working" in
"engineering". (13:33): Tang replied to just Cochran writing; "you can hire [Freddie] as an alternative".

11/01 (13:40): Cochran emailed Kuenning, writing; "[f]ollowing our discussion yesterday[, 10/31,] I've considered what I would, ideally, like to come out of a forthcoming meeting with you, [Tang], and [Doe]. This includes", one, "[that] [Doe] be appropriately counseled on UNL's Standards of Academic Integrity and Responsible Conduct", two, "[t]hat [Doe] acknowledge that [he] will and how [he] will modify [his] behavior, and make a plan or articulate actionable steps to be successful as an []CRP student", and, three, "[if] [Doe] is unreceptive to the previous list items and refuses" then "steps should be taken to escalate" the process " beyond the College, potentially resulting in dismissal from the []CRP program", going on to write that in "regards to [Doe] serving as my paid" intern "I will wait and see as to whether that position needs to be terminated" and that the internship "could continue through the end of the semester, but not if [Doe] continues to bring up" the "co-authorship discussion". (15:16): Kuenning forwarded Cochran's email to just Tang writing; "I think the next step is going to be a meeting with me and you and [Doe]", and "we'll need to be very clear that [Doe] is toeing the line from being maybe 'overly engaged' to disruptive", "[d]isruptive behavior can and should be reported" for "further investigation, of course". Kuenning went on to write; "[o]ne of my chief concerns is the discomfort that [Cochran] feels", and "I want her to be supported by our administrative team", noting to Tang that "I need your help deciding when" to "involve [UNL OGS Dean Debra Hope (Hope)] or [UNL CoA Dean Kevin Van Den Wymelenberg (Wymelenberg)]". (15:23): Kuenning replied to Cochran's email (13:40)

writing to Cochran; "[t]hank you for sending this [Cochran]", "I have also shared this with Dr. Tang", and "[p]lease don't hesitate to reach out".

11/02 (07:16): Tang emailed Kuenning, copying Cochran, replying to Kuenning's 11/01 (15:16) email writing; "I plan to bring up this matter during the CRP faculty meeting scheduled for next Wednesday, [11/08], to seek faculty input".

11/02 (~18:00): Doe and Julie's client-course team Zoomed to discuss the final work that needed to be done to the team's slide deck before their remote presentation to a locality stakeholder on 11/07. Analysis of results from the area's digital survey still needed to be added to the presentation, (pseudonym: Xavier) CRP Student Xavier, who is a male, volunteered to do that. Doe thanked Xavier for volunteering. Then Julie said that she would be the one to add the analysis of the digital survey. Doe asked Julie if, perhaps, Xavier might do it instead. Julie reiterated that she would do it.

11/03 (~14:00): Doe and Cochran Zoomed to discuss the research. They spent a meaningful amount of time reviewing the software used to make and log recurring thematic codes of the transcripts, though Cochran noted that Angie would likely be doing the thematic analyses. Doe mentioned that he could help as an intern and asked for some more information about Angie's research background. Cochran did not offer details about Angie's work qualifications but said something to the effect of; 'I think "she" will add something the program is lacking', placing a tonal emphasis on "she".

11/03 (~20:00): Doe, Morgan, Julie, and (pseudonym: Jerry) CRP Student Jerry got together at a restaurant for an informal social gathering that Morgan had organized on the group me associated with the RSO. The group shared affable small talk about various topics. At one point Doe asked Julie "if since there are so many documents from so many different departments, someone could find a way to do whatever they wanted in the city of Lincoln". Julie said, "absolutely not". Julie said she thought "the insinuation was that the [c]ity was not doing everything it could to follow the rules and regulations" and that Doe had "insulted her colleagues". The group shared more affable small talk in front of the restaurant. Jerry and Doe said goodbye to Morgan and Julie. Morgan and Julie left the gathering together on foot heading eastbound. Jerry and Doe talked for a bit more, then said goodbye to one another. Jerry went southbound on foot as Doe unlocked his bike. Then Doe went southbound on bike. Jerry saw Doe pass Jerry as Doe rode his bike southbound.

11/06 (~20:00): Doe checked the team's remotely accessible group slide deck and noticed that Julie had not added the analysis of the area's survey results, so Doe added that to the deck for the presentation the team was to give the next day.

11/06 (22:38): Doe messaged his client-course teammates writing that they should change the slide deck; "if you'd like change anything".

11/07 (08:00): Doe emailed his client-course teammates writing that they should change the slide deck; "if you'd like change anything".

11/07 (~12:15): At the beginning of Cochran's client course Julie told Doe that she was unset with him for changing the slide deck. Cochran and Tang were present for the class, and Cochran was observing the interaction closely. Doe noted to Julie that he added the slides for the survey results because Julie did not and that she should change the deck before their presentation if Julie would like to do that. Julie did not do that. Instead, Doe's team spent about an hour rehearsing the presentation. Then Doe's team, and the other team, gave their presentations remotely to the area stakeholder. After the presentations the area stakeholder asked multiple questions, all of which regarded the presentation given by Doe's team. Morgan was not in Doe's team. (~15:00): After the class Julie had a meeting with Cochran in her office, Julie did not want to be in a team with Doe anymore. Cochran contacted Kuenning and requested that she joint the meeting. Kuenning did joint the meeting, and Kuenning said that hearing that Julie was upset about Doe was the "cherry on the top".

11/07 (16:32): Kuenning emailed Julie writing; "I wanted to follow up [on] our meeting today by providing you with the University information regarding our Discrimination and Harassment Policies", included was the link to the policies, going on to write; "[a]s I mentioned, you are able to file a report directly with UNL's Institutional Equity and Compliance office by clicking on the Red Box at the top of the form that says 'Report an incident' or you can contact the office directly at [phone number] to schedule an appointment". (16:36): Kuenning forwarded Tang the email she sent Julie, copying Cochran, writing; "I wanted to let you know that I met with [Cochran] and [Julie] today", noting that "I provided [Julie] with Title 9 resources both in person and in the email below" and that "[Julie] and I are going to meet again on Monday to follow up". (16:58): Tang replied to Kuenning's email, copying Cochran writing; "[t]hank you for taking the time to meet with [Cochran] and [Julie] today. [Cochran] also just called", "[t]he CRP faculty will be addressing this issue during tomorrow's faculty meeting", and "you and I should arrange a formal meeting with you and [Doe] as soon as possible. I am available on this Thursday". (17:00): Kuenning replied to Tang's email, copying Cochran, writing; "[a]t this point, I am leaning toward filing a report on my own". (17:06): Tang replied to Kuenning's email, copying Cochran, writing; "[i]f you have [the] time, you are welcome to join the faculty meeting", "[w]e can adjust the agenda for your attendance".

11/08 (08:00): Doe emailed Tang writing; "I am reaching [out] about N-card access to Architecture Hall. A couple of weeks ago I wasn't able to gain entry when I arrived at Architecture Hall" to do work "for a group-project meeting", "[who] do I contact to be granted access to our facilities". (08:17): Tang forwarded Doe's email to UNL CoA Assistant to the Dean Kathy Bateman (Bateman), copying Doe, writing; "please give the ARCH building access" to "the Ncard for [Doe]". (08:32): Bateman replied to

Tang, copying Doe, writing; "I have submitted the access request", "[p]lease be advised that it could take up to 24 hours for this to go into effect".

11/08 (~10:30): The CRP tenured and tenure-track faculty members held there weekly meeting. In attendance were Cochran, Tang, Doe's faculty advisor, the CRP faculty member who graduated from the same institution as Cochran, and Kuenning; who said that "it is normal for her to attend those" meetings. Tang said he thought they "had a long discussion" regarding Doe. Tang "explained that if a question is academically related, then a student has the freedom to ask challenging questions" and "discussed senior faculty sitting in on [Cochran's] class[] to make sure no further conflict arose". However, Kuenning "said that it would be appropriate to discuss the matter with Title IX or Student Affairs", she said "they needed to stop talking about it" and "elevate it to the next level". After the meeting Kuenning said she "elevated the concerns to her direct supervisor, [Wymelenberg]".

11/08 (17:57): Cochran emailed Kuenning, copying Tang and Wymelenberg, writing: "[Kuenning], I called the Student Affairs office today and had a long discussion about their process for investigating Student Code of Conduct & Community Violations. They advised, much like you, that any of us who feel it's warranted submit a report and that they investigate the case. I think this is the right course of action. However, I feel that I could use additional guidance on how to proceed with certain matters. One being whether [Doe] should be allowed to continue attending my class or other courses in person while the investigation is ongoing. While [Doe] has not demonstrated violent behavior, by my view, I am concerned about how [Doe] may react to being investigated. And I do believe that [Doe] is capable of behavior that could be emotionally or reputationally damaging. I truly cannot predict how this will go, which makes me think that, out of an abundance of caution, perhaps we should cease their attendance. The Student Affairs representative stressed that they cannot issue this cease - they said it either needed to be done by the College of Architecture or Graduate Studies (they weren't sure which in the CRP case). It would help me to know what you and [Wymelenberg] advise as far as making sure myself, other CRP faculty, and students in [the client course] are safe when we initiate investigation into [Doe]'s behavior. Again, I don't know whether it is ceasing their attendance, but this is something to consider. I continue to appreciate your help on this. While I do intend to file a report with Student Affairs, I will wait to proceed until I've heard from you. Thank you, [Cochran]".

11/08 (18:01): Cochran emailed Doe: "Hello [Doe], I've had something come up that will conflict with our Friday afternoon meeting. I suggest that we do an email check-in this week, alternatively. Please do let me know how transcript cleaning is going and if I can answer any questions later this week. Thanks, Dr. Cochran".

11/09 (08:35): Wymelenberg emailed Cochran and Kuenning, copying Tang, replying to Cochran's 11/08 (17:57) email: "Dear [Cochran], I was able to catch up with some of the challenges you have been facing this semester yesterday afternoon and this morning. I am sorry you have had to deal with these

challenges. I was travelling yesterday afternoon and again all day today, so I have asked [Kuenning] to find a time tomorrow for the four of us to meet. Please know we will find a pathway that you are comfortable with and feel fully supported. Also, I think you should feel at liberty to file the report at the time you feel appropriate." (09:07): Cochran emailed Wymelenberg and Kuenning, copying Tang, replying to Wymelenberg (08:35), writing: "All, I'll look forward to meeting tomorrow at 12:30 pm. I appreciate your support. All my best, [Cochran]". (14:14): Kuenning emailed just Wymelenberg, forwarding Cochran's 11/01 (13:40) email.

11/10 (~12:30): Wymelenberg, Kuenning, Cochran, and Tang had a meeting regarding Doe. Tang said that Wymelenberg "agreed with the mitigation measures that the senior faculty" would "sit in on the [client] course[]". But Kuenning said Cochran "felt unsafe", so Kuenning said she "called UNLPD", which is the UNL campus police department, but that UNLPD "did not think a plainclothes officer was warranted", and "did not have" any "reports of alarming behavior about [Doe]", but that UNLPD told her "they may increase patrols around the building". Kuenning said she contacted UNLPD even though she "did not know of any physical threats". Wymelenberg said he told Cochran "that the decision was hers" if she wanted to file complaints about Doe.

11/12 (10:47): Lisa emailed the RSO's five student leaders, including herself, Doe reasonably infers that Lisa blind copied all CRP students and faculty. Lisa wrote that "[i]f you have any topics that you would like to discuss at the [RSO] meeting [11/16], please email them ahead of time to [RSO] President, [Lisa]".

11/13 (11:21): Doe emailed RSO President Lisa, copying RSO Vice President Morgan, writing; "I wanted to offer some potential topics" for "conversation at our coming [RSO] meeting", writing that "[s]ome students desire to acquire the necessary experiences and references to be competitive applicants to doctorate programs", that it was Doe's "impression there aren't enough research internships nor research assistan[t]ships for all interested", that "it seems there is not a readily transparent and equally accessible way for interested students to know which faculty have, or are soon to have, those available", noting that "co-authorship" on "published works is hugely beneficial to building a competitive CV for doctoral application", and that he would like the RSO to "[a]dvocate for a transparent formalization of how to apply and be competitively selected for internships and assitan[t]ships", and advocate for "an explicit threshold for co[-]authorship".

11/13 (12:23): Cochran digitally filed written complaints about Doe to UNL SA SCCS and UNL IEC claiming that "on [10/24] [Cochran] was providing direction to the student team that [Doe]'s a part of", that "[Doe] disagreed with direction [Cochran] was giving", that Doe's "language began escalating in tone", and that as a result Cochran "felt threatened and otherwise upset". Cochran wrote that she "said to [Doe] something like, 'You are being confrontational[]'" and that "did deescalate the discussion", but that she "then excused [her]self to use the restroom, as [she] was feeling very anxious". Cochran went

on to write that Doe emailed Cochran later that day stating to Cochran that her comments could "be a deeply and irreparably stigmatizing way" for a "male's presence to be framed". Cochran wrote that Doe's 10/24 email "made [her] feel very upset and concerned", that she "was afraid that [Doe] w[as] accusing [her] of acting improperly" when she "felt as though [she] had responded appropriately to deescalate". Cochran wrote of Doe's 10/24 email that she "did not appreciate what [she] perceived to be sarcasm", and that "[Doe] has used sarcasm in a manner that [she] felt to be disrespectful". Cochran went on to write that "[Doe] and [Cochran] m[e]t via Zoom on Friday, 10/27", where she told Doe she "did not mean harm with [her] comment that [he] w[as] being confrontational, but that [she] did feel as though [he] w[as] acting, in that exchange, confrontationally and aggressively, which upset [her]", that she "asked that [he] reflect on how [his] behavior could have been interpreted as such, and how [he] might more effectively communicate [his] opinions to [her] and [his] peers moving forward", but that "[Doe] did not seem to internalize [her] comments" and that "instead, [Doe] wanted to identify and discuss instances in which [he] perceived other students' behavior to be inappropriate" and, "[a]ccordingly, [she] did not feel th[at] exchange to be particularly productive" because "[she] did not feel as though [Doe] heard [her] remarks, acknowledged or reflected on [his] behavior, or expressed intent to change [his] behavior in future interactions". Cochran wrote on noting that she was the "Principal Investigator on a research grant for which [she] hired [Doe], as a paid, hourly student worker", that "on 10/[06], [Doe] asked" if "[he] would be given co-authorship on future manuscripts and publications arising from the work", that "on 10/27[]" Cochran told Doe "that co-authorship would be considered when one made a substantial" and meaningful "contribution to the work" and that "opportunities might be available for co-authorship on [the] project if [Doe] were to continue with the project, in some capacity [sic] (likely unpaid), beyond the period of their hourly work appointment". Cochran went on to write that "[Doe] did not bring the topic of co-authorship back up with [her] in a research Zoom meeting on 11/03[]; however, [she] continue[s] to be concerned that [Doe] seems to be returning to th[at] topic". Cochran went on to claim that "on 11/[07]" after "class, in which students had given presentations in their research groups", "[Julie] came to [her] office and shared that [she] was feeling uncomfortable and upset working with [Doe]", that Doe had "significantly changed portions of the presentation", that Doe had done so "without [Julie's] consent", and that "[Julie] felt [Doe] was overly aggressive, 'dominating,' and unwilling to listen to [Julie]". Cochran went on to write that Julie told her that "[Doe] was also present the previous Friday evening (11/[03])—a meeting of the [RSO]", that "at [the] event, [Julie] said that [Doe] engaged [Julie] in an unusual and confrontational conversation regarding professional ethics in urban planning", that "[Julie] felt very upset after the exchange", and that "[Doe] may have been especially aggressive with [Julie] because of her gender". Then Cochran's writing circled back to the "the meeting in [Cochran's] office on 11/[07]", writing that "[Julie] was very emotional", claiming that "[Julie] was feeling sick with frustration and anxiety from having to interact with [Doe] in [the client course] and otherwise", that "[Julie] expressed feeling as though [Julie's] learning had been significantly disrupted by [Doe]'s behavior, and that [Julie] felt as though [Julie] had 'checked out' or disengaged from the course's primary assignment and related activities [sic] (the group assignment with [Doe]) because [Julie] no longer felt comfortable interacting

16

with [Doe]". Cochran then wrote that "[Cochran] asked [Kuenning]" to "come and speak with [Cochran] and [Julie]", that "[Kuenning] described resources for [Julie] that [Julie] might choose to utilize and directed [Julie] on how [Julie] might file reports with either Student Affairs or the university's Title IX office [sic], again, if [Julie] so chooses". Cochran wrote on, claiming that on 11/10 Morgan sent an email, supposedly titled "Response to [Doe]", wherein he's transcribed by Cochran as having written; "[r]espectfully, I and nearly everyone else in the [client] course have seen that [Doe] has been belittling students, has extremely questionable behavioral conduct, and his motives" seem "very self-serving", that Cochran's "instructional engagement has been [sic] EXCELLENT", that Doe was "extremely combative with Dr. Cochran and his group members" and "vehemently disagreed with many of the suggestions [Cochran] shared", that Doe was "very intimidating to his groupmates and they did not feel completely comfortable", and that Doe's "conduct across the program's courses this semester has been very much derogatory towards other students and faculty to create an intimidating classroom experience". Doe would later learn that "Response to [Doe]" was a fabrication made by Cochran, but it would be some time prior to Doe becoming aware of that fact.

11/13 (14:18): UNL IEC Equal Employment Opportunity Specialist Deanna Schuldeis (Schuldeis) emailed Cochran writing that "[Schuldeis] would like to visit with [Cochran]", asking Cochran, "when are you available for a phone call". (14:45): Cochran replied to Schuldeis writing; "I can talk about this today. Please feel free to call [phone number]", "[o]therwise, I should also be available for a call between 10:30 and 11:30 [] tomorrow".

11/14 (09:54): Schuldeis replied to Cochran's 11/13 (14:45) email writing "[g]ood morning, I can call you at 10:45 if that is still a good time". (09:58): Cochran replied to Schuldeis writing; "[y]es, 10:45 [] will work", "[t]alk then". (11:38): Cochran emailed Schuldeis, replying to Cochran's (09:58) email, writing; "I'm glad we were able to connect this morning", and "[p]lease find" attached "memoranda I've written detailing" Doe's "concerning behavior and interactions" in Cochran's client course "between [Doe] and [Julie]".

11/14 (~12:15): Tang and Doe's faculty advisor were present at Cochran's client course. Cochran informed the class that the remainder of the course would be spent working individually, and that students would be assigned specific sections of the final report to author. Doe had two sections at the beginning of chapter four. Tang handed students hard copies of the section assignments. Cochran said at the end of the semester Xavier would be responsible for formatting the final draft of the report. Students spent class time working individually. During class Doe addressed Tang, Doe's faculty advisor, and Cochran, asking if he might give a conference presentation on the client course's report at the state-level professional conference associated with the CRP discipline next semester. Doe said that he had previously given a professional conference presentation on the topic. Tang told Doe there was a student-research session, but that Tang was unsure if the client course's research would be ready.

11/15 (08:35): Lisa emailed herself and the other RSO student leaders, copying Tang and Cochran, Doe reasonably infers the email was blind copied to all CRP students. Lisa wrote; "[h]ello everhyone", "[u]nfortunately, we need to cancel our planned [RSO] meeting for [11/16] due to some unforeseen circumstances and scheduling conflicts. Some of you have contributed agenda items - thank you! We will make sure to carry that forward" or "reach out directly", and that students should "reach out if you have any questions or need support".

11/15 (08:42): Lisa emailed Doe, copying the other RSO student leaders, replying to Doe's 11/13 (11:21) email to Lisa, writing; "[t]hanks so much for contributing very thoughtful agenda topics", "Morgan and I would like to dig into these further with you and see what we can arrange with the faculty", stating that "there is always room to improve transparency", and asking Doe "[w]hat's your schedule like in terms of availability".

11/15 (09:14): Schuldeis emailed Cochran, replying to Cochran's 11/14 (11:38) email, writing; "[t]hank you for providing this information to me. I will save the documents in the case file".

11/15 (13:02): Doe emailed Lisa and Morgan, replying to Lisa's email (08:42), writing; "I am available Friday", "all of Saturday and all of Monday".

11/16 (11:18): Cochran emailed Doe regarding the research work, writing; "we'll plan to meet again and commence Dedoosing", i.e. using the thematic coding software for coding the transcripts, "the week of 11/27". (17:07): Doe replied to Cochran, writing; "sounds good to me". (17:44): Cochran replied to Doe, writing; "[t]o be clear" regarding the schedule "I propose we meet this Friday, [11/]17", "then we reconvene on Monday, [11/]27, to get Dedoosing". (17:44): Doe replied to Cochran, writing; "[y]es, understood".

11/17 (09:27): Cochran emailed herself, claiming she "[s]poke with [UNL SA SCCS Director Andrea Barefield (Barefield)]: [phone number]", that "IEC ha[s] asked that Student Affairs hold off on their investigation into [Doe]'s behavior until they [have] moved things ahead", that SCCS is "not going to proceed with investigating [Doe] until they get the go-ahead from IEC", that "[Barefield] advised that we keep submitting any information on [Doe]" to SCCS "via incident report forms, or by phone/email", that "[Barefield] said that her cursory determination would be that [Doe] is, indeed, violating the Code of Conduct", that Cochran "asked about how students typically respond to being investigated, and [Barefield] said that, in her experience, students who have demonstrated behavior like [Doe] typically" will "try to track down individuals who may have made reports", and that "[Barefield] said that, in any case, we should continue taking detailed documentation of [Doe]". (09:36): Cochran forward the email she sent herself to Tang and the CRP faculty member who graduated from the same institution as Cochran, copying Kuenning, writing that "[Barefield] from the Student Affairs Office called this morning", that Cochran "just wrote up the below notes about the call", that Barefield's "main reason for

calling was to tell [Cochran] that SA are delaying their investigation into [Doe]'s behavior at the Office of Institutional Equity and Compliance's (IEC's) request", that Barefield "encouraged [Cochran] and any other faculty" to "keep detailing and reporting" Doe to "[Barefield's] office and/or to IEC".

11/17 (~14:00): Doe Zoomed with Cochran regarding the research work. They spent time exploring the ways to use the qualitative research software to create, log, and query recurring thematic codes. Toward the end of their meeting Doe asked Cochran if he would be able to continue working on the research next semester. Cochran told him that Angie would be taking over the research work, so there would be no work for Doe to do. Doe then asked if he could receive by-name attribution on the publication submission of the research, saying something to the effect of; 'there are some academic programs that make an effort to be inclusive of student researchers on publication submissions'. Cochran indicated she would give Doe by-name attribution, Doe quickly asked if they could formalize that understanding, Cochran paused then said "yes" and quickly added that she had to be going.

11/17 (~15:00): Doe called UNL SA ASUN SLS, which is a student legal service provided to students by the student government, to schedule an appointment with an attorney about drafting a contract for Doe to receive by-name attribution on a publication submission of research that Doe had work on. (15:33): SLS emailed Doe a link to fill out an intake form, which Doe completed. (16:28): Doe received an email from SLS confirming an appointment for 11/21.

11/18 (08:33): RSO President Lisa emailed Doe, writing; "I'm hoping I can Zoom with you Monday [11/20]. I think I could talk over my lunch, around Noon", asking "[w]ould that work". (11:43): Doe replied to Lisa, writing; "Monday sounds good", "I though[t] my meeting with my lawyer about drafting a contract to ensure I'm acknowledged" by "name, for any research submitted for publication that I've worked on is around that time, but I checked and that is on Tuesday".

11/19 (12:10): Doe received an automated email, confirming his registration for a "UNL Search Process Seminar - Zoom" on 11/28. Doe intended on asking for information as to what employment requirements were involved when faculty hire students for salaried research positions.

11/20 (07:38): Lisa replied to Doe's 11/18 (11:43) email, informing Doe that she would not be able to Zoom over the lunch hour, writing; "[Morgan] remined me that we have class today at 12:15".

11/20 (10:00): Doe emailed the Vice President of Representation for the graduate-student government assembly, writing; "I am reaching out" to "inquire if I may attend the [12/0]5 GSA meeting" to have a "potential at-large GSA membership voted upon".

11/20 (10:11): Doe replied to Lisa's email (07:38), copying Morgan, writing; "thoughts on the below times", offering five alternative times to Zoom.

11/20 (10:14): The GSA Vice President of Representation replied to Doe's email (10:00), writing; "[w]e would be happy to have you".

11/20 (16:32) Lisa replied to Doe's email (10:11), copying the four other RSO student leaders, which included Morgan and Julie. Lisa wrote, "I am unable to accommodate those times", and that she would "continue to work on this as [her] time permits and in the manner of [her] choosing". (16:44): Doe replied to Lisa, copying the four other RSO student leaders, writing that "it would seem [Lisa's] time does not permit working on basic [RSO]-related matters, such as establishing and hosting general meetings". (17:12): Julie forward Doe's reply to Lisa to Tang and Cochran, copying Morgan.

11/20 (17:31): Cochran emailed Tang, writing; "[i]n that email", "[Doe] references meeting with a lawyer to seek contractual obligation of being named" in "any publication coming from my research project", "[w]e have to do something about this", "[Doe]'s behavior is becoming increasingly concerning". (17:38): Tang replied to Cochran, writing; "[t]hanks for your information sharing", "[i]f you have time, can we discuss" this "tomorrow morning in my office", "I will have [a] 1-1 meeting with [Wymelenberg]". (19:36): Cochran replied to Tang, writing; "[h]ow about we do a phone call at [0]8[:00] tomorrow? I probably won't be on campus until a little closer to class time".

11/21 (08:42): Cochran emailed Schuldeis, writing; "[t]here's been a significant escalation in [Doe]'s communications and behavior over the last several days", "I am becoming very concerned about [Doe]'s continued presence in the classroom", asking "[h]ow can the IEC office support me, my colleagues, []CRP students, and the College of Architecture in managing [Doe]'s behavior and participation in classes", offering "perhaps by ceasing [Doe]'s in-person attendance in class(es) for the remainder of the semester".

11/21 (09:03): Cochran emailed Barefield, writing; "I just sent the following to [Schuldeis]", "[y]our input would also be greatly appreciated", "[p]lease feel free to call [phone number]", Cochran pasted the text from the prior email (08:42) to Schuldeis below the text in Cochran's email to Barefield.

11/21 (09:49): Cochran emailed Barefield again, writing; "[t]he students are also very concerned, and several have expressed feeling uneasy about coming to my class" which is "today at 12:15".

11/21 (10:12): Cochran emailed the five RSO leaders, writing; "[p]lease keep sending any concerning communications from [Doe] to me, [Tang], [Kuenning], [Wymelenberg], Student Affairs, the Institutional Equity and Compliance (IEC) office, or whatever person/entity you feel is appropriate".

11/21 (~10:30): Doe Zoom with a lawyer at UNL SA ASUN SLS. The lawyer asked for some background, going on to note something to the effect that UNL was ultimately his client, and as such he

could not act against UNL's interests. Doe clarified that a faculty member that Doe was working with already agreed to formalize the understanding that he could get by-name attribution on a publication submission of research they were working on together, and Doe was trying to figure out how that could be done. The lawyer said that based on his reading of the contractual agreements between UNL and associate professors, that the only contractual relationship they could have was the one they had with UNL, but that was different for tenured faculty. Doe then asked if a memorandum of understanding was a contract. The lawyer said an MOU was not a contract. Doe pulled up an MOU template and asked the lawyer if it look like a standard MOU format. The lawyer said that it looked fine. Doe thanked the lawyer for his help and said goodbye. Doe then typed up a MOU based on the template that stated that he be given by-name attribution on a publication submission of research conducted between Cochran and Doe and made a place for both parties to sign. Doe printed the MOU to take with him to Cochran's client course.

11/21 (~11:00): Barefield made a SCCS case creation form for Doe. The demographic section noted Doe's birthdate, that he was a graduate student, that he was not an athlete, that his sex was male, his program, that he was not in a fraternity, his race(s), incorrectly noted his advisor as some who was not Doe's advisor, that he was not in an honors program, the GPA from his last term was incorrectly noted as being 0, his cumulative GPA was corrected noted, that he was not a veteran, his "Risk Level" was left blank, and that his primary campus was UNL. The incident information section noted that the incident occurred on 11/07 at UNL Architecture Hall, that it was reported by Cochran on 11/13, that Cochran was a faculty member, that the charges were one academic charge, "Interfering with Academic Work", and two conduct charges, one for "Disruption of University Operations", and another for "Interfering with Instructor's Ability to Conduct Class", it noted that the incident was "Not Clery Reportable", that the case was open and assigned to UNL SA SCCS Student Conduct Officer Adam Fitzwater (Fitzwater) on 11/21.

11/21 (~12:15): Doe went to Cochran's client course, in addition to Cochran, Tang and Doe's faculty advisor were present. The students were to continue their work on their individual section assignments for the final client report. (12:37): Barefield emailed Cochran, writing; "I did receive a response from IEC" and "have been given approval to move forward with an investigation into [Doe]'s disruptions and the editing of the class project without approval from his group", Doe "will receive an email today for a meeting next week", "[o]ur plan is" to "follow up with any witnesses" so "[p]lease continue to share information or details about incidents that happen as we reach out to [Doe]". (12:57): Cochran forwarded the email from Barefield to Tang and the CRP faculty member who graduated from the same institution that Cochran had, copying Doe's faculty advisor, Kuenning and Wymelenberg, writing; "[p]lease see the below from [Barefield] with the Student Conduct & Community Standards office". (~1:00): Immediately prior to Doe receiving the SCCS formal service of charges, the CRP faculty member who graduated from the same institution as Cochran showed up to class, then all four tenured and tenure-track faculty members stared intensely at Doe. Which Doe noticed. Doe reasonably infers

that most of the students in Cochran's client course noticed the senior CRP faculty members intensely staring at Doe too, as the course took place in a modest medium-sized classroom. (13:07): Doe received notification of the SCCS formal service of charges by way of email and text message. Cochran received an email too, informing her of Doe's SCCS notification. This is how the notification system for formal charges works. When Doe clicked the link and began reading the letter from SCCS, Cochran giggled. Doe skimmed the letter, the first sentence read; "[t]his letter serves to inform you that the UNL Office of Student Conduct & Community Standards has received a report form a Faculty Member regarding an alleged incident occurring on or about [11/07] at UNL - City Campus: Architecture Hall in which you [sic] you deleted other students' work from a group assignment and disrupted the classroom environment by being argumentative toward faculty and other students related to coursework". Doe immediately understood the deliberate design of the circumstance Doe was in, such that Doe intuitively rolled his eyes in a quintessential, and sincere, manner. Then Doe closed his laptop and continued helping (pseudonym: George) CRP Student George, who is a male, who had encountered software issues while working on his individual contribution to the final client report. The CRP faculty member who graduated from the same institution as Cochran slumped his shoulders and walked out of the classroom, Tang abruptly got up and momentarily paced back and forth in the hallway adjacent to the classroom, Cochran hurriedly began typing on her laptop, and Doe's faculty advisor leaned back and peered over Cochran's shoulder. (13:17): Cochran emailed Barefield, copying the CRP faculty member who graduated from the same institution as Cochran, writing; "I'm in class with [Doe]", "[c]ould you wait to send the email until after class", "I'm concerned that [Doe] would make a disturbance while we're all together in the classroom". (13:21): Barefield emailed Cochran, copying the CRP faculty member who graduated from the same institution as Cochran, writing; "[u]nfortunately, it already went out", "[w]e can retrack it if it hasn't been opened, but I believe that would also potentially cause a disruption". (~13:30): Doe finished helping George and began composing an email for SCCS. (14:14): Doe emailed SCCS, writing; "I received communication regarding [case number]", "I will attend the informal meeting on [11/30]", and that "[Doe] believe[d] the alleged violation(s) are in retaliation to complaints". Doe wrote on asking some questions of SCCS; if "retaliation" could be "part of this investigation", if it could, "what documentation should [Doe] bring" to his pending SCCS meeting, if retaliation was not part of the SCCS investigation "who do[es] [Doe] contact to formally address that concern to", and if "[Doe] ha[d] the right to record [the] meeting". (14:22): Doe received an email from the UNL mail delivery subsystem that stated that his email failed to be delivered to SCCS, stating that "[t]he following organization rejected your message: unl.ed". (14:29): Doe resent his email to SCCS, changing the SCCS email suffix to "unl.edu". (~14:30): Doe approached Cochran, seated beside Cochran at a table toward the front of the classroom were Tang and Doe's faculty advisor, all three were seated looking toward the students. Seated at the table adjacent the faculty members' table were Julie and Morgan, who were seated looking toward the three senior faculty members. Doe spoke to Cochran, saying something to the effect of; 'I know we had talked about formalizing the expectation that I be given by-name attribution on our research work when it's submitted for publication, so I made this memorandum of understanding for us to sign'. Doe signed and dated the MOU and asked if Cochran would too. Cochran said that she

would look at the MOU and get back to Doe about it later, Cochran took an extra hard copy that Doe had printed for Cochran's records. Toward the end of class Doe observed with interest that Mike asked Cochran about her upcoming salaried research assistantship, Cochran told Mike that she did not have an research assistantship, to which Mike said that he thought that Cochran did have an assistantship, to which Cochran asked Tang to confirm that she did not have an assistantship, which Tang did do, after a pause.

11/21 (~15:00): Doe left Architecture Hall to go to the SCCS office. As Doe was walking there George approached Doe and said that he was walking the same way Doe was. Doe and George shared small talk unrelated to Doe's SCCS citation. When Doe and George reached the building that houses the SCCS office George said that he was heading a different way, Doe said goodbye to George and they parted ways. Then Doe went to the SCCS office. When Doe entered the SCCS office he was greeted by the office's front-desk secretary. Doe explained to the secretary that Doe had received a citation from SCCS and that Doe believed that the faculty member that reported Doe to SCCS had done so out of retaliation against Doe for issues that Doe had raised with the faculty member. The secretary said that he had been reading Doe's emails regarding that. Doe asked for clarification as to whether SCCS had received both of Doe's emails, as it was Doe's understanding that the first did not send due to the email address being incorrect. The secretary said that the office had both emails. Doe asked the secretary if he could see someone at SCCS to speak about Doe's allegation of retaliation. The secretary said he wasn't sure if that was something that was part of SCCS's process, and went on to note that Doe could bring that up at the meeting with Fitzwater. Doe took his laptop out to review the formal citation and saw that Fitzwater's email was noted. Doe thanked the secretary and said that he would contact Fitzwater, then Doe left.

11/21 (~16:00): After returning home, Doe thoroughly reviewed the citation notification from SCCS, it stated that SCCS was "currently investigating th[e] matter and would like to meet with [Doe] regarding the alleged violation(s) of the Student Code of Conduct", that SCCS had "review[ed] [Doe's] class schedule" and had "scheduled an informal meeting with a Conduct Officer on Thursday, [11/30] at [10:00] in [office number and building]", that "[a]s described" in "the Student Code of Conduct, [Doe] ha[d] the following rights and responsibilities", the "responsibility to attend the meeting requested above", that Doe was "under no obligation to make any statement or admit misconduct", that Doe had the "right to be accompanied by an advisor during the meeting", and that could "be anyone, including an attorney at [Doe's] own expense", that the "advisor may provide you guidance during the meeting but may not otherwise directly participate in the conduct process", and that "[t]he process cannot be unduly delayed based on the availability of [Doe's] advisor". The citation went on to note that "[t]o request an accommodation for this meeting, please reach out to Services for Students with Disabilities", that SCCS "encourage[s] [Doe] to utilize" the "resource[]", and that there were "resources [] available at" the office of "Student Advocacy and Support" too. The citation went on to state that "[Doe] [was] encouraged not to discuss this incident with others prior to [his] scheduled informal meeting", that "[i]nvolvement in any further incidents prior to [his] meeting may result in additional outcomes", and that "[i]f [Doe] ha[d]

any questions after reviewing th[e] letter" he should contact "[Fitzwater]@unl.edu", and that Fitzwater was the SCCS Assistant Director.

11/21 (17:00): Doe emailed Tang, writing; "I'm reaching out to ask if you'd consider accompanying me to the UNL Office of Student Conduct & Community Standards on [11/30 at 10:00]", that "[SCCS] has received a report from a Faculty Member regarding an alleged incident occurring on or about [11/07], at Architecture Hall", that Doe was "alleged to have deleted other students' work from a group assignment", that Doe was "alleged to have disrupted the classroom environment by being argumentative toward faculty and other students related to coursework", and that "[t]he reported behavior has been said to potentially be in violation of the [SCCS] Student Code of Conduct". Doe went on to cite the specific three alleged violations, and noted that "[SCCS] has told me that I have the right to be accompanied by an advisor" and "that the advisor may be anyone", and that if Tang was Doe's advisor he could provide "guidance, but not directly participate" in the 'informal meeting'. (17:15): Tang forwarded Doe's email to Kuenning and Wymelenberg, addressing "[Kuenning] and [Wymelenberg]", asking "[w]hat will be [your] advice for [Doe's] request", and asking "[s]hould I ask [Doe's faculty advisor] go with me and [Doe] to the university office". (17:25): Wymelenberg emailed Tang and Kuenning, replying to Tang's email, writing; "[t]hank you [Tang], let's discuss by phone tomorrow".

11/21 (17:46): Doe emailed Fitzwater, writing that Doe had "emailed [SCCS] regarding [case number, date, time], but" Doe was "sending this to [Fitzwater's] email as well", that Doe "will attend the informal meeting", that Doe "believe[d] the alleged violation(s) are in retaliation to complaints [Doe] made", that Doe "assume[d] violation-allegation retaliation isn't within the scope of the [SCCS] investigation, though perhaps" Doe was "mistaken", that Doe had "been instructed that [his] advisor can be anyone", and that Doe had "requested the presence of [Tang]". Doe wrote on, asking if "violation-allegation retaliation" could be "part of th[e] [SCCS] investigation", if it's the "case that retaliation could be part of th[e] investigation, what documentation should [Doe] bring" to the 'informal meeting', if "it is not the case that faculty retaliation could be part of th[e] [SCCS] investigation, who" Doe should "contact to formally address that concern to", asking if Doe could "record [the] meeting on [11/30]", asking if there was "any rule or regulation that bars [Doe] from speaking openly about this investigation", "[i]f so, what rule or regulation is that", and if Doe "need[ed] to fill out any additional form to ensure the presence of [his] potential advisor".

11/22 (07:10): Doe emailed Fitzwater and Tang, blind copying the UNL Chancellor, writing; "[h]ello to Assistant Director of the UNL Office of Student Conduct & Community Standards [] Fitzwater and to my requested informal-meeting advisor [] Tang", that "[a]ttached to th[e] email" was "a .pdf" that "pertain[s] to" the "alleged violations (case number: [])", going on to wish both "Happy Holidays". The attached PDF contain a screengrab of Doe's 10/24 (15:51) email to Cochran, wherein Doe wrote to Cochran that in class that day she had "made reference to feeling as though [he] might have expressed a

24

disagreement in a confrontational manner", that Doe "care[d] about [Cochran's] feeling as well as others['] perceptions of [Doe]", and that "being perceived in such a manner" could "be a deeply and irreparably stigmatizing way" for a "male's presence to be framed", Doe also wrote in the PDF that when he and Cochran Zoomed together on 10/27 that Doe noticed that Cochran was covertly recording their video conference. At this point in time Doe did not yet know that SCCS was already aware of Doe's 10/24 complaint to Cochran regarding sex discrimination, by way of the complaints that Cochran had filed with SCCS on 11/13. (08:35): Fitzwater replied to just Doe, writing: "Good Morning [Doe], Thank you for reaching out regarding this matter. First, I want to confirm that I have received your email that was sent this morning [date, time]. To address your questions: Our office did not receive any information to indicate that this matter was in retaliation to another situation. As such, retaliation will not be a focus of our conversation. If you believe that this report is retaliatory in nature, we recommend you contact your academic Program Director or the Dean of the College of Architecture to address those concerns. Regarding our meeting on [11/30], we do not permit recordings of meetings related to the Student Conduct process. Additionally, there is no rule that prevents a student from speaking about an investigation. However, we have found that Student Conduct cases are more easily resolved when the student keeps matters private. We will have a Release of Information form for you to fill out if you have an Advisor in attendance at your meeting. This form will give us permission to discuss matters related to your private Student Conduct record with another person present. If you would prefer, I can send you that [sic] for via DocuSign prior to your meeting, otherwise we can fill it out in person at the scheduled meeting time. Please let me know if you have any additional questions."

11/22 (09:44): Tang emailed Doe, copying Fitzwater and Barefield, replying to Doe's 11/21 (17:00) email requesting Tang as an advisor, writing; "next Thursday [11/30], I can meet you at 9:40[] in my office [office number], and assist you in navigating from ARCH Hall to the Office of Student Conduct & Community Standards for the meeting at 10[:00]", "[t]o ensure a private conversation during the meeting, I will wait outside the meeting room and then accompany you back to Architecture Hall".

11/22 (09:48): Tang emailed Doe, copying only Fitzwater, replying to Doe's email (07:10) that had the attached PDF, writing; "[t]hank you for your information", "[i]f you need any assistance, please let the Office of Student Conduct and Community Standards know", then Tang included his phone number.

11/22 (10:26): Cochran emailed Barefield, writing; "[o]ne more item to add" to the case file, "[Doe] did not disrupt class yesterday, as was my concern after hearing [he] had received the email from your office", "[Doe] did, however, present me with the attached document during class", "I do not feel comfortable signing it, as the products emerging from the research are still unknown, and named attribution for the type of work [Doe] has" done "is not typical", so " I do not feel comfortable signing this MOU", Cochran attached a digital copy of the MOU. (11:08): Barefield replied to Cochran, writing; "[t]hank you for sharing this information", "[i]n reading the document, I can see why you would not

wish to sign the MOU", "I would discuss with Dr. Tang ways that you can communicate your decision to [Doe] if/when [Doe] asks about the MOU in the future".

11/22 (11:16): Cochran emailed Tang, writing; "[m]y next planned meeting with [Doe] for research work is on Monday", asking Tang, "[m]aybe you could drop in for discussion of this MOU". Going on to write; "I'm sure [Doe] will bring it up", or "I can try to politely tell [Doe] that I do not feel comfortable signing it, but I'm not sure how [Doe] will respond".

11/22 (13:11): Doe emailed Wymelenberg, copying Fitzwater and Tang, writing; "[SCCS] has received a report from a Faculty Member regarding an alleged incident", "I'm alleged to have deleted other students' work from a group assignment and am alleged to have disrupted the classroom environment", "[t]he reported behavior has been said to potentially be in violation" of the "Code of Conduct", "I am attending the informal meeting on [date, time]", "I've requested the presence of [Tang] as an advisor", "he's said he will accompany me there and back, though not attend" the "meeting", "[i]mportant to note, I believe the alleged violation(s) are in retaliation to complaints I made", "[w]hen I asked [Fitzwater]" if "retaliation was within the scope of the investigation" he "advised that I reach out to you", "[a]ttached to this email is a .pdf". Doe wrote on asking Wymelenberg, "[h]ow to I prompt a formal investigation" of "retaliation on part of a faculty member", and "[w]ould [Wymelenberg] attend" the "meeting" as "my advisor". Doe attached the PDF with the screengrab of his 10/24 sex-discrimination complaint, and mention of Cochran covert video recording of Doe on 10/27.

11/22 (13:25): Doe emailed Fitzwater, asking, "[d]oes my email wherein I expressed suspected retaliation not qualify as
information pertaining to retaliation", asking, "[w]hat is the documented rule or regulation that grants the Office of Student
Conduct & Community Standards the ability to bar recordings", and requesting that Fitzwater send Doe the release form to have and advisor attend. (14:09): Fitzwater replied to Doe, offering, "you can contact [Tang] or [Wymelenberg] to submit information related to potential retaliation" and "[a]dditionally, a formal complaint may also be submitted to the Office of Institutional Equity and Compliance", offering that, "[i]t is [SCCS's] standard practice that Student Conduct Meetings are not recorded", and stating that SCCS would send the release form shortly.

11/22 (14:25): SCCS emailed Doe the electronic release from "to enable a Student Conduct & Community Standards staff member to share information related to a Student Conduct case".

11/22 (15:30): Doe emailed Fitzwater, asking, "[i]s there a limit on the number of people that I can list on my [release form] regarding" Doe's "case", asking, "[w]ill the documents that [Doe] sent" Fitzwater "be included" in the "Conduct Case [file number]", and Doe reiterated his prior question; "what is the documented rule or regulation that grants [SCCS] the statutory authority to bar recordings of meetings".

11/22 (15:47): Fitzwater forwarded Doe's email (07:10) that alleged retaliation to the SCCS case file's electronic filing cabinet, Fitzwater attached the PDF with the screengrab of Doe's 10/24 sex-discrimination complaint and claim of Cochran's covert video recording of Doe on 10/27.

11/22 (16:36): Cochran emailed Wymelenberg, copying Tang, writing; "I just spoke with [Tang]", "[h]e advised that I avoid meeting in person or one-on-one via Zoom with [Doe]" for "the remainder of the semester", "I will be moving my class, [the client course], online for our remaining two meetings", "[Doe] is still on a paid, hourly research appointment with me through December", "[w]hile I hope to be able to finish out this appointment without too much incident, I am concerned that [Doe] may want to act in some retaliatory manner with me, and accordingly, might do something damaging to the integrity of the research (or the privacy of research subjects)", "I am also planning to cancel all remaining research-related meetings with [Doe]", "I suspect [Doe] may react poorly to this, as well, but I do think it's in the best interest of myself and the research", "[p]lease do not hesitate to email or call anytime if and when questions, comments, concerns or the like come up", "[p]rovided how disruptive dealing with this case has been to my teaching, research, and otherwise this semester, I do think it's worth pursuing some sort of 'probation,' as [Wymelenberg] mentioned, or suspension for [Doe] while the SA/IEC investigations are ongoing", "[t]he fact" that "I do not feel safe returning to the classroom is, again, extremely disruptive and deeply upsetting", "I know you understand, and I appreciate your efforts in doing what's best for our college".

11/22 (16:47): Wymelenberg emailed Fitzwater and Barefield, writing; "[i]f either of you happen to be available for a short call before the holiday weekend it would be helpful", "I have a couple brief questions related to the upcoming meeting with [Doe]".

11/22 (17:34): Wymelenberg emailed Doe, copying Fitzwater and Tang, writing; "[r]egarding your two questions", one, "[SCCS] indicated their office did not receive information to suggest that this matter was retaliatory", "[t]herefore, I recommend you participate in the meeting on 11/30 before arriving at that determination", "[i]f you still feel the same way after the meeting next week", "I believe your question would be addressed by [IEC]", and, two, "I am out of town on 11/30 so I will not be able to attend the meeting".

11/27 (07:55): Doe emailed the NU Records Director. Doe cited state statute regarding public records and requested an opportunity to obtain digital copies of public records pertaining to Doe's own person from October and November, in the form of emails sent and received by a list of UNL email accounts that included the senior CRP faculty and some CRP Students.

11/27 (08:00): Doe emailed Wymelenberg, Tang, Fitzwater, and UNL IEC Associate to the Chancellor (i.e. the Director) Marc Pearce (Pearce), blind copying the UNL Chancellor. Doe address Wymelenberg,

Tang, Fitzwater and Pearce at the onset. Then Doe offered detailed background about "wrongly alleged instances of supposed violations of UNL's student code of conduct", noted that "attached to th[e] email" was a "document[] that had been previously sent to [Fitzwater] providing robust evidence" (said document being the PDF of Doe's 10/24 sex-discrimination complaint and allegation of being covertly video recorded on 10/27), Doe went on to categorically assert that Doe did not violate the code of conduct, Doe explicitly stated that he "believe[d] the alleged violation(s) are in retaliation to complaints [Doe] made", Doe stated that when he asked Fitzwater if retaliation could be part of Doe's SCCS case "[Doe] was told that retaliation would not" and that "[Doe] was instructed" by "[Fitzwater] to ask [Wymelenberg] about retaliation", that "[u]pon asking [Wymelenberg] about what [Fitzwater] said regarding [Doe's] belief that alleged violations were in retaliation, it was perplexingly noted that [SCCS] did not receive suggestions of retaliation", and that subsequently "it was recommended by [Wymelenberg] that [Doe] participate in the [SCCS 'informal meeting'] before addressing [Doe's] allegations of retaliation to [IEC]", and that Doe's "intention is to send a formal complaint to [IEC]". Doe wrote on noting that both Tang and Wymelenberg declined to be Doe's advisor and Doe inquired if Pearce would serve as Doe's advisor at Doe's 'informal meeting' at SCCS. Then Doe went on to address a series of questions to Fitzwater.

11/27 (08:05): Doe emailed Tang, requesting that Tang review the email (08:00) that Doe had sent. (08:22): Tang replied to Doe, writing; "[t]hanks a lot for your information", "[p]lease share the document to [SCCS] and let them know the information", "I will see you around [09:45] on [11/30] morning in my office and then we can walk together to [SCCS]".

11/27 (11:42): Pearce emailed Doe, Wymelenberg, Tang and Fitzwater, copying UNL IEC Case Manage Tony Reed (Reed), replying to Doe's email (08:00), writing; "Hello [Doe], I am writing to respond to the questions that you directed to me and to provide you with some information about your concerns of retaliation", "you asked me if I would consider attending your 11/30 meeting with [SCCS] as your advisor", "I am not able to serve as an advisor", "I recommend that you contact the Office of Student Advocacy and Support", "[m]y information might be out-of-date, but it is my understanding that the SAS office provides advisors for students who are involved in the SCCS process", writing on, "you wrote that you believe the alleged conduct violations are in retaliation for complaints you made about a faculty member", and "you were advised by your Dean to submit a report about that to [IEC]". Writing on, "IEC addresses reports of discrimination, harassment, or retaliation that is based on a status (or statuses) protected by law", "[t]here are several ways that reports can be made", one "can email our office", "call our office", "stop by our office", or "use our webform". Writing on, "[n]o matter how a person chooses to contact us, they will receive a follow-up from our case manager", "[t]hat follow-up will include scheduling a time to meet to discuss the report, response options" and "information about making a formal complaint". Writing on, "I will forward your email to our case manager, [] Reed", "[h]e will reach out to you" to "discuss it with you", as well "[y]ou wrote that you believe you are experiencing retaliation for complaints you made", "[y]our discussion with [] Reed will help us

28

determine whether your report falls within the scope of the university nondiscrimination policy", "[b]ut even if the retaliation you are reporting is not connected to a protected status (such that the nondiscrimination policies and procedures are inapplicable), we will help forward your report to the appropriate unit", "[f]or example, Academic Affairs - specifically, the Office of the Executive Vice Chancellor - could be best suited to address a complaint" to.

11/27 (13:00): Cochran emailed Doe, writing; "I apologize for the late notice, but I am going to be unable to meet today on Zoom after all", "I've also encountered some administrative issues with the [thematic coding software] account, which may take time to sort out", "[a]ccordingly, instead of shifting focus to coding in these remaining weeks", "I'm going to ask you to focus, again, on the literature review/annotated bibliography, as well as gathering information on the [UNL survey product]", "[y]ou're able to work up to 30 more hours before [12/15]", "I suspect we'll both be quite busy in this final stretch, I will also cancel our remaining Friday standing meetings", "[a]gain, please keep me updated on your progress and send along any questions", "I saw that you were able to clean the transcript for [respondent] last week, which is great", "[t]hank you for getting to that during the holiday break", "[a]nother thing, [Doe]", "[w]hile I appreciate your putting that [MOU] together, I, personally, do not feel comfortable signing it, and, professionally, as a UNL employee, also do not feel it's appropriate to sign", "I recognize that a named attribution of your work" is "important to you, and I will keep this in mind and try to include such attribution when feasible". (13:09): Doe replied to Cochran, writing; "I will plan on moving forward with our research within the parameters set forth in your previous email to me". (13:19): Cochran replied to Doe; writing; "[u]nfortunately, I may need to move our class session online tomorrow, as I'm feeling a bit under the weather and do not want to risk spreading anything around before finals".

11/27 (13:27): Barefield emailed Cochran, writing; "[p]lease let me know if you have any questions". (13:31): Cochran replied to Barefield, writing; "unfortunately, I plan to move the remaining class sessions [dates] for [the client course] online via Zoom", "[w]hile I do think this may be more comfortable for me", "it is not an ideal modality for this course", "[a]nyway, do let me know if you would like me to send anything else or discuss anything further". (13:41): Barefield replied to Cochran, writing; "[t]hank you for letting me know", "I will add this information to the case", "I may follow up with questions as they come up", "please feel free to reach out if you have any questions".

11/27 (13:47): Schuldeis emailed UNL IEC Deputy Title IX Coordinator Leslie Shaver (Shaver), writing; "I just spoke with [] Cochran, professor of [Doe]", "Cochran said that she is going to have all remaining classes [Z]oom and is limiting her contact with [Doe] as her research assistant", "[s]he also said she thinks [Doe] is becoming increasingly aggressive towards females".

11/27 (15:38): Doe emailed Pearce replying to Pearce's email (11:42), copying Reed, Wymelenberg, Tang and Fitzwater, writing; "per your recommendation, I will reach out to the Office of Student Advocacy and Support", "[a]dditionally, I will watch for the message from [] Reed".

11/28 (08:00): Doe email UNL SA SAS Director Sarah Frankel-Russell (Frankel-Russell), copying Pearce, writing; "I am reaching out to your office based on a recommendation from [] Pearce", "[i]t was communicated that the SAS office provides advisors for students involved in the [SCCS] process", "I am seeking an advisor to accompany me to my 'informal meeting' at [SCCS] on 11/30 at 10:00", asking if "there someone at the SAS office that can accompany me", and noting that "[s]hould the SAS office need further context on my matter please refer to the previous messages that I have forwarded along". (08:57): Frankel-Russell replied to Doe, copying Pearce, writing; "I would be happy to accompany you to your [SCCS] meeting", "[i]f you can please meet me at my office [room number] at [09:45] so that we can meet and then we can walk over to the SCCS Office together".

11/28 (~09:30): Doe attended the "UNL Search Process Seminar - Zoom" that he had registered for on 11/19 (12:10). The seminar was hosted by Schuldeis and UNL IEC Equal Employment Specialist Jody Wood (Wood). The content of the presentation given by Schuldeis and Wood pertained to serving on a hiring panel for faculty and staff applicants. Toward the end of the seminar Doe asked what the hiring-process requirements were for student researchers that were hired by faculty members. Wood said that she was not sure about that. Then Doe asked if there were exemptions in instances where a potential student employee was a spouse of a current UNL employee. To which Schuldeis quickly replied that spousal exemptions were extremely rare.

11/28 (10:51): Frankel-Russell emailed Fitzwater, writing; "I spoke with [Barefield] this morning", "[j]ust wanted you to have the heads up that I will be accompanying [Doe] to his meeting on Thursday but I plan to make my role very clear with him before we come to SCCS ([Barefield] gave me some of the back story)".

11/28 (11:21): Fitzwater emailed Doe, Wymelenberg, Tang and Pearce, replying to Doe's 11/27 (08:00) email. Fitzwater answered the series of questions Doe had addressed to Fitzwater, writing; "[d]uring the Informal Meeting, [Fitzwater] will take written notes", "[t]he Informal Meeting is not a formal hearing, so no verbatim record of the meeting will be created", that "[t]he written notes will be transcribed into the case file by [Fitzwater]", that "[Doe's] email communications have been added to the case file in [SCCS]'s electronic system" and "[a]ny additional information that is sent regarding this case will also be added to that electronic file", that "[t]he release of information that was sent to [Doe] provides [SCCS] staff permission to communicate information related to [Doe's] Student Conduct Record", that the "release of information is to allow [SCCS] to" communicate "reference documents that are included in [Doe's] Student Conduct Record", that "[s]hould the matter go to a Hearing, [Doe] would then have the opportunity prior to the Hearing to review all relevant information that would be presented to the

University Conduct Board", which "would be in the form of a physical file that could be reviewed in-person at [SCCS]", and that "[f]or a case to have an opportunity for an appeal, the case would need to have been heard by the University Conduct Board, which would occur after the Informal Meeting", and that "[t]ypically, if it is determined that a student violated the [] Code of Conduct, the student will be offered an Administrative Resolution with the following options", one, "[a]dmit to the violation" and "accept the proposed Administrative Resolution", two, "[d]o not admit the violation" but "accept the proposed Administrative Resolution", and, three, "[d]o not accept the proposed Administrative Resolution and acknowledge that this case may be forwarded to a Hearing Officer or University Conduct Board". Fitzwater referred Doe the conduct code to seek answers to Doe's other questions. (11:25): Fitzwater forwarded his email to the SCCS case file's electronic filing cabinet.

11/28 (15:22): Doe emailed Frankel-Russell, writing; "I'll plan on being at your office at [room number] at [09:45 on 11/30]", "[t]hank you for acting as my advisor during my 'informal meeting'".

11/29 (02:21): Xavier emailed Cochran, Doe and all the other students in Cochran's client course, informing everyone that he had complied their individual work into a single PDF. (08:48): Cochran replied to Xavier, copied were Doe and the other students in Cochran's client course, asking Xavier; "[c]an you please upload an editable file format of this document" and "then share the link" with the class.

11/29 (11:11): Doe emailed Xavier, copying Cochran, as Cochran had said that at the end of the semester Xavier would be responsible for formatting the final draft of the report. Doe sent Xavier the charts that Doe had made for the specific sections at the beginning of chapter four in the final report that Doe had been assigned to when Tang handed students hard copies of their section assignments on 11/14. Doe wrote; "having the chart version allows for more editability on your end".

11/29 (12:11): Reed emailed Doe, writing; "[a]s [Pearce] explained, our office addresses allegations of misconduct, including retaliation, related to the university's non-discrimination policy", "[i]t is unclear whether the policy would apply to the retaliation you allege", and "[a]s Marc explained, there may be other avenues better suited for you to formally complain", "[h]owever, I'm happy to meet with you" to "discuss your options", "[a]nd, as [Pearce] also explained, we can forward your concerns to a more appropriate office, if applicable". (14:40): Doe replied to Reed, copying Pearce, Fitzwater and Frankel-Russell, writing; "[h]ello to you [IEC] Case Manager [] Reed, I do believe sex" based "discrimination to be part of the retaliation levied against me", "I have documentation", "[i]n my prior correspondences, I sent a thorough document outlining the germane instances leading up to the retaliatory [SCCS] misconduct allegations", "I've attached that document here", "[p]lease refer to the screen grabs on pages 26 and 28", "[i]f it is the case that addressing this issue of retaliation extends beyond just [IEC], then I would greatly appreciate information as to where else I ought to seek an additional investigation", writing on to ask "what time works best for [Reed]" and attaching the PDF of Doe's 10/24 sex

discrimination complaint to Cochran and allegation of being covertly video recorded by Cochran on 10/27. (14:56): Reed replied to just Doe, asking if Doe "[c]ould you meet Friday at [09:00]" via "Zoom", and noting that "[i]n advance, [Doe] may want to read the non-discrimination policies and procedures". (15:02): Doe emailed Reed, copying Pearce, writing; "I ha[ve] previously reviewed the non-discrimination policies and procedures", and can "Zoom, [12/01 (09:00)]", "[p]lease let me know if there is additional documentation that I can prepare that would aid this process".

11/29 (15:19): Doe emailed Tang, copying Frankel-Russell, writing; "[m]ight we amend the time you set for us to meet together from [09:45] to [09:30] tomorrow morning", "I must meet Director of [SAS] [] Frankel-Russell at her office at [room number] at [09:45], as she will be advising me during my 'informal investigation,' so my hope is that we might leave earlier than previously scheduled so that you might walk me from ARCH hall to [SAS] then to my 'informal meeting' and then back to ARCH hall after my 'informal meeting'". (15:20): Tang replied Doe, copying Frankel-Russell, writing; "[s]ure".

11/29 (16:01): Fitzwater forwarded Doe's email (14:40) to Reed to the SCCS case file's electronic filing cabinet; the email wherein Doe alleged that the SCCS investigation was sex-based retaliation,.

11/30 (01:05): Doe digitally signed the SCCS release form to "authorize [SCCS] at [UNL] to release the information contained within [Doe's] individual educational record as related to the UNL Student Conduct Case [number] to the following person(s)", listing access for "[Doe]" and "Frankel-Russell".

11/30 (~09:30): Doe met Tang at his office. Then Tang walked with Doe to Frankel-Russell's office. The two had to wait in the SAS lobby for a bit, they shared affable small talk unrelated to the SCCS process. Then Frankel-Russell invited Doe into her office space. Tang quickly followed Doe into Frankel-Russell's office, which neither Doe nor Frankel-Russell protested. After entering, Frankel-Russell closed her office door, and the trio seated. Doe thanked Frankel-Russell for serving as his advisor at his 'informal meeting' and mentioned that he had granted her access to his SCCS case file. Frankel-Russell mentioned that she had been looking at Doe's SCCS case file that morning. Doe asked Frankel-Russell if the way he was to access his SCCS case file was the permission form that he listed himself and Frankel-Russell on, or if it was state-level public records statutes, or if it was federal-level student records statutes. Frankel-Russell said that she did not know. Then Doe suggested that they should head to the SCCS 'informal meeting'. Doe, Tang and Frankel-Russell walked together to SCCS. Doe asked Frankel-Russell if she was acquainted with Fitzwater. She said they were effectively work friends. When the trio reached SCCS they were greeted by the front-desk secretary. Tang told Doe he would wait for Doe in the SCCS lobby. Then Frankel-Russell and Doe went into Fitzwater's office for the closed-door 'informal meeting'. Fitzwater told Doe that SCCS had received reports from Cochran that Doe deleted Julie's work and that he had disrupted the class by being argumentative. Doe said that he was no more or less argumentative than Julie, but that Cochran seemed to embrace Julie's classroom engagement and respond poorly to Doe's attempts to be part of the classroom discussion. Fitzwater asked if Doe knew

that Cochran had to excuse herself to go to the restroom due to Doe's argumentative conduct and asked what Doe's thought about how Doe's actions effected Cochran. Doe told Fitzwater that Doe had not noticed Cochran ever being in a state of distress. Fitzwater said that a classmate had said that Doe was being combative. Doe asked Fitzwater how he knew that. Fitzwater did not understand. Doe clarified that when he had sent documentation of correspondences to SCCS, he had made an effort to send screengrabs of his emails, and Doe wanted to know if Fitzwater had heard firsthand from the student or if he only heard the claim secondhand from Cochran. Fitzwater said that he had been told that by Cochran, but that Fitzwater had no reason not to believe a faculty member, and that he would be interviewing classmates during the investigation. Doe expressed appreciation for that, and told Fitzwater that after Cochran had made a stigmatizing remark to Doe when discussing stakeholder outreach that Cochran and Doe said they would Zoom about the issue, and that Doe subsequently noticed Cochran covertly recording Doe. Doe told Fitzwater that it would be helpful to get that recording. Fitzwater asked about deleting classmates' work. Doe explained his team's workflow in the client course, noting that teammates were graded as a group and not on individual contributions and that Doe had to do the work that Julie neglected so that the team had a completed slide deck. Doe also noted that he told Julie that she should change the deck if she wanted to, and she did not do that. Doe also noted that Tang had the client course switch to individualized work, and that Cochran's course was no longer working in teams. Doe mentioned that while working in a team that Doe made efforts to have Cochran be more instructionally engaged with the process by including her on team emails and messages, but that Cochran was not very engaged. Doe said he already knew about the topic due to prior research, but that was not the case for other classmates, some of whom seemed to be struggling to find a way to contribute. Doe asked Fitzwater who he should contact to get access to his SCCS case file and noted that Doe granted himself access on the SCCS release form. Fitzwater told Doe to contact the NU Vice President for his case file. At that point Frankel-Russell said that she had to leave shortly because she had to participate in a search committee meeting. Doe asked Fitzwater if he could read Fitzwater's notes. Fitzwater handed Doe his notepad. Doe could not read Fitzwater handwriting; Fitzwater's handwriting was small and written in cursive. Doe gave the notepad back and asked who the NU Vice President was. Fitzwater said it was Stacia Palser (Palser). At that point Frankel-Russell got up and started exiting the room, so Doe thanked Fitzwater and followed Frankel-Russell. Frankel-Russell and Doe exited Fitzwater's office together, Tang and Doe thanked Frankel-Russell for her time.

11/30 (~14:40): Fitzwater called Cochran to speak about the SCCS case, Fitzwater wrote that Cochran told him that "[t]he intention of the group work in the course [wa]s to collaborate", such that "[t]here was no need to debate as students should be working together", and that "[d]uring the interaction on [10/24] she had been reviewing research proposals for the 2 groups in the class and providing feedback", and then "[t]here was an escalating conversation with [Doe] about a research question related to a disagreement about the audience", that "[Doe] appeared upset with [Cochran's] guidance and [Doe's] responses were very sarcastic", that "[t]he interaction lasted for a couple of minutes", that "[t]he interaction took time away from the other group to receive feedback", and that as a result "[Cochran]

33

had to 'dramatically change the class' by moving meetings online, breaking up groups and assignments, and minimizing student interactions".

11/30 (~15:00): After the class taught by the CRP faculty member who graduated from the same institution as Cochran, (pseudonym: CARL) CRP Student CARL approached Doe. CARL told Doe that one of their classmates in the CRP program was thinking about filing Title IX charges against Doe, but CARL would not, at that time, tell Doe who.

11/30 (15:35): Cochran emailed Wymelenberg, writing; "I just had a brief call with Adam at [SCCS]", "[h]e let me know that [] Barefield would be calling you later today to give some updates", "[i]f you could call after your discussion with [Barefield], I would really appreciate it", "[a]s you know, I moved class online this week and have been trying to minimize interactions with [Doe]", "[w]hile I am feeling more comfortable with this in the short term, it is obviously not a sustainable, long term solution and has been quite disruptive to my class, research, and otherwise, frankly, to my day-to-day", "I appreciate any news you're able to share".

12/01 (08:30): Wymelenberg emailed Cochran, copying Tang and Bateman, replying to Cochran's 11/30 (15:35) email, writing; "I spoke with [Barefield] yesterday afternoon", "I am traveling today but could call this afternoon", asking "[d]oes a time thereafter work for you", and stating that "[f]or sale of efficiency, perhaps we can arrange a time that works for [Tang] also".

12/01 (09:00): Doe met with Reed for a Zoom meeting. Doe told Reed that Cochran had filed complaints about Doe with SCCS due to the concern that Doe had raised with Cochran that she spoke to him in a sexist manner. Reed told Doe that IEC does not investigate allegations of retaliation. Doe pointed out that the IEC nondiscrimination policy states that IEC will investigate discrimination, harassment and retaliation. Reed said that IEC only investigates retaliation if the retaliation is based on a protected status. Doe reminded Reed that he thought that the retaliation was due to Doe raising issues based on sex. Reed told Doe that he was misinterpreting IEC's policy, and that IEC does not investigate retaliation. Doe asked why the policy said that IEC investigates retaliation if IEC does not investigate complaints of retaliation. Reed said that IEC only investigates retaliation of the retaliation occurs after an IEC investigation is initiated and is occurring. Reed said that because Doe was speaking to Reed after the SCCS process already begun, retaliation was not something that IEC would investigate. Doe pointed out to Reed that the policy did not state that the protected status based retaliation had to occur after an IEC investigation started to qualify. Reed said that the policy is not read that and will not be applied that way. Reed said that he thought discrimination or harassment might be applicable, but not retaliation. Doe told Reed that he felt that Doe, a male, was treated differently than Julie, a female, by Cochran. That Doe and Julie's conduct was similar, but that Julie had not had complaints filed about her. Reed told Doe that IEC used the preponderance of evidence standard to evaluate allegations. Doe asked what that met. Reed told Doe that met their evaluation was based on evidence. Doe reminded Reed that he

had sent IEC evidence in the form of the email he sent to Cochran which stated issues of sex discrimination. Doe noted he had sent that prior to the SCCS investigation being used against Doe. Reed said that he would send Doe a document that day related to IEC reporting options. Reed said that he thought the EVC might be a more appropriate office for Doe to complain to, and that he could reach out to EVC Executive Vice Chancellor Katherine Ankerson (Ankerson) to lodge a complaint about academic issues. Doe asked how doing so would affect his complaint about Cochran with IEC. Reed said that the EVC would be delayed in investigating Doe's complaints regarding Cochran if IEC was investigating Cochran. Reed also noted that there was no time limit on Doe's ability to file complaints with the university or with entities external to the university.

12/01 (11:31): Tang emailed Wymelenberg, copying Cochran, writing; "I made some phone calls this morning", :[h]ere is the proposed alternative for your consideration", "[f]or Spring 2024, [Cochran] can take one course off, which is on her contract for two course wavers during the six-year window", "[a CRP Professor of Practice in planning theory] initially agreed to teach the [the spring theory course] on Thursday night", "[Bateman] has checked the financial availability, and [Kuenning] is OK to update the information whenever the final decision will be made", "[i]f you need more information from me", "please let me know", "[b]ut I had discussed with Abigail last night". (11:52): Cochran replied to Tang's email, sending her reply to Tang and Wymelenberg, writing; "[h]ello [Tang] and [Wymelenberg], I do not wish to instruct [Doe] in any future courses", "[h]owever, I would not like to use my remaining, pre-tenure course waiver to avoid teaching [the theory course] this spring", "I am willing and able to teach the course, but I do not think it's safe or appropriate for [Doe] to be under my instruction", "[b]eing asked to use the course waiver for a semester in which I do not necessarily want or need to waive a course seems punitive", "I propose that I am allowed to teach [the theory course] in the spring, as planned, and that [Doe] be given the opportunity to complete an independent study with another instructor in order to fulfill the [theory] course requirement".

12/01 (12:00): Cochran emailed Wymelenberg, Tang, and Bateman, replying to Wymelenberg's email (08:30), writing; "Hello [Wymelenberg], I'm available for a call anytime [15:30-17:30] today", asking "[s]hould we plan on [15:30] or just after", "[a]gain, I'm available at [phone number]".

12/01 (16:03): Doe emailed Reed, copying Pearce and Frankel-Russell, writing; "[m]y recap of points we'd covered in our [09:00] meeting this morning", "IEC only investigates allegations of retaliation as they pertain to work conducted with or for the office of IEC", "[a]llegations of retaliation unrelated to issues concerning discrimination are handled by the Office of the Executive Vice Chancellor", "[a]llegations of sex-based discrimination are evaluated as a Title IX issue, and prompt an evaluative hearing", "[s]aid hearing's outcomes are based on a preponderance of evidence", "I believe that there is a sex" based "dimension to the retaliatory allegation of misconduct levied against me", "[y]ou think that based on my description of events that I'd offered that the two policies of the office of IEC an investigation of my allegation might fall under could be [specific policy citation for discrimination] and

[specific policy citation for harassment]", "[i]n instances where allegations of retaliation have a discriminatory element, the IEC conducts their process first before the Office of the Executive Vice Chancellor", and "[y]ou will send me the necessary information to file a formal complaint with the office of IEC today".

12/01 (16:23): Doe emailed Palser, copying Frankel-Russell, Fitzwater and Pearce, writing; "[h]ello to [NU] Vice President [] Palser, [a]s per affirmative clarifications received from [] Fitzwater in the presence of [] Frankel-Russell and in accordance with [an exact federal statute citation regarding student records] and my Release of Information Authorization Form (see attachment), I am contacting the Office of the General Counsel to request a digital copy of Student Conduct Case [number] as of 12/01".

12/01 (16:46): Reed emailed Doe a notification from the system for formal charges, the letter outlined reporting options and resources, stating; "[t]hank you for speaking with me via Zoom on [12/01]", that "[Doe] reported that a faculty member retaliated against [Doe] for complaints [Doe] made about the faculty member's instruction by alleging to the [SCCS] that you violated the Student Code of Conduct", and "[a]dditionally, you reported that the faculty member threated you differently in class this semester because of your gender", that "[i]f [Doe] would like to file a complaint with the university, [Doe] will need to submit a document to [Pearce], detailing the allegations, requesting that the university investigate the misconduct, and signing [Doe's] name", that "[i]t is important to keep any evidence [Doe] may have related to [his] situation" and that "in some circumstances, allegations of gender-based discrimination will fall under the university's sexual misconduct policy", the IEC notification listed "Legal Aid of Nebraska" as an addition resource.

12/01 (16:49): The NU Records Director emailed Doe, replying to Doe's 11/27 (07:55) records request email, writing; "[Doe], [g]ood afternoon", "[t]hanks for your patience on this request", "I've reviewed the below and it appears that you are requesting a search of the email accounts of other University students", "[t]he University will not produce those records under the public records laws because student information is exempt from disclosure under [state statute citation]", "[i]f you are making a request related to a specific conduct matter or would otherwise like to discuss the process for obtaining your own student records under [federal statute citation], please let me know and I can more efficiently route your request or provide a response", "[t]hank you, and have a good weekend".

12/01 (17:00): Doe email Ankerson, copying Frankel-Russell, Fitzwater and Pearce, attaching the PDF of Doe's 10/24 sex discrimination complaint to Cochran and allegation of being covertly video recorded by Cochran on 10/27, writing; "[h]ello to you [EVC] Executive Vice Chancellor [] Ankerson", "I am proactively reaching out to offer some background about an allegation of faculty retaliation in the form of" a "student misconduct allegation reported to [SCCS] due to complaints made" by Doe, "[a]fter meeting with a case manager at [IEC] it is my understanding that instances of retaliation that encompass a dimension of discrimination are first handled by [IEC] before the []EVC", "[h]owever, as the

36

preponderance of evidence in assessing my allegation of retaliation that encompasses a dimension of discrimination might not clear the evidentiary level necessary, am proactively reaching out to offer some background to your office", "[o]n [11/21], I was notified about a wrongly alleged instance of supposed violations of UNL's student code of conduct", "[t]he alleged violations were said to have occurred on or about [11/07], at Architecture Hall", "[SCCS] notified me that I ha[d] a responsibility to attend an 'informal meeting' on [11/30] with [] Fitzwater which I did with [] Frankel-Russell present as my advisor", "[p]rovided to [SCCS] was a document providing robust evidence of my innocence (see attachment)", "I allege the alleged violation(s) are in retaliation to complaints I made".

12/04 (07:55): Doe replied to the NU Records Director's 12/01 (16:49) email, writing; "I am following up on the public records request made on 11/27[] under [state statute citation]", "[i]n accordance with [state statute citation], you have stated the portion of my request that has been denied due to [state statute citation] on 12/[01]", "I am reaching out to clarify that on 12/[01]", "I did not receive the records encompassed within my request that do not correlate to the portion of my request that was denied", "[s]pecifically those emails sent from, or received by, faculty accounts within my request's previously stated parameters", "as no price was quoted within the four business days after my request as required by [state statute citation] for the records encompassed within my request that do not correlate to the portion of my request that was denied under [state statute citation] it has been reasonably evidenced in good faith that there are no costs associated with that portion of my request", "[f]urthermore, and relatedly, as no significant difficulty or earliest practicable date for providing that portion of my request that was not denied was offered within the before mention four business days as required by [state statute citation], I understand in good faith said portion of my request was available on 12/[01] and that shortly after receiving this correspondence" the "location of those public records on the internet will be provided to me as required by [state statute citation]", "[a]ccording to [state statute citation]", "any official in violation of the sections provisioned within [state statute ciation]", "is subject to removal and deemed guilty of a Class III misdemeanor".

12/04 (07:55): Doe emailed Reed, copying Frankel-Russell, Ankerson and Pearce, writing; "I apricate the IEC letter sent to me on [12/01] detailing my report to you during our meeting and outlining my 'Reporting Options[]'", "I am reaching out to ask for a correction to, and reissuance of, the IEC letter sent to me", "[s]pecifically, it was reported by me, to you, during our [09:00] meeting on [12/01] that the faculty member treated me differently in class this semester because of my sex" and "not my gender", "I am requesting that the IEC letter" be "resent to me with the word 'gender' replaced with the word 'sex' to accurately reflect what I had reported to [] IEC on the morning of [12/01]".

12/04 (12:11): Cochran emailed just Tang, writing; "I spoke with [Wymelenberg] on Friday afternoon", "[w]e're all in agreement that I shouldn't be [Doe]'s instructor, and that we will need to find a creative solution to make sure that", one, "[Doe] is not under my instruction in any future courses", and, two, "I do not need to use a course release next semester, which may not benefit me as I'm not yet preparing my

tenure package", "[h]appy to discuss with you further, whenever it's convenient", "[f]eel free to call", "I'm home sick with a cold [sic] 😣, but, again can talk whenever".

12/04 (14:22): Reed emailed Doe a notification from the system for formal charges. The document was amended with the word "gender" replaced with the word "sex". (14:22) Reed emailed Doe, writing; "I resent the letter".

12/04 (15:37): The NU Records Director emailed Doe, replying to Doe's email (07:55), writing; "I apologize for any confusion here", "[t]he University of Nebraska will not provide student records in response to a public records request, as they are not subject to disclosure under the Act (see [state statute citation])", "[h]owever, the records contained in faculty emails might be considered a part of your personal education record", "[y]ou have certain rights to inspect your own education records under [federal statute citation]", "[p]ut differently, the University is denying your request in full under the [state statute citation]", "[y]ou can challenge that decision as outlined in the attached statute", "I am the public official responsible for the decision not disclose these records under the public records laws", "[w]ith that said, if you would like to maintain a request under [federal statute citation] for your own education records, please let me know and we can process the request in that way", "[u]nder [federal statute ciation], the University must respond to a student request to inspect his or her education records within 45 days of receipt of the request".

12/04 (~18:00): Doe was working on his chapter four section assignments for Cochran's client course within the editable file that Xavier had shared with classmates. The file was live and students could see work occurring as content was being added. Doe noticed that Morgan was changing Doe's charts within Doe's section assignments in chapter four. Doe typed within the body of the document below where Morgan's edits of Doe's work were occurring, telling Morgan to stop. Then Doe changed his charts back. (18:10): Doe made a commented on his sections, asking; "@Morgan [] Why do you keep changing the format". Then Morgan changed Doe's charts again. Doe typed within the body of the document below the edits once again asking why he was changing Doe's work, and informing Morgan that he would just end up changing it back again. Morgan typed back, writing that he was simply trying out some different formats. Doe told him to try out different formats within Morgan's section of the document, not Doe's. Then Doe changed Doe's charts back again. (18:30): Doe made another commented on his sections' discussion thread, adding; "@Morgan []", "perhaps it's in a good place now", "[p]erhaps we might consider leaving it w[h]ere it is". (19:01): Morgan replied to the thread, writing; "@[Doe] I'd defer to Xavier on whatever he thinks is the best". (19:11): Doe replied to Morgan, asking "@Morgan []", "how is it that the edits are within the Xavier style".

12/04 (19:39): Morgan emailed Cochran, writing; "[y]ou may be getting an email from [Doe] complaining about extremely minor style changes I was making to the charts within the chapter 4", "I was simply testing what styles we would like to see incorporated into the final document and intended to

ask" Doe "tomorrow what [his] thoughts were on this", "[h]owever, shortly after making no data changes and simply editing a color, I got an email from [Doe] asking why the chart changed colors", "[h]e proceeded to go into many different explanations (all of which are in the comments section on the document) save the attached image below", "I explained to him exactly what I told you in the first sentence", "[j]ust wanted you to be aware of what happened and let you know my side of the story". Morgan pasted a screengrab at the bottom of his email to Cochran, it featured an indecipherably small image of a word document that did not depicted Morgan's chart edits, nor the comment thread with Doe and Morgan's comments.

12/05 (07:55): Doe replied to the NU Record Director's 12/04 (15:37) email, writing; "[a]s defined by [federal statute citation], faculty emails are not defined as an educational record", "[h]owever, as provided by [federal statute citation] & [federal statute citation] institutions receiving federal funds are required to allow a student eighteen years of age or older the right to inspect and review their educational record", "[f]urthermore, as stated in your correspondence on 12/[01]" the "portion of my request that has been denied due to [state statute citation] within the lawfully prescribed four business days after I filed my request on 11/27", "(see [state statute citation]) were those emails sent or received from the email accounts of other university students, not those of faculty", "[t]herefore, even were some of those faculty emails to include information of, or be encompassed within, my educational record, [federal statute citation] does not proscribe my access to those faculty emails, but rather prescribes my access right".

12/05 (09:34): Cochran replied to Morgan's 12/04 (19:39) email, writing; "[t]hanks for sharing", "I see the comment thread in the document", "[p]lease keep up with your revisions", "I appreciate your trying to make the charts follow a coherent aesthetic", "[i]f [Doe] sends anything else, feel free to pass it along", "[o]therwise, I recommend trying to work collaboratively on Chapter 4 content/visualizations", "[t]hank you for your continued efforts on the report, and see you on Zoom later today".

12/05 (~12:15): During Cochran's client course Zoom session, Doe addressed a question to Cochran in front of his remotely assembled classmates. Doe waited until he was certain that Morgan and Xavier were in the Zoom room. Then Doe noted that last night he had noticed that someone was editing sections they were not assigned to, including Doe's sections, and Doe wanted clarification if that was permissible. Cochran told the class that if a student wanted to change a section that was not their assigned section, they were to use the suggested edit feature within the shared online document, and then it was up to the discretion of the student that was assigned to the section as to whether to confirm the edit or deny the edit. Doe asked if it was still the case that Xavier was the student with editorial authority to edit other classmates' work. Cochran replied that Xavier had the authority to edit other classmates' work for a coherent aesthetic after everyone had finished their final draft of their sections.

12/05 (~19:00): Doe attended the December general meeting of the graduate-student government assembly at the Main Campus Union at UNL. Present at the GSA general meeting was (pseudonym: Willa) CRP Student Willa, who is a female, and who was the CRP RSO GSA Representative. Doe asked the graduate assembly members, which numbered around 50 members, for a vote to be seated on the assembly as an at-large graduate representative. Doe received a majority vote. Doe was seated as an at-large GSA member.

12/05 (19:55): Morgan changed Doe's chart again. Morgan did not use a suggested edit.

12/05 (22:09): Doe emailed Cochran and Xavier, writing; "[t]his is an explicitly prohibited reformatting of my chart (based on what was established in class)", "I've repeatedly asked in a polite way for it to stop", "[t]hough, it has happened yet again", "[t]his is the fourth time this has happened", Doe provided screengrabs of his original chart and the version that Morgan had changed. (22:54): Cochran emailed Xavier, replying to Doe's email, writing; "I advise that you be careful about proceeding with any discussion with [Doe] about this", "[Doe] is obviously feeling upset about changes to their visualizations", "[a]ll to say", "feel no need to reply to this message". (23:02): Cochran emailed Tang, replying to Doe's email, writing; "I'll be in touch in the morning, but there have been some upsetting developments with the report work tonight".

12/06 (09:00): Cochran email Doe and Xavier, replying to Doe 12/05 (22:09) email, writing; "I want to stress, [Doe], that I interpret no malicious intent in your peers' actions", "[a]ll of you are working to create the best possible product for [the client]", "I expect that you and all can continue to work collaboratively and collegially towards that aim".

12/06 (09:57): Doe emailed Cochran, copying Morgan, writing; "I want to stress that I've observed misconduct in Morgan[]'s actions", "[t]he modifications", "happened multiple times", "[a]lmost every time I asked for it stop, then changed my charts back", "[i]n some instances, those charts were changed again", "[i]n all of those instances the modifications were a decided act", "[f]urthermore, a modification of the [specific chart] happed after class on [12/05], during which you'd stated to everybody, including Morgan [], that any further peer revisions of other authors' sections should be done as 'Suggested Edits'", "[s]ometimes Morgan [] has changed my charts in real time, during which I asked Morgan [] to stop, he did not stop", "I am asking you, as the instructor of this course, to reach out to Morgan" to "reiterate your explicit expectation that any further peer revision of other authors' sections should be done as 'Suggest Edits'". (10:07): Cochran forwarded Doe's email to Tang, copying Wymelenberg, writing; "[j]ust received", "I've already corresponded with [Morgan] this morning, and [Doe]s strongly worded 'request' is inappropriate", "I would also like to express to [Doe] that their language" was "accusatory, judgmental, and otherwise hostile". (11:07): Cochran email just Doe, replying to Doe's email (09:57),writing; "[l]et me reassert, [Doe], that I do not believe Morgan was acting with malintent", "I also feel that your language" was "accusatory, judgmental, and read to me as hostile", "I understand

that you feel your peers crossed a boundary in reformatting the charts that you generated", "[t]his, however, does not justify impoliteness or hostility", "[k]now that in future interactions and communications, it is an expectation that you are respectful and collegial", "[p]lease proceed in accordance with this expectation".

12/06 (11:31): The NU Records Director emailed Doe, replying to Doe's 12/05 (07:55) email, writing: "Thanks for your note. Just to clarify, the University will not provide student information/education records - even your own student information/education records - under the [state statute citation]. However, you have rights under the [federal statute citation] to inspect your education records. Based on my review of your initial request, there may be records contained within the faculty emails identified that would be considered a part of your education record. Would you like to proceed with a request under [federal statute citation] to inspect those records?"

12/06 (12:06): Doe email Cochran, replying to Cochran's email (11:07), writing; "I hope your day is well", "[l]et me reassert that Morgan engaged in observed misconduct", "I also assert that the language within my email last night decidedly implied accusations of misconduct" and "read to me as wholly understandable given the circumstance", "I understand that Morgan violated an explicitly established course expectation in reformatting the charts that I generated (as was established verbally by you in class [12/05])", "[r]elatedly, section assignments were emailed by you to the course's students on 11/14", "I respectfully assert that I did not engage in impoliteness nor hostility given my circumstance, but rather that it was Morgan [] that was engaged in acts of impoliteness in the form of chart modification outside of his assigned segments and hostility in the form of repeatedly engaging in that behavior after being asked repeatedly to stop", "I will abide by your expectation that my future correspondences are respectful and collegial", "I request that you provide two examples of what respect and collegiality look like within the context of course interactions and communication related to allegations of misconduct". (12:23): Cochran forwarded Doe's reply to Tang, copying Wymelenberg, writing; "I suppose I will reply with a brief message, once again, acknowledging what [Doe] said and asserting my expectations", "I will not acknowledge [Doe]'s request for 'examples of what respect and collegiality look like within the context of course interactions and communication related to allegations of misconduct'". (12:31): Cochran forwarded Doe's reply to just Barefield, writing; "[Doe] does not seem to have agreed with much of my response", "[n]evertheless, thanks to you and [Fitzwater] for your help crafting this response earlier", "I'm inclined to reply now reasserting that I recognize that changing the chart upset [Doe], however", "I do not believe this act constituted misconduct", and "I appreciate that [Doe] will meet the outlined expectation that future correspondences are respectful and collegial", "I would rather not acknowledge or address [Doe]'s request that I 'provide two examples of what respect and collegiality look like within the context of course interactions and communication related to allegations of misconduct[]'", "[b]ut, if you feel I should, especially in a particular way, please do let me know", "[a]ny advice is much appreciated". (12:49): Barefield replied to Cochran, writing; "[y]our response with this explanation makes sense to me", "[i]t is not necessary to provide him examples", "[y]ou could

41

specify that the changing of a chart isn't misconduct", "I'm assuming [sic] his drawing some correlations between his case and this situation", "[l]et me know if you have any questions". (13:05): Cochran replied to Barefield, writing; " [t]hank you for your input, [Barefield]", asking "[w]hat do you think about the below"; "[t]he Research Report is a collaborative, co-authored project", "I understand, as stated, that you feel other students crossed a boundary", "[h]owever, I do not believe their actions in reformatting the chart constituted misconduct; again, I believe this arose from a miscommunication", "I believe that this issue is resolved", "I appreciate your abiding by the outlined expectation regarding respectful and collegial correspondences", "[a]nd, while I will not accommodate your request for examples of such communications in the specific context of alleging misconduct, I will direct you to UNL's Standards of Academic Integrity and Responsible Conduct and other resources available from the Student Affairs office". (13:25): Barefield replied to Cochran, writing; "[y]ou are not required to respond or acknowledge his request for examples", "I would not provide them", "[i]f he responds to this email, it might be appropriate not to respond further at this point". (13:44): Cochran replied to Doe's email (12:06), writing; "[t]he Research Report is a collaborative, co-authored project", "I understand, as stated, that you feel other students crossed a boundary", "[h]owever, I do not believe their actions in reformatting the chart constituted misconduct; again, I believe this arose from a miscommunication", "this issue is resolved", "I appreciate your abiding by the outlined expectation regarding respectful and collegial correspondences". (13:45): Cochran replied to Barefield's email (13:25), writing; "[j]ust sent, [Barefield]", "[t]hank you, again".

12/06 (14:32): Doe replied to the NU Records Director's email (11:31), writing; "I formally request under [federal statute citation] to obtain digital copies of emails sent to or received by", "university emails that are included in my educational record; that were not sent to nor received by [Doe]@huskers.unl.edu; from and including the day of 10/10[] to and including and day of 12/05[]".

12/07 (08:00): Doe emailed Cochran, replying to Cochran's 12/06 (13:44) email, writing; "I hope Thursday morning is treating you well", "[y]ou have outlined your connotative expectation regarding respectful and collegial correspondences on 12/[06] at [13:44], but I noticed you did not color definitional parameters within said lines", "[a]s previously requested on 12/[06] at 12:06", "please 'provide two examples of what respect and collegiality look like within the context of course interactions and communication related to allegations of misconduct[]'". (08:20): Cochran forwarded Doe's email to Barefield, writing; "[a]nother message this morning", "[a]t this point, as you advised, I'll stop responding". (09:03): Barefield replied to Cochran, writing; "I felt certain that he would ask again for examples", "I imagine he will reach out to you again when you don't respond", "[i]t might be necessary to discuss with [] Tang whether there are program specific expectations that might need to be developed or provided to him as this will likely be an ongoing need for [Doe]". (09:11): Cochran forwarded Barefield's reply to Tang, writing; "[s]ee [Barefield]'s suggestion below".

12/07 (15:26): Fitzwater emailed Doe, writing; "[t]his message is to provide you with an update related to your case with [SCCS]", "[w]e are still following up on information that has been provided related to this case", "[a]t this time, we anticipate sending an outcome prior to the University Holiday Closedown on [12/]22". (16:43): Doe replied to Fitzwater, copying Frankel-Russell, writing; "I reached out to [] Palser on 12/[01] at [16:23] as per the affirmative clarifications received by you regarding receipt of my Student Conduct Case", "[t]hough, I've yet to hear anything back", "[a] question for [] Fitzwater", asking "[i]s it the case that [] Palser is the correct university employee to contact to request my Student Conduct Case File from".

12/08 (09:01): The NU Records Director emailed Doe, somehow replying the 12/07 (15:26) email that Doe sent Fitzwater, writing; "I will handle your below request in tandem with your other pending request to review your education records under [federal statute citation]", "I will be in touch on both requests when there is an update".

12/08 (15:43): SCCS edited the 'informal meeting' notes within Doe's SCCS case file.

12/10 (21:21): Doe emailed Wood, copying Ankerson, writing; "I attended the UNL Search Process Seminar via Zoom on 11/28[] at [0]9:30", "I was the one that inquired as to the extent that the competitive hiring policies for faculty and staff that the seminar was providing information in regard to applied to the hiring process for funded student assistan[t]ships", "If memory serves me, the answer I received was ambiguous", "I'm reaching out of offer some context as to the motivation behind my question and to ask a follow-up question", "I'm currently a full-time student in the [CoA] Master of [CRP] program", "[a]t the beginning of this semester, I had heard that one of the faculty members in my program might have a funded research assistan[t]ships available beginning Spring '24", "I sent my CV to the faculty member and expressed my interest in the assistan[t]ship", "I was told that the funding for the assistan[t]ship was in a tentative place, but that for the time being I could work with them as a research intern", "[t]hroughout that work I would occasionally inquire about the potentially pending research assistan[t]ship", "[r]ecently upon inquiring about the potential of attaining the position of their funded research assistant I'd been told that the position had been filled", "the faculty member said that when they were at a professional conference a colleague had approached them and asked about the assistan[t]ship position on behalf of their spouse", "[t]he faculty member said that the position would be filled by their colleague's spouse", "I was confused by the way that the assistant was selected", "I had thought that a position at the university that pays tuition, offers healthcare and a salary would be a position that would require a competitive application and evaluation process", "question: [t]o what extent is the competitive hiring policies for faculty and staff at the university applied to the hiring process for funded student assistan[t]ships?"

12/11 (08:00): Doe email Fitzwater, copying Frankel-Russell, writing; "[a]t our meeting on 11/30[] in the presence of [] Frankel-Russell you did not state what my academic standing is throughout this

process", "[a]fter glossing the code, I didn't see that mentioned anywhere", asking "[i]s it the case that I'm in some state of probation as this process proceeds". And writing, "[a]fter looking at the code I saw no portion that addresses dropping the alleged violations", asking "[d]oes that mean that I'm guilty upon being accused", and "[w]hat, if any, are the ways in which I could be found to not be in violation of the code". (09:26): Fitzwater replied to Doe, stating; "[y]ou are not on probation as the Student Conduct process is being conducted", and "[s]tudent are not 'guilty upon being accused'", "[w]e will use the preponderance of evidence standard to determine if it is more likely than not that a violation of the [] Code of Conduct has occurred".

12/11 (09:30): Doe emailed IEC, alleging that Cochran had engaged in discrimination, copying Pearce, Frankel-Russell, Ankerson, Tang and Wymelenberg, and blind copying the UNL Chancellor, writing that "Cochran did not feel threatened by, nor took issue with the behavior of, nor report for misconduct the conduct of, nor openly insinuate hostile behavior in front of class toward", "female Julie", and that "[Julie] occasionally spoke disagreeably to [] Cochran about topically applicable topics", but that "Cochran did feel threatened by, took issue with the behavior of, report for misconduct the conduct of, openly insinuate hostile behavior in front of class toward", "male [Doe]", who "occasionally spoke disagreeably to Dr. Cochran about topically applicable topics" and "that [] Cochran had claimed", "that [Doe] had deleted [Julie] work" even though "Cochran never instructed that group members were barred from editing portions of [their] shared presentation". And that "on the late evening of [12/05]", "[Doe] reached out to [] Cochran to address repeated alterations of [Doe's] own work on a class wide final report that [Doe] had repeatedly asked to stop in no uncertain terms, and that [] Cochran had explicitly said should not happen earlier that day", but "[u]nlike the group presentation from earlier in our course, specific sections of the final report were assigned to specific people" and that "[Morgan] was editing charts within [Doe's] explicitly assigned sections" and that "[o]n [12/06] Doe emailed Dr. Cochran and explicitly stated that [Morgan] had engaged in acts of misconduct" and "cited the assignment documents that [] Cochran had given" that "allocate[ed] work to specific students" and "cited her explicit verbal instruction in class" but "unlike when [Julie]", a "female, had supposedly alleged misconduct toward [Doe] resulting in a misconduct investigation of [Doe] with [SCCS], when [Doe]", a "male, had alleged misconduct" of a "male, Dr. Cochran did not complain to [SCCS]". Then Doe went on to conclude that "Cochran did not file a misconduct allegation on [] [Julie] for equivalent behavior", that interacting with the "[SCCS] process has impacted the time [Doe] would otherwise have been able to focus on [his] scholarship" and that "[Julie] has not had her time impacted the way that [Doe] ha[s]" and "[t]hat is due to prohibited sex" based "discrimination on part of [] Cochran", and that "Cochran did not file a misconduct allegation on [Morgan] for misconduct that [Doe] reported to [] Cochran, unlike" she "did for [Julie]" and that the "[i]nteraction with" the SCCS "process has impacted the time [Doe] would otherwise have been able to focus on [Doe's] scholarship" but that "[Morgan] has not had his time impacted the way that [Doe] ha[s]" and "[t]hat is due to prohibited sex" based "discrimination on part of [] Cochran". As well Doe stated that "[h]aving to interact with [SCCS]'s spuriously provoked investigation due to sex" based "discrimination [wa]s a harassing experience" and that "[e]nduring that

44

harassment [wa]s a condition of [his] continued enrollment at UNL" and that "[a]ny reasonable person would find an [SCCS] investigation based on sex" based "discrimination an intimidating, hostile and abusive process". Doe provided many screengrabs of digital correspondences to bolster the veracity of his claims. (09:34): IEC forwarded Doe's email to UNL IEC Title IX Coordinator Meagan Counley (Counley), copying Schuldeis.

12/11 (10:00): Doe emailed the NU Records Director writing that "[o]n 11/30[] [] Fitzwater told [Doe] that the correct official to whom the request for [Doe's] student conduct case file should be addressed was [] Palser", that Doe "reached out to Palser on 12/[01]" to "request[] a digital copy of [Doe's] [] file, citing [federal statute]". Then Doe asked if the NU Records Director was "the correct official to whom that request ought to have been addressed". (10:11) The NU Records Director replied, writing; "yes, I was forwarded your" case-file-request "email for response".

12/11 (10:52): Counley emailed Doe replying to IEC's email (09:34), copying Shaver and Reed, writing; "I received your formal complaint", "Shaver has been assigned as the investigator", "[s]he may contact you for additional information regarding your allegations", "[p]lease let [Shaver] or [Counley] know if you have any questions".

12/11 (12:03): Doe replied to the NU Records Director (10:11), writing that the university board of regents' rules state that "[i]f the records are not maintained by the university official to whom the request was submitted, that official shall advise the student of the correct official to whom the request should be addressed", asking if the NU Records Director was "the correct official whom that request ought to have been addressed". (12:08): The NU Records Director replied, writing; "I informed you on [12/08] that I would handle both your pending requests". (12:22): Doe replied, writing that "[t]o clarify, my question[] to you do[es] not regard my requests you had informed me you were handling", asking "[i]s [the NU Records Director] the correct official to whom that request ought to have been addressed". (12:26): The NU Records Director replied, writing; "I am the correct official to handle your request".

12/11 (16:50): Shaver emailed Doe, replying to Counley's email (10:52), writing; "[a]s [Counley] mentioned below, I am the investigator assigned to your case", "[t]he first part of the process is for me to send a Notice of Allegations", "[t]hat document goes to you and the Respondent, [] Cochran, simultaneously", "[i]t will set forth the allegations, as well as the applicable university policies", "[y]ou have provided enough detailed information below for me to put together that document (thank you)", "[a]fter I send out that Notice, which will likely be sometime later this week, I will reach out to you about gathering additional information", "I believe [Reed] may have discussed the complaint process with you, but if you have any questions", "please don't hesitate to let me know".

12/14 (07:00): Doe emailed Barefield, copying Ankerson, the UNL Chancellor, Counley, Fitzwater, Frankel-Russell, the NU Records Director, Plaser, Pearce, Reed, Shaver, Wood and Wymelenberg,

writing that he was "address[ing] [Doe's] concerns regarding the way [his] misconduct case has been handled by [] Fitzwater", then Doe "allege[d] that Fitzwater has engaged in prohibited conduct and that Fitzwater has made others complicit", Doe offered a detailed retelling of his time leading up to his 'informal meeting' that Fitzwater directed Doe to Palser at Doe's meeting as the official that Doe's should request his conduct file from, that the NU Records Director was the correct official that Doe ought to have been referred to, then Doe cited the university board of regents rule and asserted that "Fitzwater broke university rules by referring [Doe] to the wrong university official to seek [Doe's] conduct case file from", and that "Frankel-Russell and Palser [were] complicit". Doe included numerous screengrabs of correspondences to bolster the veracity of his claims.

12/14 (09:05): Wood emailed EVC Associate Vice Chancellor Judith Walker (Walker), forwarding Doe's 12/10 (21:21) email, writing; "[h]ere's the email we'll discuss this afternoon". (10:26): Walker replied to Wood, copying Reed, writing; "I'm copying [Reed], as I know he's been involved in other conversations regarding" Doe.

12/14 (10:39): Barefield replied to Doe's email (07:00), writing; "I have received your email".

12/14 (~13:00): Wood said that she had a meeting with Walker regarding Doe's questions about the hiring of students for research by faculty. Wood said that "[i]n the eight years [she] has had her role, she has never been involved in the process for filling any assistantship or student worker position", and that Walker told her that "the hiring [faculty] can pick whomever they want, and there is not a process". Wood made no mention of Reed or Schuldeis. However, Schuldeis said she was at the meeting, saying she "participated in a Zoom meeting with [Wood] and [Walker]" to "learn more about how assistantships are formed and selected". Schuldeis claimed that Walker said that "[s]ome departments have an internal posting board where they may place them", but "[t]here is no documentation or tracking of applications", and supposedly "[t]here usually is not even competition for a position". (15:32): Wood emailed Doe, writing; "[t]hank you for your inquiry", "UNL's hiring policies do not apply to student assistantship positions", "[m]y understanding is that there is not usually a competitive application process for these opportunities", "[t]he selection process for student assistantship positions can differ depending on the needs of the department, the hiring faculty member, and the source of funding", "[t]o find out more information about your college's process, you should speak with [] Wymelenberg".

12/15 (11:56): Shaver emailed Doe a Zoom meeting invite for 11/20 (09:00), Doe confirmed he would attend. (13:58): Doe emailed Shaver the PDF that contained a screengrab of Doe's 10/24 sex discrimination complaint to Cochran and allegation of being covertly video recorded by Cochran on 10/27.

12/15 (14:31): Reed emailed Cochran and Doe a notification from the system for formal charges, contained was Shaver's notice of the formal complaint Doe filed. It stated that Doe alleged conduct that

"could constitute discrimination/harassment" and that the letter "provides notice of the allegations [IEC] will be investigating". Under the protective measures section it noted that "[t]he university prohibits retaliation", which "means intimidating, threatening, coercing, or discriminating against any individual", "for the purpose of interfering with any right or privilege secured by law or policy, or", "because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, or proceeding under this policy", and, "[i]f [one] believe[s] [they] may be experiencing retaliation" to "please contact IEC". Under the allegations section it noted that Doe's allegation that were to be investigated were, one, that "[Cochran] treated [Doe]", a "male student, differently than" a "female student who engaged in similar conduct in class by confronting [Doe] about class behavior and not the female student", two, that "[Cochran] submitted a report to [SCCS] alleging" Doe, a "male, violated the [] Code of Conduct", "[Cochran] did not submit a report to SCCS alleging" a "female student who engaged in similar behavior, violated the [] Code of Conduct", and, three, "[Cochran] submitted a report of SCCS alleging" Doe, a "male, violated the [] Code of Conduct by deleting" a "female student's coursework", "[Cochran] did not submit a report to SCCS alleging that" a "male student violated the [] Code of Conduct for repeatedly editing [Doe's] coursework".

12/18 (09:07): IEC emailed Doe a notification from the system for formal charges.

12/18 (10:52): SCCS edited the 'phone call with Cochran' notes within Doe's SCCS case file.

12/18 (11:26): The IEC Informal Resolution Specialist emailed Doe, writing; "I am reaching out to you regarding the informal resolution outreach letter I sent to you this morning", "[i]nformal resolution is a non-disciplinary alternative to resolving formal complaints of discrimination and harassment", "[i]f you are interested in learning more", "please let me know".

12/18 (13:05): SCCS emailed Doe a notification from the system for formal charges, which stated that "[r]esolution information regarding this case is awaiting your review".

12/19 (09:20): Reed emailed Doe a notification from the system for formal charges, which was noted as being "AN OFFICIAL CORRESPONDENCE FROM [IEC]".

12/19 (10:00): Doe emailed Wymelenberg, copying Tang, forwarding Wood's 12/14 (15:32) email, wirting; "I had previously reached out to [] Wood to inquire about a situation I'd encountered within the []CRP program", "[s]pecifically, about university policy as it relates to hiring practices for assistants", "I was instructed to direct my question about the issue to you". (14:22): Wymelenberg replied, copying Tang, writing; "[t]he College of Architecture practices are consistent with [Wood]'s description below: graduate assistants are selected based on their ability to support faculty needs and grant outcomes". (14:29): Doe replied, copying Tang and Wood, writing; "I have two good faith follow-up questions to help me learn more about this important topic", asking, one, "[w]as it the case that the assistan[t]ship

that I had referenced within my previous message to [] Wood one that was selected for based on the assistant's ability to support faculty needs and grant outcomes", and, two, "[i]f so, how was their ability to support faculty needs and grant outcomes greater than mine". (14:52): Wymelenberg replied, copying Tang and Wood, writing; "[t]he College's practices are consistently applied to support faculty needs and grant outcomes", "I do not discuss the qualifications of other candidates".

12/19 (15:40): Doe replied to Reed's email notification (09:20), copying Pearce, Shaver and Counley, writing that Doe had received formal-notification emails, and that one "was contextualized by a follow up email from [the IEC Informal Resolution Specialist]", and that, in the email, the specialist "said they had sent a non-disciplinary alternative to resolving formal complaints of discrimination and harassment", and that Reed sent another formal-notification email "today", "[t]hough, [Doe] received no contextualizing email as was the case with [the IEC Informal Resolution Specialist]", going on to ask, "[c]ould you offer some context regarding", Reed's "email", and asking, "[h]ow do these communications potentially affect my title IX investigation".

12/19 (15:44): Reed forwarded Doe's email (15:40) to the IEC Informal Resolution Specialist. (16:14): The IEC Informal Resolution Specialist emailed Doe, replying to Reed, writing; "Reed forwarded the email below, in order for me to answer your questions, as they are related to informal resolution", "[t]he [formal notification] email regarding informal resolution was re-sent today", "I noticed you hadn't retrieved the previous letter", "I apologize for any inconvenience and confusion", "[t]hese communications about informal resolution do not affect the progress of your formal complaint and the investigation", "[a]t any point during an investigation, before a determination is made, the parties involved can choose to resolve the matter through informal resolution", "[w]hile informal resolution is non-punitive, it does allow participants to speak".

12/20 (08:00): Doe emailed Fitzwater, replying to Fitzwater's 12/07 (15:26) email that updated Doe that SCCS anticipated sending an outcome regarding Doe's SCCS case prior to the holiday closedown, copying Frankel-Russell and Barefield, writing; "[y]ou said you anticipated sending an outcome before [12/]22", asking "[w]hat is the current anticipated outcome date". (08:22): Fitzwater replied, writing; "[t]he outcome has already been sent", "[y]ou were sent a notification on 12/18".

12/20 (09:00): Doe had his IEC Zoom meeting with Shaver regarding the Title IX sex-discrimination case Doe initiated regarding Cochran's misuse of SCCS. At the onset of the meeting Shave said, "I tried my best to review the information you sent me, so, you had, um, the screenshots and such from the PDF you sent me, and then the initial information to, so, um, what I think would be helpful, before you start going into some of the, the details of the course, is for me to have a better understanding of what, what your, the program is [Doe], and what that class is, and what you do in it, and what the purpose is, can you tell me a little about that?" Doe offered background regarding the program, which Doe said was "the city planning master's degree, to be city planner, or something like that", i.e. civil service. Then

48

Doe offered background about the class. Noting that it was about research methods, offered a reading of the syllabus description, going on to note that practically speaking the course split into teams early on and students were largely left without much curriculum to prepare them for the final product of the course, which was a large final report for the course's client, which was a locality in the state. Doe said he already knew about the topic due to prior research, but that other students did not and were struggling as a result. Shaver asked about who was doing what in Doe's team, and clarified Shaver wanted to know about the "edits and things like that" that Doe had done to his team's work. Shaver asked that Doe focus on "however it helps to explain that, to, to where we get to that point, is helpful to me". Doe and Shaver spent a meaningful amount of time accessing and reviewing the shared editable class work that Doe had worked on with his team. Doe showed Shaver how one could review iterations of the work to see who edited what on the document. Shaver exclaimed, "I was hoping maybe, maybe by color it would show who had done what, but it's looking like it just shows changes period". Doe noted that there were timestamps associated with names that denoted who had made each sequential edit. Shaver said, "oh, I see, yeah, you're right". Doe noted to Shaver that Julie had insisted on adding the locality's survey results to their team's presentation, even though Xavier had expressed interest first, but that Julie did not add that to the presentation, and that was why Doe added it the night before the presentation. Doe noted that he told Julie that night and the next day that she should change the work that Doe had done before the presentation if she wanted to, and that Cochran was privy to those interactions, in one instance in-person no less, but that Julie did not change the presentation. Doe told Shaver that he had asked Fitzwater at their 'informal meeting' if the SCCS charges were wholly based on Cochran's claims, and that Fitzwater had confirmed that to be the case. So, Doe said he was uncertain if Julie had actually alleged that Doe had deleted her work. Doe went on to note that there were other SCCS charges that were not about the team's presentation on 11/07, "there was another instance that pertained to disrupting the learning environment and that, that occurrence would have been, before this occurrence". After hearing which, Shaver cleared her throat. Doe continued preparing to talk about his sex-based complaint to Cochran on 10/24, "that would have been, I think when we were, yeah, it would have been when we were dialoguing about who to reach out to, um, for, for our stakeholder outreach". Shaver interrupted, saying "before you tell me about that, can I ask you a question that relates to the previous thing, real quick, just so I don't lose it?" Shaver asked if before the presentation on 11/07 if there was the expectation that teammates would not change one another's contributions to the presentation. Doe told Shaver, "no, no there wasn't". Then Shaver said that Doe could tell her about the other instance. Doe said that on 10/24 he had a difference of opinion with Cochran regarding stakeholder outreach. Doe said, "it was told to me by Fitzwater that because I spoke quickly" that Cochran "felt threatened". Doe said that he thought Cochran's issue with Doe "was more of an ego thing". Doe said that during the 10/24 class Cochran responded to Doe by making the insinuation in front of Doe's peers that he seemed to be behaving aggressively. Doe said, "I was kind of put off by that because I wasn't being any more or less disagreeable than Julie had been". Doe said that he reached out to Cochran with his concern because; "I don't want people saying I seem aggressive, it's like, you know, they're trying to seed the idea in my, in my peers' minds that I'm like, this like", "aggressive evil monster guy". Doe said that he emailed

Cochran to express his concern about being spoken to in a sexist manner. Doe went on to note that Cochran and Doe talked about that at a work Zoom session on 10/27, and, "that's when I noticed her recording me, was during that conversation". Doe said that, "I think that it put Dr. Cochran on edge that I was willing to be so forthright about addressing, like, the being insinuated as being an aggressive presence issue, because I was quick about that, you know, like, I'd reached out to her that day, or the next day, and I'm like, 'hey yeah, I don't, you know, I don't want people making insinuations about me being aggressive, we should talk about this'". Doe went on to say that he thought that Cochran was, "paying close attention to me after that point, like, maybe trying to build a case, because it's like 'oh, I, I, can't do my passive aggressive making insinuations about people thing', so I'm going to build a case against them, maybe". Doe said he thought Cochran was actively trying to build a case against him after 10/24 because on 11/07 Cochran was "obviously paying close attention" to his dialogue with Julie. Doe noted that after the presentation, the client course students were assigned individual assignments by Tang, "and that's when things became more prescriptive about who does what". Doe said that he thought the primary reason that Doe was charged with SCCS violations, "was retaliation, for me complaining". Doe said that, "I do think that was very discriminatory, ah, you know, my conduct was not different than Julie's, and- but I guess my conduct was different than Julie's in the sense that I complained". Shaver interjected saying "tell me about Julie's behav- tell me about Julie and ha- how you would describe, or the particular things you're thinking of when you say the wasn't, it wasn't different than her's, tell me about some of the things that you remember her doing and engaging in". Doe said that he and Julie were similar in that they were both "inclined to express one's disagreements", and that was the "shared equivalent behavior". Adding that "Dr. Cochran doesn't seem, didn't seem to feel threatened by that when Julie behaved that way, but I guess it's an issue when [Doe] behaves that way, um, which is, um, discriminatory I'd say". Then Shaver asked about how the issues with Morgan changing Doe's work differed from the issues with Julie on the presentation. Doe said that after the presentation students were given individual assignments for the final report. Shaver asked for the document with the individual assignments. Doe said he would send that. Shaver asked why it was "problematic" that Morgan was making edits to Doe's work. Doe said it was an issue because "it wasn't his section, he wasn't assigned to it" and that Xavier had been the one that had been assigned to format students' work in the report at the end of the semester. Shaver asked if Doe talked to Morgan about the issue. Doe said that he told Morgan to stop by typing in the shared document when Morgan was editing Doe's work. Doe told Shaver that during the client course's 12/05 meeting Doe asked Cochran if student's could edit outside of their assigned section, and Cochran said that if one was going to do that they should use a track edit that requires the original author to confirm the edit in order to implement the edit, and despite that, later that day Morgan changed Doe's work with a "hard edit", not a track edit. Doe said, "as far as I know, know misconduct process has been initiated against him, for that". Shaver asked for a list of people for Shaver to talk to. Doe said he would provide that. Doe went on to say, "I don't know if it's the case that Fitzwater empathizes with Cochran's situation, or if they are maybe work friends outside of this situation, but, um, you know, it seems odd to me that he referred me to the wrong person to get my student conduct case file from, um, and then that that person didn't redirect me to the right person, I,

yeah, I don't know what's going on there with that, if that's, like, coordinated somehow, it seems to me that there is some coordination between Fitzwater and Cochran, because, ah, the situation within which I received the letter seemed so very orchestrated, you know, it's like, all four faculty were there that day during class when I got that, that letter, and, um, yeah, they, eee, were watching me, you know, like a hawk, while I was reading it, um, so, eee, Fitzwater, I would think would know that I was having class at that time, and so that whole situation, it just seems, deliberately orchestrated to me, to be as provocative as possible, so, um, you know, I bring that up because, ah". Shaver interjected, "potentially him?" Doe replied, "yeah, yeah, Fitzwater as well, potentially him, also, you know, was it the case that he had reached out to Palser, um, after he had told me about her, and said, 'hey, don't, don't get back to this guy, I'm doing my own thing, with this case, give me some time,' she's, she's required to tell me about, um, [the NU Records Director], I mean, I'd already been interacting with [the NU Records Director] about a FOIA request, and a subsequent FERPA request, but, you know, I thought Palser was the student conduct case file person, um, and, and it turns out that's [the NU Records Director], supposedly, based on what I was told, so, I mean, did he coordinate with Dr. Cochran? Like, aah, you know, having me get letter right in the middle of class while I was being observed by all of the faculty? Or, or is it completely happenstantial? Because, ah, you know, it a, having this process, having the misconduct process used, I would argue, against me in a harassing, discriminatorily-in-part motivated way, um, ah, you know, ah, I'm curious to know if that, that, that, that getting the letter was a specifically coordinated aspect of that, and subsequently if obscuring my process of getting my case file was, was, like, a knowingly, decidedly engaged in act, you know, did he shoot an email to Palser, and be like, 'hey don't, don't tell him, don't tell him anything, for a few days,' you know, I'd be curious to know, um, because I think I've made a good faith effort to know as much as I can, to know as much as I can about what's going on with this process, which I, I don't think I should have encountered, and never encountered before, so I've been reaching out to, to get information, and you know, I am by right entitled to, like, information about myself that the university has, and it's, you know, doesn't really feel like the university being exceptionally forthright about, you know, giving me records about myself to me, um so, yeah, in terms of, of the misconduct process being used in a harassing way, which it definitely feels like it has been, um, you know, I feel like, I would like to know, is, is it case that Fitzwater's friends with Cochran? Do they know each other outside of work? Was there some coordination there? And, and was he, like, actively trying to keep me from getting my student record, um, I don't know, I'm guessing those are issues that you happen, um, have you encountered that before? Issues with students getting their records?" Shaver replied, "I have not encounter them, primarily records requests go to general counsel and not to us, so, I don't necessarily, I'm not necessarily familiar if there are issues with people getting those, so yeah, it's a good question". Doe asked if they should schedule a time for another meeting. Shaver said that she would reach out to Doe and that unless Doe had anything to add that she probably wouldn't need to talk to Doe again until she had a chance to talk to witnesses. Shaver said "I'll reach out to you, um, so I won't necessarily, unless you have additional things that you think of, that you want to add, I won't necessarily need to, to meet with you, at, probably until after I gather some additional information, from some of those witnesses, and, and maybe even the respondent, so I will, um, I'll just

be in touch with you that first week, about, because that's probably when those, um, documents will go out to witnesses, um, because I don't want to send them before break and then disappear for, you know, however many days, and be like wh- so I'll probably wait til, um, we return, to, to put those documents together, then I'll be in touch with you then about that, and we can kind of coordinate there, ok?" Doe thanked Shaver, and asked if there was anything else they should talk about. Shaver said there was not, but that if Doe thought of something to reach out.

12/20 (~14:00): Doe found Fitzwater's 'resolution' in the 12/18 (13:05) email from SCCS which had been made with a notification from the system for formal charges. In the resolution section it noted that it was an administrative resolution, that the administrator was Fitzwater, that the charge was "Not Clery Reportable", under the charges section it was noted that Doe was proposed by Fitzwater as being "in violation" of the academic charge of "Interfering with Academic Work", that Doe was "in violation" of the conduct charge of "Disruption of University Operations", and that Doe was "Not in violation" of the conduct charge of "Interfering with Instructor's Ability to Conduct Class". In the sanctions section it noted, one, university probation, during which were Doe to "repeat the violation or violate other University policies" Doe "will be subject to further disciplinary action, including possible suspension or expulsion", two, an administrative fee, three, the completion of an "intervention program to help individuals recognize the impact of their behaviors", paid at Doe's own expense, and, four, a reflection letter or video on what Doe learned from his experience, which required answering six prescribed questions and was to follow the outline as to what the letter or video should include. The rationale section stated that initially in Cochran's client course students "were split into 2 groups", and that there was to be a presentation. Fitzwater claimed that "[Doe], had 'deleted or significantly changed' portions of the presentation that other students had prepared without the[ir] consent". That at Doe's informal meeting "[Doe] stated that [he] did make changes to the presentation". Fitzwater wrote that "[t]he act of changing the academic work of other students without consent", "would more likely than not constitute harmful academic action towards others", and that "[t]he greater weight of evidence supports a finding of in violation" for "Harmful Academic Action Towards Others". Fitzwater claimed that Cochran submitted "documentation" related to instances of disruption. That the "first reported instance was an interaction between [Doe] and [Cochran] on [10/24], in which [Doe] disagreed with direction from [Cochran] in a manner that was described as 'confrontational' and caused the faculty member to feel 'threatened and otherwise upset'". That a student stated that Doe "'has been belittling students' and 'has extremely questionable behavioral conduct'", and that Doe "vehemently disagreed with many of the suggestions [Cochran] shared". Fitzwater wrote that Cochran was "forced to 'dramatically change the class' as a result of [Doe]" by "moving class meetings online" and "breaking up groups". That Doe "confirmed that [he] had reached out" about "concerns". Fitzwater claimed that Doe "confirmed that the structure of the course had been changed as a result of [his] email" at the informal meeting. Thus, Fitzwater wrote that "[b]ased on the information provided to [SCCS], the greater weight of evidence supports a finding of in violation [] for Engaging in Conduct that Disrupts Classes". Toward the bottom of Fitzwater's proposed resolution it stated that "[b]y completing this document", Doe would "verify"

that " the decision below can be used for the purpose of the Administrative Resolution, which is an agreement between [Doe] and the University", and that Doe would "further acknowledge that if [he] d[id] not respond within five [] University days", from 12/18, "the resolution will be considered accepted". Then there were three options for Doe to select one option from; one, admit to the violation and accept the resolution, two, do not admit the violation, but accept the resolution, or, three, do not accept the resolution, understanding that may result in the case being "forwarded to a Hearing Officer or University Conduct Board".

12/20 (~14:30): After Doe read Fitzwater's resolution and noticing that he only had five "University days" to respond from 12/18 or else "the resolution w[ould] be considered accepted", he quickly selected the option to "not accept the proposed Administrative Resolution". Then digitally signed the form. As Doe rushed to click submit, he noticed that the digital timestamp for his signature did not seem to match the present day. But Doe was not able to review the form after submitting. Doe would later come to know that the form's digital timestamp for Doe's signature denoted, "[s]igned electronically on Thursday January 4, 2024 at 11:37am CST from IP address [number]".

12/20 (~15:00): Doe called SCCS and asked the front desk secretary to speak to Fitzwater. Fitzwater quickly took the call. Doe asked Fitzwater if he received Doe's rejection of Fitzwater's resolution. Fitzwater said that he received it, and quickly added that he could resend it if Doe wanted to fill it out again. Doe quickly responded that was not necessary and that Doe was just confirming that it had been received and asked that Fitzwater email Doe confirming that SCCS had received Doe's rejection. Fitzwater said that he had received the resolution. Doe asked Fitzwater if he knew that Palser was the incorrect university official for Doe to request his conduct file form. Fitzwater told Doe that he should refer his records requests questions to NU general counsel.

12/20 (15:11): Doe replied to Fitzwater's email (08:22), copying Frankel-Russell, writing; "[t]o clarify, I was not recording our phone call, that said would you email me confirming that I appealed the resolution", "[a]s well, a question, during your investigation, did you receive the video file of my Zoom conference with [] Cochran", from 10/27, writing on to ask, "if so, is that content included in my student conduct case file". (16:02): Doe forwarded his email to Barefield, copying Frankel-Russell and Fitzwater, writing; "I am reaching out to clarify that earlier today I had noted on my resolution that I was appealing [SCCS]'s decision", "[r]elatedly, I had explained over the phone with Fitzwater" to "email me back confirming that my appeal had been received for my own documents". (~16:30): Doe called SCCS and asked the front desk secretary to speak with Fitzwater. The secretary said that Fitzwater was not available, but that Doe could schedule a meeting, noting that Fitzwater probably would not be available for a meeting until after winter break. Doe asked the secretary if SCCS was open the next day. The secretary paused, then he said something to the effect of 'yeah'. Doe thanked the secretary.

12/20 (~16:45): Doe called SAS and asked to speak to Frankel-Russell, she took the call. Doe asked Frankel-Russell if she knew that Fitzwater had referred Doe the wrong university official to get a copy of his conduct file from, Frankel-Russell said she could not recall details from the meeting. Doe asked Frankel-Russell if she could give Doe access to the conduct case file, as Doe had granted her access on his SCCS release from. Frankel-Russell said that the form only granted her the ability to attend Doe's 'informal meeting'. Doe asked if Frankel-Russell would serve as Doe's advisor at Doe's SCCS hearing. Frankel-Russell said she could do that. Doe asked if Frankel-Russell had served as an advisor at an SCCS hearing before. Frankel-Russell said that she had not. Doe asked if there were others at SAS that had, and if so if they could be Doe's advisor. Frankel-Russell said that she could ask and let Doe know if there was and if they could serve as Doe's advisor. Doe thanked Frankel-Russell.

12/20 (16:52): Doe emailed Shaver a list of potential witnesses, included were CRP faculty members and CRP students. Doe included a rationale for why Doe included each individual on his list. (16:55): Doe emailed Shaver the document that Cochran had previously given students that noted each student's section assignment on the final report for Cochran's client course. (16:58): Shaver emailed Doe confirming that she had received his emails and his attachments, also writing; "if you would like to listen to the recording during the pendency of your investigation, you can reach out to me", to listen to the audio of the interview that Doe had with Shaver earlier that day, "[w]e can schedule a mutually convenient time for you to come and listen", "[w]e believe we can do this for participants in our process without requiring them to make a formal records request, but we can only offer this courtesy so long as it does not interfere with our ability to conduct normal operations", "[a]fter the investigation's conclusion and the case's closure, a request to listen to a recorded interview would be directed to [] Pearce". Shaver also included a screengrab that was pasted at the bottom of the email that featured a section of the IEC investigation process, specifically Shaver's screengrab featured the appeals section, and Doe noticed that Shaver had highlighted a space in between a comma and the beginning of a word in one of the paragraphs of the screen grab. The paragraph read; "[t]he Appellate Officer will review the appeal, any written responses to the appeal,[highlighted space here]and the investigation report. The Appellate Officer may request additional information from the investigator or the parties at the Appellate Officer's discretion".

12/21 (08:00): Doe's email sent to Shaver, replying to Shaver's 12/20 (16:58) email, asking; "[w]ho are 'participants'", "[i]s allowing a complainant and participants to listen to our recording a 'procedural irregulanty'", "[i]f listening to the recording isn't a procedural irregularity, might I come to listen to the recording today", and "[w]ho is the 'Appellate Officer'". And going to list additional potential witnesses.

12/21 (08:00): Doe's email sent to Barefield, forwarding Doe's 11/20 (16:02) email, copied was Frankel-Russell, blind copied were Shaver and Pearce. Doe wrote; "I requested an email from [SCCS] yesterday confirming the receipt of my resolution appeal", "I did not receive one", "I'll be coming by the office

today to request documentation of my appeal", "[i]f preferable, you can simply email me stating that you received my appeal". (08:08): Barefield replied, copying Frankel-Russel and Fitzwater, writing; "I can confirm that we have received your rejection of the Administrative Resolution that was sent by our office", "[a] hearing will be schedule in January and we will notify you of the hearing information once we have confirmed availability of the hearing board", "[o]ur records show that the Administrative Resolution was sent to your [] email account", "I would suggest reaching out to IT[] regarding your email settings to determine if the email went to a spam folder".

12/21 (09:44): Shaver replied to Doe email (08:00), writing; "[t]hanks for the list below", "I am not in the office today", asking "[w]ould it work for you to come in on the morning of [2023/01/03] at [09:00]", "[i]f another time that morning works better, just let me know", going on to answer that "[a] party can make the argument that anything is a 'procedural irregularity' in the appeal process", that IEC "wouldn't limit what is or is not considered a procedural irregularity", "[b]ut procedural irregularities are irrelevant unless they affect the outcome of the matter", that the word "'[p]articipants' doesn't have an official policy meaning", "[t]hat was just referring to you in your request to allow you to listen to your recording", "[o]thers would be afforded the ability to listen to their own interview if requested, as well", and that "[t]he Appellate Officer's identity and contact information are provided in the final determination".

12/21 (14:41): Wymelenberg send an email to Doe. Wymelenberg said that he "asked [] Tang to start the letter", and "that [Wymelenberg] consulted with [] Walker and [] Barefield about the best timeline for sharing that information". However, Barefield said that she told Wymelenberg "to wait until the conduct process concluded" and that "Wymelenberg worked with [her] and [] Hope to draft a letter to [Doe]", making no mention of Walker. Wymelenberg attached an official CoA headed PDF to the email that contained the same text as the email. Wymelenberg copied Tang, Hope, Barefield and Frankel-Russell, writing; "I am writing to address faculty concerns that have arisen regarding your academic behavior", "the first concern regarding conflicts with another student in the [client] class", and "[s]ubsequently, on [10/24], a faculty member reported your disruptive behavior in the classroom", "[u]pon receiving the report, [] Tang promptly scheduled an informal coffee conversation for [10/27]" to "discuss your learning experiences", "[d]uring that meeting, I understand several topics were discussed, and [] Tang reminded you of the importance of respecting and collaborating with fellow students and faculty members", "[f]urthermore, on [10/31], [] Tang visited the [client course] classroom to publicly underscore the necessity of respect and collaboration", "[o]n [11/07], a student involved in a group project with you [had] reported" [Doe] "removed or significantly modified their presentation slides without proper communication", "[a]s a result" at the "[CRP] program's regular monthly faculty meeting scheduled on [11/08], serious discussions took place, leading to a program level's recommendation for senior faculty members to actively monitor and manage classroom culture by sitting in the [client course] for the coming weeks", "despite these proactive measures, additional complaints and concerns have surfaced, specifically regarding your interference with others' academic

work, disruption of team collaborations, disrespect towards instructors and fellow students, failure to adhere to instructors' rules or instructions, and the sending of inappropriate emails to faculty members", "[d]ozens of complaints and concerns have been brought to [] Tang's office and my office through various channels, including emails, phone calls, and in-person meetings", "[o]n [11/30], at your request, [] Tang accompanied you to [SAS] and [SCCS] for the informal meeting", "[y]ou may continue to work with those two offices for next steps in the associated procedures and due process", "[y]ou may also continue to work with [IEC] for any support or resources you may require from that office", "[i]n my role as dean, and in coordination with [] Tang, we expect all students, including you, to exhibit respectful behavior", "[i]t is essential that you adhere to instructors' rules and instructions in the classroom, actively engage in collaborative teamwork with your peers, and contribute to maintaining an inclusive and equitable learning environment for all students and faculty members", "[s]pecifically, there are suggested behaviors", "including: [w]hen engaging in class projects, please adhere to the guidance provided by instructors", "[w]hen offering feedback to other students or instructors, provide constructive, civil comments", "[i]n team projects, show respect for other students' participation, contributions, and opinions", "[w]hen posing questions or providing comments, keep them relevant to the academic topic", "[w]hen collaborating on team projects with other students, strive to balance time and create a collaborative learning culture that allows everyone to participate in discussions", "[y]our prompt attention to this matter is crucial, and I trust that you will take the necessary steps to address and rectify the concerns that have been raised and documented herein", "[t]he [CRP] faculty will convene in their regular monthly faculty meetings during Spring 2024 to discuss the program's student learning environment", "[t]he faculty will monitor the progress, and [] Tang will check in with you before the relevant faculty meeting(s) to gather your perspective", "[i]f you believe you have a medical condition or other disability that affects your educational experience, please know that support and resources are available", "[y]ou can contact Services for Students with Disabilities" or "visit their website", "[a]dditionally, you can receive support through the [UNL] Counseling and Psychological Services" or "through their website", "[i]f you have any questions or suggestions, please feel free to schedule a meeting with me and [] Tang by contacting [] Bateman, Assistant to the Dean". (16:00): Doe replied to Wymelenberg, copying Hope, Ankerson, Barefield, the UNL Chancellor, Counley, Fitzwater, Frankel-Russell, Pearce and Tang. Doe copy-and-pasted the text of Wymelenberg's email, offering Doe's response in red annotations. Writing that Wymelenberg's letter was an "[e]rroneous and [r]etaliatory [c]ommunication". Pasting the screengrab of Doe's 10/24 (15:51) email to Cochran, wherein Doe expressed concerns of sex discrimination. Doe asked Wymelenberg; "[w]as modification of the slides prohibited by the instructor". Doe noted that Wymelenberg articulated no exact examples of Wymelenberg's additional claims of "interference with others' academic work, disruption of team collaborations, disrespect towards instructors and fellow students, failure to adhere to instructors' rules or instructions, and the sending of inappropriate emails to faculty members". Doe asked Wymelenberg if he believed that Doe's ability to work with IEC, SAS and SCCS required Wymelenberg's permission. Doe asked "[w]hat documentation of is there of disrespectful behavior to any persons", "[w]hen did I not adhere to instructors' rules", "[w]hen was I ever not engaged in collaborative teamwork with my

peers", and "how have I made the learning environment less inclusive or equitable for any student or faculty member". Doe wrote that he "made an arduous effort to establish more guidance from an instructor within one of my classes" and that he could "provide more documentation if necessary". Doe asked want qualified as an (un)civil comment, writing; "if there is a course-topic-applicable point of disagreement, does debating the merits of another's idea qualify as not adhering to the above 'suggest behavior'". Doe stated that he decidedly made and effort to respect other students' participation. Doe stated that all his question and comments from the past semester were academically relevant. Doe stated that he could provide documentation of examples of Doe collaborating on team projects in ways that facilitated others' involvement. Doe told Wymelenberg that Wymelenberg could "[c]onsider all requisite promptness crucially offered", and that "[r]ectification, if needed, will be aided by more specificity and documentation" on part of Wymelenberg. Doe wrote, "[r]espectfully, this letter, and the above statement" that "Tang will check in with [Doe] before the relevant faculty meeting(s) to gather [Doe's] perspective", "seem[ed] designed to be intimidating". Regarding Wymelenberg's mentioned of "Services for Students with Disabilities" and "Counseling and Psychological Services", Doe wrote; "I feel quite well, truly", "[t]hough I assume these psychological services are available to faculty as well". Doe wished everyone an "merry Christmas". Then Doe wrote; "[m]y grades, I think these matter", "[p]erhaps I'm the only one that cares about rigorous student scholarship on this campus", "I hope not". At the very bottom of Doe's rebuke of Wymelenberg's official CoA expression of concern regarding Doe's academic behavior, Doe pasted a screengrab of his grades for that fall semester, which featured straight A's across all of Doe's full-time course load.

2024

01/02 (15:45): Shaver emailed Doe, writing; "[b]efore the break, you expressed an interest in listening to your interview", "we will go ahead and make it available to you online", "I will send you a link", "[w] We would just ask that you not record, copy, or share it".

01/03 (13:57): Shaver emailed Doe, writing; "[b]elow should be a link to the interview audio", "[p]lease let me know if you have nay issues accessing it".

01/03 (15:23): Doe emailed Shaver, writing; "[b]elow is additional information to be considered alongside, and potentially added to the scope of, my existing Title IX case with IEC". Doe's additional information was divided into twelve sections; one, "[a] request to broaden the scope of my investigation of [] Cochran's acts of discrimination", two, "[c]oordination and negligence on part of the others within my program", three, "[m]ore context regarding [] Cochran's animus toward me and generally discriminatory disposition", four, "[b]ackground on a dysfunctional RSO as a factor potentially affecting the program's mistreatment of myself", five, "[e]gregious misconduct on part of judicious parties outside of my program at the Office of Conduct and NU Systems", six, "[d]eceptive behavior exhibited by IEC staff member", seven, "[q]uestions for Investigator Shaver regarding my additional background

57

and regarding my request to broaden the scope of the investigation", eight, "[t]hose that should be included in the investigation if the scope is broadened to include university employees abetting [] Cochran's discrimination", nine, "[r]egarding the scope of the existing investigation in the wake of [] Wymelenberg's defamatory, intimidating and retaliatory email", ten, "[p]revious and newly applicable interviewees in the wake of [] Wymelenberg's erroneous and retaliatory communication and context as to the applicability of the inclusion of said interviewees", eleven, "[i]mportant documents and links", and, twelve, "[l]astly". Doe wrote; "[w]hen I made allegations of [] Cochran's discrimination I was as concise as possible", "[b]ut after reflecting over this past semester I think there are more instances of discrimination on part of [] Cochran that should be included in the investigation, as well as other people at the university that are complicit in abetting [] Cochran's discrimination that should be included in the investigation". Doe wrote on; "Wymelenberg's email before winter break on [2023/12/21] harassed me in a defamatory, intimidating and retaliatory way", "[h]e is writing in an intimidating manner by giving me permission to use university offices", "[h]e has no authority over my work with the IEC", "I feel relatively confident that he wouldn't be able to keep me from student advocacy, nor appealing my alleged conduct violations", "[t]here were many defaming claims in that email", "[b]ut only a few vague examples", "this is a tactic intended to redirect focus from my allegations of discrimination against [] Cochran", "[i]mportant to note is that Dean Wymelenberg was included in my email when I filed my allegations with IEC", "Wymelenberg's email frames me in a false light to [] Hope", "[h]e is libeling me per se by making unqualified statements that make it seem as though I lack professional integrity as a graduate student", "[p]erhaps [] Hope is part of the conduct appeal process", "Wymelenberg's email also claims without evidence that it was decided on [2023/11/08] that classroom culture would be monitored and managed", "[w]hat an absurd notion", "[a]s opposed to observing the students like animals in a zoo, why not simply talk to us about something specific", "[i]t was likely set-up by [] Cochran and [Julie] to entrap me by priming others' perceptions of me as problematic, then creating an audience wherein [Julie] muted her equivalent behavior", "I say that because when the other faculty came around [Julie] became uncharacteristically quiet", "[a]nd on the few occasions when [Julie] would palaver in her typical manner in front of other faculty [] Cochran would respond in an uncharacteristically wry tone", "[t]hey were likely coordinating their moves", "I suspect that [] Cochran and [Julie] are trying to get me kicked out of the program", "on [2023/10/24]", "I reached out to Dr. Cochran with my concern that her insinuation of confrontation toward me was stigmatizing", then "Tang reached out to me to ask for a coffee meeting", "I replied that I was busy during the time he'd offered", then "Tang responded that", "we could get together that morning", "I informed [] Tang that time would not work for me, but that we could get together in the morning the next day", "Tang sent me an invite to a coffee meeting", "[o]n [2023/10/25]", "Cochran reached out to me confirming that she had remarked upon my tone as confrontational and that we could spend some of our internship meeting time on Friday speaking to each other about the issue", "[o]n [2023/10/27] from about [14]:00 [] to [16]:00 [] we spent the first half of the meeting speaking about Dr. Cochran's comment of confrontation", "[i]t was during that meeting that I'd noticed Dr. Cochran covertly recording our Zoom", "[w]hen the screenshare mode is activated there is a green border around the segment of the screen that is being shared", "[i]f the Zoom is being

recorded one can see a red circle toward the top of the green border", "[t]here was a red circle", "Cochran never asked for permission to record our conversation, nor did she inform me that she was recording our conversation". Doe wrote on, "Cochran's discriminatory disposition toward me dovetailed with my forthright interest in attaining a funded assistantship through her research", "as well as my oft expressed desire to set a formal benchmark to be listed as a coauthor through my work as a research intern", "[a]t the beginning of the semester, I was proactive about seeking a paid research position", "[t]hat led to an intern position with [] Cochran", "[d]ue to Dr. Cochran's instructional disengagement, I had to do most of the group presentation slides", "[t]hat was despite including [] Cochran in my group's Microsoft Team, which she didn't engage with at all", "[t]his slide deck work was used as a false pretext to report me to the office of conduct for spurious allegations of 'deleting others work,' that is simply not true", "[t]here was no rule that stated that I couldn't modify others' work", "[t]here was no assignment parameter that stated that group members would be graded based on individual contribution", "[r]ather all the syllabus explicitly states is that 'teams of students will work together to identify a research problem, develop research questions and a methodological approach, collect and analyze data, and present findings in oral presentations and written research products'", "I perceive that part of the animus from [] Cochran toward me was due to my persistence in seeking a co[-]authorship benchmark through my research internship work", "Cochran didn't like that, and subsequently declined to sign a memorandum of understanding that I be acknowledged by name", "within her pending publication submission", "Cochran had formerly stated in a Zoom session that she was willing to do that and that she was willing to formalize that expectation", "I can provide documentation of that", "[i]mportantly, I think that the bigger source of animus from [] Cochran was my formal complaint", "[i]t would be extremely insightful to see documentation of when [] Cochran formally made the allegation of misconduct", "[a]s a side note, I think that [] Wymelenberg is omitting a great deal of what was discussed on [2023/11/08]", "I also believe that he is mischaracterizing the content of what was communicated by students around that time", "I suspect that any student 'complaints,' provided they actually exist, were solicited by [] Cochran or [Julie]", "[t]oward the end of my internship with [] Cochran when I asked about attaining an assistantship, she said it had been filled", "Cochran went on to proactively offer of her own volition that when she was at a professional conference a male colleague had approached her and asked if the assistantship could be given to his wife", "Cochran said that the position would be filled by said colleague's wife", "[c]onfusingly, [] Cochran proactively volunteered that her colleague's wife already had a master's degree", "[a]s well, she seemed to think it was appropriate to tell me that the assistant was from a foreign country", "I think this is another example of [] Cochran's discriminatory conduct", "[s]hortly after transferring into my program I reached out to [] Tang to inquire if I could get a list of emails of the program's students", Tang "informed me of the RSO", "I reached out to [] president Lisa [] on [2023/10/11] to inquire where to find the schedule for general meetings", "[o]n [2023/10/16] an invite went out for a meeting on [2023/10/23], which I attended", the "meeting was well attended by students within the program", "[i]t left me hopeful that the RSO could be a good intermediating organization for student interests within the program", "[o]n [2023/11/12] an invite went out for a[n] [RSO] meeting on [2023/11/16]", "[w]ithin the email was an

invitation to submit discussion topics", "[o]n [2023/11/13] I sent a list of discussion topics I wanted to discuss to the president and vice president", "Those topics were", "establishing a threshold for co-authorship", and "creating a procedure for student workers to voice workplace issues to [the RSO]", "[t]he president messaged back and included additional people in the president's response", "[t]he president asked if we could establish a time to meet with faculty about the topics I wanted to discuss", "[o]n [2023/11/15] the president canceled the [2023/11/16] meeting", "[i]t is worth mentioning that the RSO's constitution requires a monthly gathering hosted by the RSO", "[o]n [2023/11/18] I had corresponded with the president about a potential meeting on [2023/11/20]", "[o]n [2023/11/20] the president backed out", "[o]n [2023/11/20] I offered the president a number of meeting times", "[t]he president said that no time would be workable". Doe wrote on, "[t]here is bad faith conduct on part of university staff that is abetting [] Cochran's discrimination", "I think [] Fitzwater knew I was in class when I received my email [2023/11/21]", "If not, [] Cochran orchestrated the timing", "I was being watched very intently by all four faculty when I received that email", the faculty member that graduated from the same institution as Cochran "showed up shortly before I received it", "Cochran was gleefully giggling while I read it" and then the faculty member that graduated from the same institution as Cochran "left shortly after I reacted to it by feverishly composing a response email", "[i]t is worth mentioning that [] Cochran was noticeably flustered when I didn't react poorly during the remaining duration of class", "I asked Fitzwater over the phone on [2023/12/20] if he knew I was in class", "[h]e claimed he didn't", "I also think Fitzwater deliberately referred me to the wrong university employee for my conduct case file when he referred me to [] Palser during our meeting on [2023/11/30], "I think that Palser was in on it", "[a]nd I think that [] Frankel-Russell knew Fitzwater was lying to me and chose not to say anything", "I had previously inquired with Fitzwater if I could list myself as a recipient of my conduct file", "[s]o Fitzwater already knew that it was my intention to get the file", "I asked Frankle-Russell over the phone on [2023/12/20] if she knew I'd been referred to the wrong employee, she claimed that she couldn't recall any details from the meeting with Fitzwater on [2023/11/30]", "I also asked if she had reviewed my case file, as I had listed her as a recipient", "[s]he claimed my signature only entitled her to attend the meeting", "[t]hat is a verifiable lie", "[a]lso, worth noting is that on the morning that she accompanied me to my meeting with Fitzwater she'd mentioned that she had looked at it", "Tang was in Frankle-Russell's office with me during that conversation", "[w]hen [the NU Records Director] emailed my [] email account [2023/12/08] informing me that she would fulfill both my student records requests, forwarded below was the email I sent to Fitzwater with Frankel-Russell" copied, "I think that Frankel-Russell forwarded that email to Palser on [2023/12/08] and then Palser forwarded it to [the NU Record Director] and then [the NU Records Director] forwarded the portion of the thread that dated back to [2023/12/07] letting me know she would handle both requests", "[w]hen I asked Fitzwater over the phone on [2023/12/20] if he knew that Palser was the wrong contact, he wouldn't answer my question", "I reached out to Palser on [2023/12/01] for my conduct file", [the NU Records Director] contacted me about my conduct file on [2023/12/08]", "I alleged a violation of the university's student records rules by Fitzwater, Frankel-Russell and Palser on [2023/12/14]", "the communications from those university employees connote that they understood my student record request was handled in a

way that violates university rules". Doe wrote on; "I think that [] Reed deliberately misled me during our meeting", "Reed told me that there was no time limit on my ability to pursue a Title IX investigation, whether pursuing an investigation within the university or pursuing an investigation with an office outside the university", "[a]lso, though I had made a point to refer to my issue as one based on sex", "at the end of our meeting Reed began to interject the word gender", "[h]e subsequently sent me" a "letter that said my issue was related to gender", "[w]hich I had him correct and resend", "[s]omething else important to mention was that Reed said that IEC doesn't investigate allegations of retaliation unless retaliation occurs during an IEC investigation", "[i]nitially" Doe "was hoping [] IEC could investigate [SCCS] being used as retaliation against me", "[m]y reading of IEC's rules was that retaliation was a valid reason to initiate an investigation". Doe continued writing; "[r]elatedly, on [2023/12/20] I emailed Fitzwater to see when he would send his outcome", "[h]e said that I was sent the outcome by email and text on [2023/12/18]", "[b]ut I didn't notice the text message nor the email", "I didn't notice, because that day" Doe "received a [notification] link for [the IEC Resolution] Specialist[]'s informal resolution", "[s]ubsequently, I received an email from [the IEC Resolution Specialist] contextualizing that letter", "[t]hen the next day on the morning of [2023/12/19] I received a [notification] letter from [] Reed", "I emailed Reed in the late afternoon to clarify how his email differed from [the IEC Resolution Specialist]'s", who "emailed back saying it was her same [notification] letter from the day prior", "[a]nyhow, the most important point; I was disoriented by the receipt of three [notification] letters", "over two days", "I only had five university days to respond to the [SCCS] letter", "[l]uckily I caught it in time due to my due diligence", "I formally request the parameters of my investigation be expanded to include those abetting [] Cochran's discrimination against me as well as other instances of discrimination on part of [] Cochran". Doe wrote on asking Shaver a series of questions. Then Doe wrote on with a broadened list of potential witnesses. Then Doe wrote on; "[r]egarding the scope of the existing investigation in the wake of [] Wymelenberg's defamatory, intimidating and retaliatory email sent on [2023/12/21]", writing; "Wymelenberg's email", "attempts to redirect focus away from [] Cochran's discriminatory acts against me", "Wymelenberg erroneously frames me in a false light by using vague and unsubstantiated allusions to 'concerns' regarding my behavior", "[i]n so doing Wymelenberg is insinuating that my presence within the program was an ongoing issue that predated my complaint to [] Cochran of discriminatory language on [2023/10/24]", "Wymelenberg's spurious communication is devoid of any evidence or specificity regarding its allusions to concerning behavior", "[i]t comes after" Doe "alleged discrimination on part of [] Cochran to IEC on [2023/12/11] and after I alleged misconduct on part of the office of conduct and NU system's staff in the mishandling of my student-conduct record request", "Wymelenberg was included in and aware of my allegations of discrimination and the allegation of records misconduct", "Wymelenberg is attempting to use the claim of concerning behavior as evidence of concerning behavior", and that "[g]iven the wide ranging scope of Wymelenberg's unsubstantiated claims that seek to frame me in a false light as a source of ongoing behavioral issues, it is appropriate to expand the list of interviewees within the scope of the established existing investigation". Doe wrote on offering a list of "applicable interviewees in the wake of [] Wymelenberg's erroneous and retaliatory communication and context as to the applicability of the

inclusion of said interviewees". Doe went on to offer numerous "[i]mportant documents and links". Doe ended his letter to Shaver, writing; "[p]lease let me know if there is any more documentation you would like me to provide at this point in time, what your thoughts are about my request to see this inquiry expanded, as well, please let me know what my next steps in this process are".

01/04 (09:20): Shaver replied to Doe's 01/03 (15:23) email, writing; "I'm writing to confirm that I've received your formal complaints of discrimination or abetting discrimination against the following individuals"; "Wymelenberg", "Julie", "Fitzwater", "Frankel-Russel[l]", "Palser", "Reed", "[a]nd additional allegations against [] Cochran", "I will proceed to the next step in our process and analyze the information provided", "I will be in touch".

01/04 (15:23): Fitzwater generated an export of the conduct case file form. That form was largely duplicative of the case creation form that Barefield had created on 2023/11/21, including the incorrect denotation of Doe's GPA from the prior semester being 0. However, the exported form featured a photograph of Doe's face at the topmost of the form, and there was a resolution information section that denoted that on 2023/11/30 Doe had a meeting at SCCS, the resolution date field was left blank, the resolution type field was left blank, the hearing officer(s) field was left blank, but the "Appeal Status" field denoted "No appeal filed", additionally the notes section where Fitzwater's meeting notes from Doe 'informal meeting' were, denoted that entry had been edited on 2023/12/08, and the notes section where Fitzwater's phone call from notes from Fitzwater's phone call to Cochran's on 2023/11/30 were, denoted that entry had been edited on 2023/12/18, the last section was a list of the content of the case file's electronic file cabinet, which featured numerous files, including Cochran's written complaint, Doe's emails about the SCCS process, Doe's PDF attachments, Doe's emails with IEC that Doe had included Fitzwater on, and lastly Doe's rejected SCCS resolution form.

01/05 (11:23): Doe emailed Fitzwater, copying Frankel-Russell and Barefield, writing; "I am following up on my appeal of the resolution from [SCCS] that had been sent [2023/12/18] and appealed [2023/12/20]", SCCS "said that I was to receive that email the first week of [2024/01] and that my hearing was to be scheduled", SCCS rule's state "I w[ill] subsequently have the chance to provide my evidence and a list of intended witnesses", SCCS rule's "also s[tate] that pending the decision of the hearing I could appeal the decision to the Vice Chancellor for Student Affairs", "[t]oday, [2024/01/05], I request", one, "the date of my hearing", two, "the office of conduct resolution that lists the charges against me that I had appealed on [2023/12/20]", three, "the evidence [SCCS] intend[s] for use at the hearing", four, "the intended witnesses of the office of conduct", and, five "the contact information of the person I am to reach out to regarding my evidence intended for the hearing as well as my intended witnesses".

01/05 (11:25): Doe email Frankel-Russell, writing; "I am following up on my request for an advisor from the office of advocacy for my office of conduct appeals hearing", "[w]hen we had last spoke over

the phone on [2023/12/20]" Frankel-Russell said "[Frankel-Russell] could be my advisor during the appeals hearing", "[w]hen I asked if you had done that before you said no", "[w]hen I asked if there was another office of advocacy employee who had done that before you had said that you could inquire", "I had asked that you do so and that if it was a possibility that said office of advocacy employee reach out to me about functioning as my advisor during my appeals hearing", "[a]s of today", "I have yet to hear from any staff at [SAS]", "I am reaching out to reiterate my stated request to be contacted by an SAS employee". (11:23): Frankel-Russell's email replied to Doe, writing; "[t]hank you for your message", "I am out of the office", "[f]or immediate assistance, please email [SAS]@unl.edu or call [phone number]". (11:59): Frankel-Russell's replied to Doe, writing; "[SAS] was closed last week and many of my team members are out this week as well", "I did confirm that neither of my team members have served as an advisor in a conduct appeal hearing", "I am still happy to serve in this capacity for you".

01/05 (13:14): Fitzwater replied to Doe's email (11:23), writing; "[a]s indicated in the email that you received from [] Barefield on [2023/12/21], the hearing will be scheduled in January, and we will notify you once we have confirmed the availability of the Hearing Board", "[w]e are currently working to confirm that availability", "[w]e are required to have faculty representation on the Board, and most faculty are currently off contract during the break period, which means we must wait for them to return", "[t]he earliest that we could have a hearing would be the first week of classes, but again, that will depend on the availability of the Board members", "[r]egarding the information you requested, we will send you a hearing notice when the date and time of the hearing have been set", "[t]hat notification will also provide you with the details on inspecting the other information you have requested as outlined in the [] Code of Conduct", "[t]he notice will be sent at least 5 University days prior to the scheduled hearing", "and you will be able to inspect the information no fewer than 5 University days prior to the hearing", "[r]egarding the evidence and witnesses you intend to present at the hearing, I will be the person that you send that information to no fewer than 2 University days in advance of the hearing". (14:26): Doe replied to Fitzwater, copying Barefield, Frankel-Russell and the UNL SA Vice Chancellor, asking; "[i]s the Conduct Officer required to pass along all of the Respondent's evidence and witnesses to the Hearing Officer or Chair of the Conduct Board", "[h]ow are Respondent's witnesses contacted", "[d]oes the University Day extent to 23:59", and "[i]s [UNL] Vice Chancellor for Student Affairs [] the Appeals Officer".

01/05 (14:31): Doe replied to Frankel-Russell's email (11:59), writing; "[t]hank you for your prompt reply despite your automated message stating that you are out of the office", "I appreciate that", "[f]or the time being I will plan on your presence at my conduct appeal hearing", "[o]ne follow-up question for you based on what we had discussed on the phone on [2023/12/20]", asking "are you certain that you don't have access to my student conduct case file".

01/05 (14:54): Wymelenberg email Doe, replying to Doe's 12/21 (16:00) email, copying Hope, Ankerson, Barefield, the UNL Chancellor, Counley, Fitzwater, Frankel-Russell, Pearce, Tang and Wood,

writing; "I received your email", "[m]y inclusion of the university offices and supportive resources available to you was simply for your knowledge and awareness, not a suggestion for any need of permission to access these offices and resources".

01/05 (18:18): Frankel-Russell replied to Doe's email (11:59), writing; "[y]our conduct file is held with the Office of Student Conduct and Community Standards which is not the department I work in".

01/08 (08:00): Doe replied to Frankel-Russell's 01/05 (18:18) email, blind copying Shaver, writing; "[t]hank you for the clarification".

01/08 (14:36): Fitzwater replied to Doe's 01/05 (14:26) email, answering; "[SCCS] will add any information that you provide to a separate section of a hearing packet that will be shared with the Chair and Members of the University Conduct Board", "[Doe] is in charge of contacting [his] own witnesses and arranging their presence at the hearing" and "[w]itnesses will be asked to wait in the Zoom waiting room until they are called into the hearing" and "[w]hen they are called into the hearing, [Doe], [Fitzwater], and Board will have opportunities to ask the witnesses questions", "[a]fter the question-and-answer period is over, the witness will be dismissed from the hearing", "[t]he term 'University Day' means a weekday on which the campus offices are open" and "[w]hile the Code does not include a specific time, a University Day would include the times that University Offices are typically open ([0]8:00[]-[17]:00[])", and that "[y]es", the "Vice Chancellor for Student Affairs, is the Appeals Officer", which "would be the person [Doe] would contact after you have been notified in writing of the Board's decision if you wish to appeal the outcome of the hearing". (16:34): Doe replied, copying Barefield and the SA Vice Chancellor, and blind copying Shaver, writing; "[t]hank you for the clarifications".

01/10 (13:31): Shaver emailed Doe a formal IEC notification, writing; "[t]he purpose of this letter is to notify you of the disposition of the formal complaints you have filed with our office in your email dated [2024/01/03]", "IEC investigates sexual misconduct, discrimination, and harassment based on or because of an individual's protected status, as well as retaliation against an individual making a report or otherwise participating in an investigation or proceeding under the nondiscrimination policy", "[c]onversely, IEC must dismiss complaints alleging conduct that, even if true, would not violate the nondiscrimination policy", defining the "applicable definitions" as follows, "[d]iscriminaton"; "harmful, differential treatment of others based on a status that is protected", "[h]arassment"; "unwelcome conduct that is based on an individual's protected status or statuses, and", "[e]nduring the conduct becomes a condition of continued employment or enrollment, or", "[t]he conduct is severe or pervasive enough to create a work or educational environment that a reasonable person would consider intimidating, hostile, or abusive", and "[r]etailiation"; "intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with any right or privilege secured by law or policy". Shaver wrote on; "formal complaints based on some of the additional concerns you [2024/01/03], will be

64

dismissed", "[t]his means the current investigation will not be expanded to include the following individuals or concerns related to them", "these dismissals do not prevent you from submitting your concerns", "I offer suggestions" of who "may be appropriate for addressing some of your concerns". Regarding Wymelenberg, Shaver wrote; "[y]ou allege that [] Wymelenberg abetted [] Cochran's discrimination, and that is based on a letter sent to you from [] Wymelenberg via email on [2023/12/21]", "[t]he letter lists concerns raised about you (the accuracy of which you dispute), and it provides guidance and expectations for future semesters", "[f]or the purposes of this analysis, I take it to be true that the letter's concerns about you are not accurate", "[e]ven so, the letter and explanatory information you provided do not support a reasonable inference that the letter was sent to you based on or because of a protected status", "[f]urther, even if we assume it was sent in retaliation due to you initiating a grievance with our office under the nondiscrimination policy, the letter does not result in any adverse action for you", "but instead provides guidance for future conduct and encourages you to continue to work with and utilize IEC", "[t]he communication does not interfere with any right or privilege secured by the nondiscrimination policy", "[t]herefore, your complaint against [] Wymelenberg is dismissed", "[i]f you have concerns that [] Wymelenberg engaged in unprofessional or other concerning behavior, you may raise those with the [UNL EVC Associate Vice Chancellor Chris Marks (Marks)]". Regarding Julie, Shaver wrote; "[y]ou suspect that one of the complaints [] Wymelenberg raised in his letter to you was coordinated by Julie [] and [] Cochran, that [Julie]", "engages in debate and critiques the merits of others' ideas", "[y]ou also suspect that [] Cochran and Julie [] caused the classroom culture to be monitored and managed and that they are trying to get you kicked out of the program", "[y]our allegations regarding Julie [] do not support a reasonable inference that any of her actions were based on or because of a protected status", "[y]our complaint against Martin is therefore dismissed". Shaver reached this determination despite Cochran's written complaints to IEC on 2023/11/13 that explicitly stated that gender was an issue that Cochran perceived between Doe and Julie, and that explicitly stated that Cochran was communicating with others in the CRP program regarding Doe on the basis of protected status. Though Doe was not yet aware that Cochran sent duplicative complaints to IEC and SCCS, nor was Doe yet aware of all of the content that Cochran had included in her complaints to SCCS and IEC. Regarding Frankel-Russell and Fitzwater, Shaver wrote; "[y]ou allege that Fitzwater intentionally referred you to the wrong attorney in the [NU] General Counsel's office and coordinated your receipt of a communication from [SCCS] to occur while you were in class", "[y]ou also allege that Frankel-Russell knew Fitzwater was lying about the attorney you were referred to, chose not to say anything, and lied about knowing whether she could access your file", "[e]ven if we assume those allegations are true, nothing indicates that those actions were done because of or based on a protected status", "[y]our complaints against Frankel-Russel and Fitzwater must therefore be dismissed", "[y]ou may take concerns about [] Frankel-Russel's conduct to the [UNL SA]Vice Chancellor []", "[y]ou may take concerns about [] Fitzwater's conduct to [] Barefield". Regarding Reed, Shaver wrote; "[y]ou allege that [] Reed engaged in deceitful behavior by", one, "using the word 'gender' instead of sex in a conversation and in the outreach letter", two, "discussing timeframes in which a formal complaint could be filed", three, "indicating IEC would not investigate retaliation", and

four, "sending email communication via [the notification system] to you that coincided with communication you received from [SCCS]", "[b]ecause Reed is a member of IEC's staff, IEC should not evaluate or investigate allegations against him", "[i]nstead, if you believe [] Reed has engaged in discriminatory conduct or has otherwise violated university policy, you should present your concerns to the [NU] System Compliance Officer, Drew Nielsen [(Nielsen)]". Regarding Palser, Shaver wrote; "[y]ou allege [] Palser was", one, "in on Fitzwater's decision to refer you to Palser for your records request knowing Palser was not the correct person" and two, "did not respond to your request", "IEC is not the appropriate office to address or investigate complaints against Palser", "Palser is an employee of the University of Nebraska System, not UNL", "IEC investigates complaints made against UNL students, staff, and faculty", "[t]o pursue your concerns against Palser, you should present them to [] Nielsen". Regarding some of Doe's additional complaints about Cochran, Shaver wrote; "[a]dditional allegations against [] Cochran: In your [2024/01/03], email, you allege that [] Cochran retaliated against you by reporting you to [SCCS] after you complained", "[f]or present purposes, I take it to be true that Dr. Cochran reported you to [SCCS] because of your complaint", "[h]owever, [] Cochran's report to [SCCS] occurred before you filed a complaint or engaged in our grievance process, and there is no information that would support a reasonable inference that her report to [SCCS] was for the purpose of interfering with the right to be free from discrimination or your right to make a report or otherwise participate in the nondiscrimination grievance process", "[t]herefore, your complaint that [] Cochran retaliated against you by reporting you to [SCCS] will be dismissed", "[i]f you feel that [] Cochran made a false report about you because of your complaint", " you should submit your concern to [] Marks". Shaver reached this determination despite Cochran's written complaints to IEC on 2023/11/13 that explicitly stated that Cochran thought that Doe's 2023/10/24 complaint to her that she might be speaking to Doe in a stigmatizing manner, as a male, in front of his peers, was sarcasm. As well Shaver reached this determination despite the email that Schuldeis sent Shaver on 2023/11/27 (13:47) wherein Schuldeis wrote to Shaver that Cochran told Schuldeis that Cochran thought that Doe was "becoming increasingly aggressive towards females", though Doe was not yet aware of that email. Addditiaonlly, Shaver reached this determination despite the screen grab Doe sent to Shaver of the email he sent Cochran on 2023/10/24 (15:51) wherein Doe expressed his complaint to Cochran that she was speaking to him in front of his peers in a sexist manner. Shaver wrote on; "[t]here are, however, additional allegations you have raised against [] Cochran that will be included in an Updated Notice of Allegations", "[t]he updated notice will include the previous allegations you raised, as well as the following new allegations that Dr. Cochran engaged in the following conduct based on your sex", "Cochran declined to sign a memorandum of understanding that you be acknowledged by name" in "her pending publication submission", and "Cochran declined to provide you an assistantship you had expressed interest in, and instead filled it with a colleague's wife".

01/11 (13:21): Doe emailed Shaver, asking; "[w]hat date and time did Dr. Cochran make the report to [SCCS]", "[a]re the contacts within the [2024/01/10] [IEC notification] letter the exactly correct person(s) for me to contact to formalize my allegations against those specific person(s)", as the link in

the notification to IEC process did not work "[w]hat is the web address to navigate to for more information about the appeal process", "[w]ill all of [Doe's potential witnesses] be contacted to request an interview from", and "[c]an IEC investigations be initiated due to allegations of retaliation".

01/12 (10:00): Shaver replied to Doe's 01/11 (13:21) email, writing; "[t]he information you provided stated that you received communication from [SCCS] on [2023/11/21]", "[y]ou first contacted IEC via an email to [] Pearce on [2023/11/27] and filed your formal complaint with IEC on [2023/12/11]", "I have not investigated the date and time [] Cochran made a report to [SCCS]", "[t]he contacts I have referred you to are who I understand are the appropriate individuals to receive your concerns", "[i]f my information is outdated, I suspect they can connect you with the correct individual or unit", "[i]t is not my intention to mislead you", "I apologize for the link not working", "[t]he link should have taken you to the nondiscrimination policy, available here: [link]". Shaver wrote that the dismissals in her letter were a "particular type of dismissal" which could be found "under (J)" in IEC's nondiscrimination policy. Section J stated that a complaint may be dismissed if information comes to light that clearly and plainly establishes that the complaint cannot be proved. Doe would later be told by Pearce that it was IEC's practice to not provide evidence that IEC had gathered to complainants to inspect and review when complaints were dismissed under section J. Doe would also later come to find out that federal Title IX regulations require Title IX offices to provide an opportunity to inspect and review any evidence obtained as part of the investigation in order for complainants and respondents to meaningfully respond to. Though, at this point in time, Doe was not yet aware of IEC wholly unwritten interpretation of "J". Nor was he aware of the requirements contain with the federal Title IX regulations. Shaver wrote on; "[t]he witnesses you identified in your email on [2024/01/03] regarding your allegations against [] Wymelenberg will not be contacted to be interviewed regarding the allegations against [] Wymelenberg due to the dismissal", and "[r]egarding your question about retaliation, yes, IEC will investigate intimidation, threats, coercion, or discrimination that was done for the purpose of interfering with a person's right to invoke our process or because the person engaged in our process".

01/12 (10:13): Fitzwater emailed Cochran, writing; "I wanted to follow up on our conversation earlier this week regarding your participation in the upcoming University Conduct Board Hearing", "I understand that you do not wish to participate directly in the Hearing", "[a]s an alternative, you could submit in writing a statement of impact related to the information that you have reported", "[t]he documentation you provided in" the "incident report" will "be included as part of the hearing packet, but this would provide you with an opportunity to add anything you feel would be relevant for the Board to know", "[t]his statement could include things like how the structure of the course was changed, impact on you personally, observed impact on other students in the course, or other similar information you would want made available to the University Conduct Board", "[y]ou can submit this statement as a direct reply to this message, or as a separate attachment", "[w]e will proceed with scheduling the Hearing at this time with a tentative date for the Hearing of Monday, [2024/01/29]", "[i]f you do wish to participate directly in the Hearing, please let me know", "[p]lease let me know if you have any

questions". (13:21): Cochran replied to Fitzwater, asking; "[w]ill [Doe] have access to this statement, or just the members of the Board". (15:26): Fitzwater replied to Cochran; "[t]o answer your question, yes, [Doe] would be able to review any statement that you would submit", "[i]t would be included as part of the Hearing Packet", "[p]lease let me know if you have any other questions".

01/12 (16:12): Cochran emailed Barefield, writing; "I've been in communication with [Fitzwater] about the University Conduct Board hearing", "[a]s he may have passed on, I have a lot of hesitations about interacting with [Doe] in the context of the hearing or otherwise", asking "I'm curious whether you could give me a call soon to discuss". Going on to write; "I want to be helpful, but I am also very concerned for my own safety and well-being", "I'm at [phone number]", "[t]hank you, and [sic] talk soon". (18:24): Barefield replied to Cochran, writing; "I'm happy to talk to you", "[Fitzwater] and I have discussed the hearing for the case and the potential that you may choose not to participate", "I want to follow back up with him first to see if there is anything else I need to know before I talk with you", asking "[w]ould it be possible for me to give you a call on Tuesday at 8:30 [] or 9:00 []". Going on to write; "[i]f those times wouldn't work let me know an alternative time that would work better for you Tuesday morning".

01/15 (07:55): Doe emailed the NU Records Director, blind copied were the UNL SA Vice Chancellor, Ankerson, the UNL Chancellor, Hope, Pearce and Shaver, writing; "I requested my student conduct case file [number] on [2023/12/01]", "[i]t has been 45 calendar days".

01/15 (08:00): Doe's email sent to Marks, copied were the UNL SA Vice Chancellor, Ankerson, the UNL Chancellor, Hope and Pearce. Doe noted his program, and that he was "reaching out to respectfully allege that [CoA] Dean [] Wymelenberg [] has engaged in unprofessional behavior". Doe wrote that "Wymelenberg did so by directly defaming my professional reputation as a graduate student at the expense of an ongoing university investigation, of which Wymelenber was aware". Doe went on to offer a robust timeline and links to many screengrabs to bolster the veracity of his claims.

01/15 (08:05): Doe's email sent to Barefield, copied were the UNL SA Vice Chancellor, Ankerson, the UNL Chancellor, Hope and Pearce. Doe introduced himself, noted his program and then stated that he was "reaching out to respectfully reiterate my allegation that [SCCS] [Assistant] Director [] Fitzwater [] knowingly engaged in decidedly unprofessional behavior that broke university rules and endangered the professional well-being of other university employees". Doe wrote that "Fitzwater did so by choosing to refer me to the wrong university employee, in violation of university rules", "Fitzwater did that in front of a separate university employee, thus potentially imperiling their professional well-being", "[a]swell, despite contacting Fitzwater after the fact for clarification, Fitzwater never corrected his deception". Doe went on to offer a robust timeline and links to many screengrabs to bolster the veracity of his claims.

01/15 (08:10): Doe's email sent to the UNL SA Vice Chancellor, copied were Ankerson, the UNL Chancellor, Hope and Pearce. Doe introduced himself, noted his program and then stated that he was "reaching out to respectfully reiterate, and relay for the first time to you, my allegation that [SAS] Director [] Frankel-Russell [] has knowingly engaged in unprofessional behavior that is detrimental to advocating for, and supporting, myself as a graduate student", "[A]swell, to note that Frankel-Russell's unprofessional behavior has recently recurred and become decidedly more intense in its severity". Doe wrote that "Frankel-Russell did so by choosing to not inform me that I had been deceived by another university employee, despite being present and aware that I was being deceived", "[a]swell, Frankel-Russell's deceitful complicity recently changed from a passive issue to an active issue when they explicitly lied on two occasions about their ability to advocate for, and offer support, to me". Doe went on to offer a robust timeline and links to many screengrabs to bolster the veracity of his claims.

01/15 (08:15): Doe's email sent to Nielsen, copied were the UNL SA Vice Chancellor, Ankerson, the UNL Chancellor, Hope and Pearce. Doe introduced himself, noted his program and then stated that he was "reaching out to respectfully allege that [IEC] Case Manager [] Reed [] has engaged in decidedly unprofessional behavior". Doe wrote that "Reed did so by knowingly lying about university procedures, as well as knowingly lying about the procedures of off-campus offices, and knowingly misrepresented the words I offered him during my interview with the [IEC]". Doe went on to offer a robust timeline and links to many screengrabs to bolster the veracity of his claims.

01/15 (08:20): Doe's email sent to Nielsen, copied were the UNL SA Vice Chancellor, Ankerson, the UNL Chancellor, Hope and Pearce. Doe introduced himself, noted his program and then stated that he was "reaching out to respectfully allege that [NU] Office of General Counsel Vice President [] Palser [] has engaged in unprofessional behavior". Doe wrote that "Palser did so by knowingly neglecting university rules". Doe went on to offer a robust timeline and links to many screengrabs to bolster the veracity of his claims.

01/15 (08:25): Doe's email sent to Marks, copied were the UNL SA Vice Chancellor, Ankerson, the UNL Chancellor, Hope and Pearce. Doe introduced himself, noted his program and then stated that he was "reaching out to respectfully allege that [CRP] Assistant Professor [] Cochran [] has engaged in unprofessional behavior at the deliberate expense of my professional well-being as a graduate student". Doe wrote that "Cochran did so by making erroneous misconduct complaints against me to the [SCCS] in retaliation to a complaint I had made". Doe went on to offer a robust timeline and links to many screengrabs to bolster the veracity of his claims. (08:44): Ankerson forwarded Doe's email to Marks, copying Walker, writing; "[j]ust want to let you know that [Walker] is continuing on this case - please just forward anything to her". (11:45): Marks replied to Ankerson, copying Walker, writing; "[u]nderstood", asking "[s]hould I acknowledge receipt of his email or simply not respond".

01/15 (10:00): The NU Records Director emailed Doe, writing; "[a]s you are aware from previous discussions, the University is in receipt of your below request for access to documents comprising the case file in your pending student conduct matter", "[t]he University has compiled those documents and you may access them at the link embedded below", "[y]ou will receive a message under separate cover with a link documents responsive to your separate, pending FERPA request related to faculty email messages". The NU Records Director fulfilled Doe's 12/01 (16:23) FERPA request to Palser for Doe SCCS case file.

01/16 (07:00): Marks replied to Doe's 01/15 (08:25) email, copying Walker, writing; "[t]hank you for your email", "[m]y predecessor in the [E]VC role, [] Walker, is still handling some items while I am getting onboarded into the position", "[f]or continuity, [] Walker will remain your point of contact with the EVC [] on this matter". (10:48): Walker replied to Marks and Doe, writing; "I have received your email", "[w]e will wait to hear the outcomes of the ongoing IEC investigations and your upcoming hearing with [SCCS] before determining how to proceed regarding your concerns below".

01/16 (12:37): Frankel-Russell sent Doe a 'High importance!' email, writing; "I hope this email finds you well", "I was notified this morning by my supervisor, [the UNL SA Vice Chancellor], that you have filed a formal complaint against me", "[a]s a result, I have been instructed to inform you that I am no longer allowed to serve as your advisor for the upcoming hearing", "[f]or questions about the hearing process, please contact the [SCCS]".

01/16 (13:57): Fitzwater emailed Doe with the formal notification system. Contained was a SCCS letter informing Doe "of a hearing regarding an alleged incident occurring on or about [2023/11/07] at UNL [] Architecture Hall in which you deleted other students' work from a group assignment and disrupted the classroom environment by being argumentative toward faculty and other students related to coursework", "[a] copy of the incident report that was received from Faculty Member is attached to this letter", "This conduct may be in violation of the [] Code of Conduct", and was claimed to be based on the "reporting faculty", Doe and another student. The letter wrote on "[t]his matter has been referred for a hearing, which is an opportunity for all parties to be heard before the University Conduct Board", "[t]he hearing is scheduled for Monday, [2024/01/29] at [13]:00 [] by Zoom". A long list of 54 "members of the campus community" were listed as possible hearing board members. And it was noted that "[t]he University Conduct Board Chairperson will be Toni Anaya [(Anaya)] and [she] [is] a University Faculty Member". The supposed "incident report" as Fitzwater referred to it, were subsections of Cochran's written complaint she submitted 2023/11/13 to SCCS. It was largely comprised of the sections wherein Cochran wrote of Julie being distressed by Doe and Cochran's fabricated transcription of an email from Morgan, "Response to [Doe]".

01/16 (14:22): Doe emailed Fitzwater, copying the UNL SA Vice Chancellor and Anaya, requesting to come a physically review the material SCCS was planning on using at Doe's conduct hearing. (14:44):

Fitzwater replied, copying Barefield, writing that the information would be available for "inspection" on 2024/01/22, but that Doe would have to call SCCS to schedule a time to review the printed information. Noting that Doe "may not take photos or make copies of the information".

01/16 (14:55): Shaver emailed Doe and Cochran a formal IEC notification. It updated the notice of allegations to include Shaver's two addition charges from her determination on 2024/01/10 (13:31) to the three prior charges from IEC issued on 12/15 (14:31).

01/17 (15:24): Frankel-Russell created a BIT behavioral review case on Doe. BIT is a sub-office of SAS, and the two offices are essentially synonymous, as BIT, to Doe's knowledge, only has one employee, its director, Frankel-Russell. Some of the BIT case file was similar to the case creation and case file forms created by SCCS. For instance, the topmost case file form featured a photograph of Doe's face, and the demographics section still featured someone that was not Doe's advisor as being Doe's advisor. However, there were some important differences to the demographics section. Within the "Risk Level" field Doe was now coded as "Moderate". Doe would later come to learn that NU records retention policies are such that risk assessments are a permanent record. Different as well, the GPA for Doe's prior semester was still incorrectly recorded as 0, but Doe's cumulative GPA was now incorrectly recorded as 0 too. Failing grades are grounds for withholding a student's financial aid. Within the incident section, there was no incident date, nor time, nor location. The "Reported By" field denoted that it was reported by Frankel-Russell. The "Clery Reportability" field was still left blank. The "Reason" field denoted "Unspecified at case creation". Within the resolution section, the "Issues" field denoted "Student of Concern" and "Academic Concern". Doe would later learn that both safety and academic concerns are broadly defined and liberally interpreted grounds upon which university officials can bypass students' privacy. Some student-privacy scholars criticize the carve outs in the federal student privacy statutes. The "Incident Description" on the case creation form had written; "[Doe] is currently working with the SCCS and is therefore entitled to an advisor throughout this process", "SAS is listed as a possible advisor and he contacted SAS to fulfill this role". The notes section on the case file form had written that the electronic filing cabinet "contains all communication with the student", "[Doe] filed a formal complaint against [] Frankel-Russell and therefore she will no longer serve as his advisor in the upcoming hearing", "case closed". The electronic filing cabinet featured all the files that the SCCS cabinet contained, in addition to all of Doe's emails Frankel-Russell had been included on, as well as Wymelenberg's 12/21 (14:41) email that had expressed broad academic concerns about Doe, and Doe's 12/21 (16:00) email alleging that Wymelenberg's 12/21 (14:41) email was an erroneous and retaliatory communication. (15:30): Frankel-Russell closed the case.

01/16 (15:41): Doe emailed Shaver, inquire if the two might Zoom to review the contents of the NU Records Director's FERPA fulfillment of Doe's 2023/12/01 request for his SCCS case file. (15:57): Shaver replied to Doe, sending a Zoom link.

01/16 - IEC (~16:00): Doe Zoomed with Shaver. The records fulfillment contained the SCCS case creation form and most of the contents of the electronic filing cabinet. At this point in time Doe was unaware that Cochran had sent the same written complaint to IEC that she had sent to SCCS. While reviewing the case file Doe noticed that Kuenning had been listed as a witness, Doe said "Kuenning, as a sidenote, is um, if I remember correctly, she is thee, um, secretary, and the person that handles various files that students submit", "she's the one that people requests their permission codes from, they're registering for courses", "she was not in the classroom on that date", 2023/11/07, "I don't understand why, why that is being stated like that, there, that [] Kuenning the director for advising students, it says, at the [CoA], that, that, they have also been present for 'interactions slash events detailed', they weren't, I mean, the only time I had ever been in the presence of, um, Kuenning, was when I first, the first, the first or second week, of fall semester", "I went down with [] Tang to Kuenning's office to, to let her know that I was transferring into the program, that he let her know, um, she should make the necessary arrangements with thee, um, office of graduate studies, so that, that I could transfer in, and I think there was one other occasion, um, a semi-formal, ah, gathering for students that were getting ready to register for courses next semester, um, this would have been kind of early on, she dropped in for just a short while to say hello, but, but those, insofar as her collective presence, were the only instances wherein I was in Kuenning's presence, so I'm very perplexed that, that, that it's being said here in this document that she was a witness to anything, ever, um, just as a sidenote". Doe went on to say that "none of these dated, these date serial codes on these attachments correspond to a time prior to my [2023/10/24] email, and I'm not reading in the document here, and state that for the audio recording, um, but I think that's worth noting, because the 24th was when I sent that email, you know, asking [] Cochran, you know, not to make stigmatizing insinuations about me", "this, this complaint, which I assume it was the initiating complaint, to the office of conduct, this was made on [2023/11/13], so it would seem, you know and I'm offering my, my interpretation here, take what you will, you know, I would characterize this as the initiation of the retaliation". Doe went on to say "I'm sorry to prattle on there, but, you know, I'm very happy to see this, because this, this, this is what was happening, right, like I, you know, I think she started building a case as soon as, like, [2023/10/24], and um, but also, Kuenning, I don't know why she's included". Shave interjected, "[Doe], could I interrupt you for a second, I don't know that I'm going to be able, that I'm going to have the time, for us to read through every, through all 27 documents, all of the content, so I wonder if it might be helpful if you click through them and kind of talk about, like, the heading, and kind of summarize what the document is, and then go through them more thoroughly, like, on your own, because, I won't be able to, I hope you understand that, I won't be able to sit- to read through all 27 of them". Doe replied, "certainly, certainly, and I apologize if I was breathy". Doe asked Shaver if they should talk about the two new charges against Cochran that had been added to the previous three. Shaver said, "if you want to talk about, that now we can, but I know that we're going through these documents, we can also set up, like I mentioned previously in my email, we can also set up another time to talk about those two new allegations". Doe read on, noting that Cochran had made mention of the CRP RSO social gathering on 2023/11/03. Doe told Shaver that present were "Morgan [], Julie [], and Jerry", "I think, um, [] Cochran must be referencing that, sort of social mixer, which she

was not present for". Doe read on that Cochran wrote that Doe was "'engaging in an unusual confrontational conversation regarding professional ethics in planning'" at the gathering, Doe said "ok so, like, [] Cochran's pulling in this, like, social stuff, from like, programees, that are students, um, which, this is, this is new to me". Doe read the portion of Cochran's written complaint related to the meeting after the client course that Cochran had with Julie about working in a group with Doe, "'there was a meeting on [2023/11/07] that was very emotional'", and "they 'felt sick with frustration and anxiety from having to interact with [Doe]', um, evidentially this was just [] Cochran and this, this particular student, and 'they expressed feeling as though learning had been sig, significantly disrupted by [Doe]' and 'feeling as though somebody had check out or disengaged from the course's primary assignment because they no longer felt comfortable interacting with [Doe]'" Cochran "'asked [] Kuenning to come and speak with [Cochran] and [Kuenning] described resources they might choose to utilize, direct', ok, oh, 'how they might file reports with either Student Affair', aah, 'or the university Title IX office', um, wow, ok, so evidentially there was talk of this Title IX thing, um, ok, so that's document four, um, I, I disagree with all this by the way, I do, I do think that Julie is, ah, Julie and [] Cochran, both did not like me, and all this is, like, bad-faith false light framing of me". Doe moved on to reading some of his case creation form, "I'm assuming this is when Fitzwater, um, made, began the process", "it's background information about me", "date of birth, ah, program", "academic advisor, that's actually not my academic advisor". Shaver noted that it was a case creation form. Doe asked if he should skip to the next document and Shaver confirmed. Doe read on "ok so, it looks like, um, [] Cochran and [] Barefield, who is the person in charge of the office of conduct, were corresponding on [2023/11/21], um, and, November 21st, and then, well what happened on November 21st? That would have been, that was the day I received the [SCCS notification] letter", "and so, um, this would have been [] Cochran reaching out to the office of conduct", "so my, my intuition, I suppose, was, was correct, that that played a, a, role in the timing of when I received my [] letter". Shaver was short on time, so Doe and Shaver planned on meeting on Zoom the next morning at 09:00. Doe asked what he should prepare for the meeting, and Shaver said that they would speak about the two new charges against Cochran.

01/17 (~09:00): Doe had his morning Zoom meeting with Shaver regarding his two new charges against Cochran regarding failure to sign an MOU and failure to promote Doe to a salaried research assistantship. Shaver said she "found your MOU, I don't know if you prepared it, or how it was prepared". Shaver asked to know about the discussions that Doe had with Cochran regarding publication acknowledgements. Doe said that he had communicated to Cochran his desire to be able to work toward named credit for the research work he was working on with Cochran. Doe said that "at times [] Cochran was open to that", "but was always kind of vague", which "was frustrating" for Doe. Doe said that "the 24th was when [] Cochran actively started to attempt to get me kicked out of the program, segregated from the rest of the student body, ah, I, I more acutely appreciate that that was very much the case after reviewing my student conduct case file, but that's something different I suppose". Shaver asked what Doe met by "vague". Doe said "I do think that the unwillingness, ah, or I suppose the tendency to vacillate between openness and not open to including me in some capacity, in a publication, I do think

there was a sex based, um, reluctance there", "because prior to starting this internship, I believe on [2023/10/03] either our class session on [2023/09/26] or October 3rd, um, you know, when I had asked [] Cochran what [] Tang had told me, which was she did have paid work available, she had brought up to me toward the end of one of those class session that, um, ah, she had mentioned something to the effect that there was some sex based disparity amongst graduate students, um, oh, a, what it was, was that she had said that she was surprised to see that there were more females than males in graduate school, and, um, I'm a, I'm aware of that, ah, and I, I said 'well yeah, hasn't it been the case that there been more female graduate students than male graduate students writ large for, like, the past two decades'? um, and so, that, that comment that, ah, sex-based observation came up early, and, and Gabe and Freddie were there for that conversation, it was toward the very tail end of one of those two class sessions where she had brought up that sex-based observation, and then after I had said that to her, she had said to me, 'well, I noticed with faculty that there, there seems to be more males than females', I'm totally paraphrasing with that, that's not exactly how she said that", "so, you know, this sort of, like, sex-status consciousness, um, came up early, and she brought that up of her own volition", "but that is not your question, I apologize, what was your question again?" Shaver said "no, that was helpful". Shaver went on to ask about Cochran being "vague" and "noncommittal" regarding the naming of Doe for publication. Doe said he wanted Cochran to give him a threshold for what Doe would need to contribute to research in order to have his name included on a publication submission. Doe said that he thought that it may have been Cochran's intention from the start not to include Doe's name in any publication. Doe said that he had been "vocal early on about maybe the internship work maybe working its way to becoming an assistantship". Doe said, "I think maybe the unwillingness to give me, like, some sort of threshold for how I might be included in the research was also part of their, ah, intent never to consider me for an assistantship". Shaver asked if Cochran ever confirmed that she would name Doe in a publication. Doe said that toward the end of the internship when he had brought it up that Cochran said "sure, or, er, it wasn't quote-sure-unquote, you know sh- she had said that she was open to that, she was ok with that, um, and so, after that- well and then I asked, 'would you be ok with formalizing that, um, understanding', and I wanted to formalize it in some capacity because, you know, I'd was growing, you know, I was beginning not to trust [] Cochran, um, and she said 'yes'". Doe went on to tell Shaver that he had reached out to SLS and that he was told that associate professors can't sign contracts, so that was when Doe drafted an MOU, "which is a formal document", and on "[2023/11/21] during that class session where, um, you know, I'd gotten that [notification], um, from the office of conduct, which was a very jarring experience, but, um, later on in that class session, after I had sent my email to the office of conduct saying that I thought that the, the misconduct allegations were retaliatory, later on during that class session, I'd given that memorandum of understanding to [] Cochran, and when I did that, if memory serves me, I do believe that it does, I think that, um, sitting beside her was [] Tang and I believe [Doe's faculty advisor], and also sitting in front of her was, um, if memory serves me and do believe that it does, was, ah, Julie [] and Morgan [], and I gave, I gave her that document, and I signed and dated it, and I said 'you know, I know we had talked about formalizing the understanding that I be acknowledge'" by "'name'", "'this is a [MOU] this is not a contract, um, could you sign this, sense

you'd said that you were willing to formalize thee, thee understanding', and she said that, ah, she needed to look at it first, um, and that she would get back to me about it, and she did via email and that, that email is included with those other documents within my archive, all of those emails that I'd sent" to Shaver. Doe said that "she declined, she declined to do that". Shaver asked why Doe thought that Cochran had declined to sign the MOU, Doe said that "my forthright willingness on [2023/10/24] to address, um, her stigmatizing insinuations in front of my classmates", "I think that is the reason why". Doe also noted that around the time that Cochran had mentioned sex disparities among graduate students and faculty members, Cochran also "had sent me one or two pieces, um, that was about Institutional Caste System Theory, which I'm not sure if you've heard about Institutional Caste System Theory, it's like, an established concept in, as academics like to say, 'the' literature, but it's essentially these network analyses that show that, like, a handful of universities, um, and, and by that I mean, like, larger public universities, not necessarily Ivy League schools, where most of the research that gets published is authored, and most of the teacher tenure track faculty get their letters from, and, and she had sent that to me, and that, that email I'm pretty sure is in that longer folder I'd sent, and that kind of bothered me, because I felt like, she was trying to be, like, a little intimidating, like, 'hey you're at UNL buddy, I come from UC, and ah, you know, ya, ya, you got to go to UC if you want to get published and, you know, be a professor someday', I did not care for that, I feel like that was ultimately being intimated, with, with sending me that". Doe said, "when she had told me about that verbally, um, ya, you know, it, it, it was kind of this catty sort of like, um, jab, you know, it's like; 'I don't mean to scare you, but ah, you know I just got done reading this piece that, ah, you know, about how, how, you know, it's really hard to go anywhere unless ya, you go to UC where I went, yadadadada'". Doe said, "that was kind of like the tone". Shaver said they felt they had covered that allegation, so she moved on to the sex employment discrimination allegation. Doe added quickly that Doe's efforts to obtain co-authorship was something that Cochran was complaining about Doe to SCCS about, saying "it was one of the things that [] Cochran was complaining about me for to the office of conduct and also to IEC too, I believe, because there's your co-worker listed in here, and it also became clear, when I was going through these documents that, you know [] Cochran had gone to IEC first, before the office of conduct, and had tried to initiate, I'm, I'm not sure, I think it was a Title IX complaint case against me, they attempted, or some sort of IEC investigation against me, ah, initially, th- that didn't end up happening, so they went the office of conduct, ah, route". Does said that his email to Lisa about speaking with a lawyer to draft a contract regarding co-authorship with Cochran was forwarded to her and was in his SCCS case file. Doe said he "didn't realize that bothered [] Cochran so much that sh- that was included in this case she was building against me". Doe said that he thought attempting to get co-authorship was "totally reasonable", and that Cochran would include it in her complaints was "so silly". Doe said that he thought the contents of his FERPA fulfillment of the SCCS case file's contents "really does show, that a lot of what I had thought might be the case within that longer piece that I had sent you", 2024/01/03 (15:23), "about expanding the case, was the case". Doe said that he thought the contents of the records fulfillment showed that Doe's 2023/10/24 complaint to Cochran about her sexist remarks "sent her on the offensive". Doe said that Cochran was trying to create "hearsay-based smoke" to "create the requisite,

sort of like, concern on part of, um, university offices to, like, begin this harassing process with me". Shaver said that he gave his CV to Cochran and started working as her intern, she wanted to know when Doe had learned about the salaried assistantship. Doe told Shaver that he learned about that from Tang when he started in the CRP program. That Tang was not sure when Cochran's funding for an assistant would be approved, and that was why Doe had reached out to Cochran regarding research work. Doe said, "I think that other people were interested in that too", "I got the distinct impression that other people were asking about the ability to apply for and be considered for, um, assistantships, specifically assistantships, you know the coveted assistantship, where your tuition gets paid for and you get, like, this meager salary based stipend, um, so, but, you know, you're essentially getting paid to go to school at that point, um, which is very cool", "everybody wants the assistantship", "so there asking about it and being directed to [] Cochran", "because she did have that coming up". Shaver wanted to know how Doe expressed interest. He said he sent his CV to Cochran at the start of the fall semester of 2023 and asked about the salaried research assistantship during his Zoom work meetings with Cochran. Doe said when he filled out this hourly internship employment paperwork with Ellestad that Ellestad had said; "'oh this is just an hourly position'" and that Ellestad "kind of had that tone about it", which "miffed" Doe, who said he thought to himself; "'yeah, yeah, I get it, I get it, I'm just an intern, not an assistant'". Doe said that "then, you know, when I started thee, um, internship with [] Cochran she's like; 'let me congratulate you on this... assistantship", such that Doe was prompted to say to Cochran; "Dr. Cochran, you know, I don't mean to be pedantic, but, you know, this is an internship, not an assistantship, I would like to work toward the assistantship". Doe said that he would ask about attaining the assistantship toward the tail end of his meetings with Cochran. Doe said that Cochran was "evasive" about talking to Doe about that. Doe said that "it was kind of like they were trying to have some sort of excuse as to why I wouldn't be able to do that", that Cochran's "intimated evasiveness", "came up really early on, and so, you know, I, yeah, I don't think it was ever their intention to consider me". Shaver asked, "was there ever some kind of, so there's kind of like this idea of an assistantship out there, was there ever anything that was like posted, that you could read about and see, this is what that assistantship is going to be?" Doe said that he thought there should be, and that he corresponded with someone at IEC about that. Doe said that he did so after Cochran had told him that the assistantship had been filled at one of their work Zoom meetings, and that occurred after Cochran had gone to a late-October professional conference. Doe said he asked Cochran; "'is that still a possibility(?)'", and Doe said Cochran informed him "'oh, actually, it's been filled'", "and you know, this is after I'd been asking about it being a potential, ah, possibility". Doe said that Cochran told him that a colleague had approach her and asked about a position for his wife, and Cochran told Doe that "his wife would indeed be filling that position". Doe also noted that Cochran told Doe that the woman she selected for the assistantship was from a foreign country. Doe said, "I thought it was weird", "that she would, like, proactively offer that background". Shaver asked if Doe knew who the person was. Doe said he did not but that she transferred into the program "for the assistantship". Shaver asked if Doe thought there was a reason that information was shared with Doe. Doe said that "yeah, I do", "I believe it was that time that [] Cochran recorded me", 2023/10/27 "um, and we talked about a lot of things, you know, she'd talked about Julie's feelings maybe being hurt, um, and, ah, that

sort of vague conversation about feelings", "when we were having that conversation though, you know, one of the ideas that I had expressed to [] Cochran was that, you know, Julie talked so much that no one else really had an opportunity to speak", "the concern that I had expressed to [] Cochran was at that time, was that, you know, it really doesn't leave much room for people that aren't native colloquial American-English speaking people, because, you know, ye, you have to listen really closely, ah, to someone with a thick accent to know what they're saying, and to give a little time and space to have them, have their voice be part of the process, and so, you know, one of the frustrating things for me was that when there's talkers that don't make that effort, in particular the international students end up being wallflowers, um, and I brought that up with [] Cochran because, you know, Julie's tendency to, like, speak extemporaneously for long expanses of time, ah, grated on me, for that reason, because, you know, it didn't, it didn't leave much room in the conversation for voices that maybe have strain to speak a little bit, I think that maybe why she proactively said that to me, like, oh; '[Doe] likes international students, so even though I didn't give him a chance to apply to this position I'll tell him that it's an international student, and, and he's going to uncritically be ok with that'", "so, I'm given to speculate that that is the reason why". Shaver asked if there was an established process for applying to the position that had been communicated. Doe said, "there were obviously other people that were interested in it". Doe said that when he asked Wood about it at a remote Zoom that regarded serving on hiring committees that Wood did not seem to know how the hiring process was supposed to work for student employees hired by faculty, and that when Doe followed up with Wood asking more specifically about his particular situation, that Wood ultimately said something to the effect of the hiring authority largely being the domain of faculty. Doe said, "I don't even know if this is actually the case, I feel like it isn't, because, you know, there are laws against discriminating", "I guess I need to research that more". Shaver asked Doe there was a particular reason that Cochran didn't consider him for the position. Doe said "I and other people were asking about it", "like Mike, I'm pretty sure that he had expressed interest in it as well, and I think that Freddie", "expressed interest as well, um, because, you know, I had heard [] Cochran talking to them toward the end of a couple class sessions about potential internship positions", "I think that she had kind of already had it in her mind that she would have this, um, other woman, and, you know, I do think that's what it boils down to, I think she wanted the person that she worked with most closely to be another woman, um, ah, I, I think that she kind of had it in her mind to do it that, that way, and I almost wonder, I'm almost given to wonder if it was the case that, well and this is really me like reading the tea leaves", "but I almost wonder if [] Tang, was like, referring a lot of people to [] Cochran for the assistantship that were in the program and were interested in it, to see if she would actually give it to somebody that was in the program, like maybe, maybe he kind of knew what was up, like, you know, that, that there were all these men that were interested and, like, competing for it, and none of them were going to get it, even though they were, like, proactively expressing interest in it, and then, and then it was given to this other person, which I, I, it seem so dubious to me". Shaver asked who the other student was that was interested in the position. Doe said "that was Mike, Mike had expressed interest on a couple of occasions", "and I think, I think that, either Freddie or Gabe, more likely Freddie because Gabe already has an assistantship, but I think there both from the same country, and um, I think

that maybe Gabe was advocating on Freddie's behalf to [] Cochran for Freddie's consideration for that position".

01/17 (~16:00): Doe called SCCS and scheduled a time to come an physically review the material SCCS planned on presenting at the conduct hearing. (16:23): Doe emailed Fitzwater, copying the UNL SA Vice Chancellor and Anaya, noting that he had called SCCS and had scheduled a time to physically review his SCCS documents on 2024/01/22 at 13:30. Doe also asked why all three charges were included on his hearing notification when Fitzwater's 'resolution' dropped one of the two conduct charges.

01/18 (09:48): The IEC Resolution Specialist emailed Doe letting him know that she had sent him a reminder of IEC's informal resolution process.

01/18 (17:55): Doe received an email with his ticket for the state-level CRP professional conference for 2024/03/06 through 2024/03/08.

01/19 (08:00): Doe emailed Shaver a link to a working version of his written annotations regarding the contents of his SCCS case file contents that were in his FERPA fulfillment, 01/15 (10:00), including a catalogue of all the serial codes associated with the contents of the file's electronic filing cabinet.

01/19 (unknown): Shaver hosted a Zoom interview with Cochran regrading Doe's IEC investigation. Cochran said that she had "received an email from [Doe] regarding 'an allusion to perceptions of confrontation[]'", "[Cochran] found the email sarcastic", Cochran "would [] identif[y] [Doe] as a 'white-passing male[]'". Cochran said that Julie "has a louder voice and speaks up more than some other students", but according to Cochran "[Julie] is appropriate", though Cochran did say that Julie "[o]ccasionally", "goes off on a tangent", but that "she responds well to [Cochran] or others redirecting her", and that the "similarity between [Doe] and [Julie] is that they speak up more than others", however to Cochran, "[Doe] is a large, white-passing male" and that as "[Cochran] is a petite female" Doe seemed "intimidating" to Cochran. Cochran said "[t]he difference in size" did "create[] some of the discomfort" for her. She said that "[Kuenning] told [Cochran] that she was going to file a report with [SCCS] or [IEC]" against Doe. And that Cochran "wanted [SCCS] to have the full information and she wanted to support [Julie]", "[Cochran] felt personal responsibility to at least communicate what she had observed directly", so Cochran "submitted her first report on [2023/11/13]". "[Cochran] had hired [Doe] as a research assistant on a project, and they started on [2023/10/02] and the end date was [2023/12/15]", "[Lisa] had been [Cochran]'s previous research assistant on the project, but she had too much on her plate and let [Cochran] know she could not continue with the position", "[Cochran] needed someone urgently", "[i]t was a small hourly wage position", and "[t]here were no tuition remission or benefits". Cochran claimed "[t]here are not many in the program who are interested in academic work", and "[a]t the beginning of the fall semester, [Doe] expressed to [Cochran] that [he] w[as] interested in a more academic path and forwarded their CV". "[Cochran] thought it could be a good opportunity for

both if it went well: she could fill the position with someone who was qualified and interested in doing research work, and [Doe] would have an opportunity to add it to their resume". Cochran said that "[Doe] was discussed in a faculty meeting on [2023/11/10]" and that "Tang, [Cochran], [Kuenning], and [] Wymelenberg had a discussion which led to a senior male faculty member attending [Cochran]'s class for the remainder of all in-person classes because [Cochran] was feeling anxious about interacting with [Doe]", "In another meeting [Cochran] had with the [Wymelenberg] and [Kuenning], there was a discussion about [Kuenning] requesting a plainclothes officer for the building", which Cochran claimed "did not end up happening". Regarding the internship Cochran said "[Doe] had done the work that she had asked them to do for the project and was efficient and communicative about it", and "[t]hey talked back and forth about what might be possible in terms of credit or attribution on future research projects", and that "[Cochran] said she would be amendable to naming them", to which "[Doe] asked if the agreement could be formalized", to which "[Cochran] said that [Doe] could send an email articulating their expectation for this and [Cochran] would consider signing or return an agreement articulating that if the research included an acknowledgement section, [Doe] would be acknowledged by name", going on Cochran said "[Doe] later sent an email to [Lisa] [] indicating that they would be meeting with a lawyer about drafting a contract to ensure they are acknowledged by name", and "[t]his concerned [Cochran]". She said that "[o]n [2023/11/21], [Doe] presented [Cochran] with a [MOU] in class and asked that she sign it", which was "also when she was expecting that [Doe] would be hearing from [SCCS]", and that "[Doe] said, '[] Cochran, as we discussed in our Zoom meetings, I prepared this memorandum of understanding[]'", to which "[Cochran] said she needed to review it, and they could talk about it later". Cochran said that she "was not comfortable signing the MOU, particularly in her role as an employee and assistant professor" and that "[i]t was all very hypothetical because no products had been produced, and it is one small piece of what will be a long research project that a lot of people work on in different capacities". Cochran said she "sent [Doe] an email after Thanksgiving break" and emailed that "she was not going to be signing the MOU", and around that time "[Cochran] was increasingly concerned about [Doe]'s behavior in and outside of her class", "[s]he had submitted her first report to [SCCS]" and claimed to have "knowledge of reports submitted to IEC by [Julie] [] and perhaps [] Kenning". Cochran said that "[Doe] felt it constituted an 'academic misconduct violation' because Morgan had augmented the draft chart" and that "[Cochran] drafted a response to [Doe] and had some guidance from [] Barefield and [] Fitzwater", "[s]he expressed to the [Doe] that she would not be taking action and that it does not constitute an academic misconduct violation", and that "[Cochran] was communicating about the exchange with [SCCS] to make sure it was, in fact, not a violation, which was her instinct", and that "[Barefield] and [Fitzwater] helped with the language regarding [Doe]'s allegation that it would be some kind of conduct violation". Cochran said she "received a grant that is different than the one used to pay for the hourly work assignment" and "[i]t is a full-time graduate research assistantship with tuition remission", that "[Doe] and [Cochran] had a conversation on [2023/11/17]" and that "[Doe] asked if they would be considered for future hourly research appointments under her supervision", to which "[Cochran] said she was not sure of her needs but would keep in mind their interest". Cochran said that "[i]n meeting in November 2023, [Cochran] said she thought she would

79

have an assistantship opportunity for another project; however, it had already been filled", and that "[Doe] pressed about who filled it, and [Cochran] said it was an incoming student", and that "[Cochran] does not remember saying specifically that the person was from a foreign country, but it is accurate that they are from another country". Cochran said, "[t]he hiring for research assistantships is not done under any kind of competitive process", that "[Cochran] is the principal investigator of the grant, and she makes the budget", that "[t]he investigator has full discretion over hiring positions for that project", claiming "[s]he did not know, even after it was approved, when the money would be dispersed or whether it would be dispersed in full", and that "[i]t is hard to know when researchers are going to have positions available at all", stating "[t]his was approved last spring and she thought she would be able to hire someone in the fall but was not able to due to a delay", that "[t]ypically, researchers do not know when positions are available until soon before they are going to be filled", claiming that "[i]n the [Cochran]'s field, it is not a competitive process; positions like this are not publicly posted", that "[Cochran] had a few hourly work appointments that had been funded" she had previously funded, that "[w]hen she was new", to the CRP program "she didn't know the students well and asked [] Tang to send something on the listserv about it, and whoever was interested could send a resume and brief statement of interest to [Cochran]", and "[t]hat was her choice because she did not have knowledge of who would be a suitable candidate", Cochran claimed that "[Doe] was hired for their hourly research position in this way, without a competitive process". Cochran said that "[t]he person that [Cochran] selected for the assistantship was [Angie]" that "[Cochran] was introduced", "through [Angie]'s spouse" a "student in engineering at UNL", that Angie's spouse "attended a talk [Cochran] gave and sent her an email afterward saying he enjoyed the talk, and he had a spouse". Cochran said "[Cochran] became aware that she was awarded a grant [for an assistant] in the summer of 2023", "[s]he thought she might get it for fall", "[Cochran] told her current hourly employee at that time, [Lisa] [], about the grant, and [Lisa] was not interested in continuing the next year because she did not have the time". Cochran claimed that "[Angie] emailed [Cochran] on [2023/08/17] regarding research opportunities", that "[Cochran] replied to [Angie] on [2023/08/18] and told her that there was a funding opportunity for her this fall", "[Cochran] hoped that would be the case, but that was inaccurate due to funding delays", that "[Angie] expressed enthusiasm but was concerned she would not be able to change her visa in time to be hired for fall", that "[Cochran] found out from the granting agency that the funds would not be dispersed until at least mid-fall", and that "[Cochran] told [Angie] that if it does not work out for fall, they could think about [Angie] starting in the spring and initiating the assistantship then", "[Cochran] requested a no-cost extension on the grant so that she would be able to offer a full assistantship for the 2024 calendar" to Angie, and that she "began the process for applying and the necessary English proficiency tests in the fall 2023 semester", "[Cochran] continued to communicate with Angie about her progress to make sure she would be able to start in 2024". Cochran claimed that "[Doe] had not expressed interest in this specific assistantship explicitly because [Cochran] was not advertising it", but that "[Doe] was pressing [Cochran] about potential future opportunities" and that "[Cochran] had already made the decision to select Angie and it was not an advertised position". Cochran said, "[t]here were a few other students who expressed an interest in potential assistantship opportunities", and that "[o]ver 90% of the

applicants to the program are international students who will send an email to faculty". Cochran said "[Cochran] has hourly appointments that do not come with the benefit of tuition assistance", "[Cochran] would consider [Doe] for those types of future appointments if they were interested, but those are a more superficial level of engagement, where they would be doing tasks like those which were completed in the hourly research position [Doe] previously had", claiming "[Cochran] told [Doe] they can always email with their interest and send a CV; if [Cochran] feels they are qualified, she will consider them", stating that "[i]t is at her discretion for who she is hiring, and it is not a competitive process". Cochran also said that "[Cochran] believes this case filed by [Doe] is in retaliation for her submitting a report to [SCCS] and for emailing [Doe] that [Morgan]'s conduct did not constitute a violation", claiming "[t]hat is when [Doe] indicated to [Cochran] and [] Tang that they thought [Cochran] was acting against them in a retaliatory manner", and claiming that "[Doe] was upset that [Cochran] was not pursuing a case with [Morgan] and thought that [Cochran] had submitted her case to [SCCS] because [Doe] challenged her in class".

01/22 (06:55): Doe emailed the NU Record Director asking that that his FERPA request, 12/06 (14:32), for CRP faculty member's emails from, and including, 2023/10/10 to, and including, 2023/12/05 that are included in Doe's educational record be fulfilled.

01/22 (07:00): Doe emailed the UNL SA Vice Chancellor, copying Anaya, Pearce and Fitzwater, blind copying Shaver, writing; "[a]s per University Code of Conduct [specific citation], I am sending this written request that my SCCS hearing date that I was notified about [2024/01/16], be rescheduled to be held on or after [2024/04/01]", Doe's "reasons for this request", "a. [t]he faculty member that reported the incident contained within my SCCS hearing is the respondent in my ongoing Title IX investigation", and "b. [t]here is overlap between the witnesses intended for both the hearing and the investigation, such that outreach from two formal processes could inhibit witnesses' willingness to engage with either".

01/22 (07:05): Doe emailed Shaver, writing that he had attached a file of his completed annotation of his SCCS case file for Shaver's records. And offering some points to consider after having a chance to thoroughly review the SCCS case file fulfillment's contents. Doe noted that there was no content that evidenced that there was contact between Cochran and SCCS prior to 2023/11/13. Doe also noted that there was a timestamp on the case creation form's notes section for Cochran's 2023/11/30 phone interview with Fitzwater that stated that it had been edited on 2023/12/18. Doe sent an updated list of potential witnesses.

01/22 (~13:30): Doe went to SCCS to review the documents that the Fitzwater was to use the following day at Doe's hearing. To Doe's knowledge SCCS was unaware at this time that Doe had the chance to review most of the contents of the file by way of Doe's records request fulfillment. The secretary gave Doe a light folder with hard copies. The secretary took Doe to a small room to review the contents of the folder. Doe asked if he could use his laptop to type out notes, the secretary said he could. Then the

secretary left Doe to review the contents. The small room had a desk. Perched above the desk was a camera pointed down at the desk. Contained within the folder was the truncated version of Cochran's written complaint wherein Cochran wrote of Julie being distressed by Doe and Cochran's fabricated transcription of an email from Morgan, "Response to [Doe]", additionally there was the case file form, as distinct from the case creation form. When Doe finish reviewing the contents, he took the folder back to the secretary. Doe mentioned to the secretary that he noticed on the case file form with the notes section that there were timestamps that said the notes had been edited on 2023/12/08 and 2023/12/18, and Doe was curious what the reason for that was. The secretary did not have an answer for Doe. Doe thanked the secretary and then left.

01/22 (16:14): The NU Records Director emailed Doe a fulfillment of his FERPA request, 12/06 (14:32), for CRP faculty member's emails from, and including, 2023/10/10 to, and including, 2023/12/05 that are included in Doe's educational record.

01/22 (~16:50): Doe called SCCS and asked the secretary to if he could add people to his release form. The secretary said that Doe could do that, and that he would send Doe the digital form to do that.

01/22 (17:25): The UNL SA Vice Chancellor forwarded Doe's email (07:00) to Barefield, writing; "[p]lease see below a request from [Doe] to delay his hearing", "I am forwarding this to you for your review".

01/23 (09:45): Doe emailed Fitzwater, copying the SCCS secretary and the UNL SA Vice Chancellor, writing that Doe was following up on his 01/22 (~16:50) phone call to add someone to his SCCS case file release form.

01/23 (10:00): Doe emailed Shaver, asking; "[i]f you have the time today, might we Zoom together", "I'm a bit concerned that my student-aid refund", "hasn't been direct deposited into my bank account", "I don't recall encountering having to wait until after the semester began to see that in my account".

01/23 (10:55): The SCCS secretary email Doe the release from for his case file. Doe granted Shaver access.

01/23 (11:19): Doe emailed Shaver informing her that he granted her access to the SCCS case file. (~11:30): Shaver called UNL Financial Aid Director George Chase Brown (Brown) regarding Doe's email (10:00). (11:53): Shaver replied to Doe's email (10:00), writing; "[u]nfortunately, that is not something that we can assist with", "[i]f you call [the financial aid office] and ask for a supervisor, or if you go in person there are specialists who can help to see if there are issues with your refund", "[SAS] may also be able to help". (11:52) Shaver replied to Doe's email (11:19) thanking Doe for digital access to his SCCS case file.

01/23 (11:53): Barefield replied to Doe's 01/22 (07:00) email , copied were the UNL SA Vice Chancellor, Fitzwater, Anaya, Pearce and NU Title IX General Counsel Bren Chambers (Chambers), writing; "[y]our request to have the hearing postponed until April for an ongoing investigation with [IEC] has been forwarded to me as the [UNL] Vice Chancellor for [SA] designee", "[i]n communication with [IEC], no concern was raised that would suggest that a delay is warranted", "[t]hey will proceed independently with their investigation, and the hearing will proceed as scheduled on Monday, [2024/01/29], at [13]:00". (14:42): Doe replied to Barefield, copying the UNL SA Vice Chancellor, Fitzwater, Anaya, Pearce and Chambers, blind copying Shaver, asking; "[h]as the hearing panel been selected", and "[i]f so, who sits on the hearing panel".

01/23 (14:52): Doe emailed Shaver, asking if there was a way to grant her access to his "entire educational record".

01/23 (16:58): Doe emailed Anaya, copying the UNL SA Vice Chancellor and Fitzwater, blind copying Shaver, greeting Anaya in her role as the University Conduct Board chair, writing; "[w]hen I visited the SCCS office yesterday", "to review the information that SCCS intends to present at the hearing (in accordance with conduct code [specific section]), I noticed that only about five of the roughly thirty documents within my SCCS-case-file's "ELECTRONIC FILE CABINET" were intended", "[f]or the sake of the hearing panel's ability to ponder all of the evidence held within the SCCS conduct file, I request that all the documents within my SCCS-case-file's "ELECTRONIC FILE CABINET" be made available to the hearing panel", "[t]he document identification numbers, names associated with those documents, and reason for their inclusion are listed below", Doe offered a catalogue of all the serial codes associated with the contents of the file's electronic filing cabinet with written explanations as to why each should be included.

01/23 (17:51): Anaya emailed Doe, copying the UNL SA Vice Chancellor, and Fitzwater, writing that Anaya would review the "hearing packet" that Doe had reviewed in person at SCCS.

01/24 (08:00): Doe emailed Fitzwater, copying Anaya, the UNL SA Vice Chancellor, Ankerson, Barefield, the UNL Chancellor, Chambers, Hope and Pearce, writing; "I'm reaching out to", one, "catalog my recent communications regarding my Monday SCCS hearing date and", two, "inform SCCS that I will be sending two additional emails today (the last day I am technically able according to Code of Conduct [specific citation]); one additional email sent later today will contain my list of indented witnesses and another additional email with my indented evidence", Doe went on to paste the text from his prior email asking for the SCCS hearing to be delayed due to it potentially interfering with his Title IX hearing. And the email from Barefield wherein she denied his request on the grounds that IEC had been communicated with. And the email that Doe had sent to Anaya wherein he detailed that SCCS only intended for a small portion of the electronic filing cabinet to be offered to the Conduct Hearing Board

in their hearing packet. And Anaya's email to Doe wherein Anaya said that she would review the "hearing packet".

01/24 (08:43): Barefield emailed Doe, copying the UNL Vice Chancellor, Fitzwater, Anaya, Pearce and Chambers, writing; "Bren Chambers works in the Office of General Counsel, and he will serve as the advisor to the hearing panel", "[t]he following is a list identifying the panel: [] Anaya, faculty, Chair, Ty Schmidt (Schmidt), faculty, [UNL ASUN Representative], student", "[f]or questions about the hearing format or process, you may ask either [] Fitzwater or myself", "[f]or questions about hearing content, your contact is [] Anaya", "[t]he other panel members should not be contacted at this time as the Chair will make determinations on their behalf and in consultation with them as needed".

01/24 (08:53): Fitzwater replied to Doe's email (08:00), copying Anaya, the UNL SA Vice Chancellor, Ankerson, Barefield, the UNL Chancellor, Chambers, Hope and Pearce, asking if the purpose of Doe's 08:00 email was to have the email added to the hearing packet.

01/24 (10:00): Doe emailed Fitzwater, copying Anaya and the UNL SA Vice Chancellor, writing; "[a]s per University Code of Conduct [specific citation], I am sending this statement of intent to present witnesses at my SCCS hearing", "[a]n additional email will be coming later today, the last day I am technically able, with the evidentiary documents intended for the hearing", Doe provided a full written out version of the code citation and a very thorough list of intended witnesses.

01/24 (10:36): Shaver replied to Doe's 01/23 (14:52) email, writing; "I'm not entirely sure", "[i]t's my understanding that parts of student records are housed in different departments on campus", asking "[i]s there something in particular that you think is important that I access", "I may be able to access or figure out how to do so if I have a better idea of what it is that you would like to include".

01/24 (10:59): Fitzwater emailed Anaya, copying Doe and the UNL SA Vice Chancellor, providing a listing of the electronic filing cabinet's contents and claiming that most of the cabinet's contents had been previously included in the "hearing packet", with a small subsection of files labeled set aside as not relevant.

01/24 (11:12): Fitzwater emailed Doe, copying Anaya and the UNL SA Vice Chancellor, confirming Doe's thorough list of intended witnesses, and asking if Doe had confirm their attendance. (12:55): Doe replied, copying Anaya, the UNL SA Vice Chancellor, Ankerson, Barefield, the UNL Chancellor, Chambers, Hope and Pearce, writing "that was [his] intention". (13:38): Fitzwater replied, copying Anaya, the UNL SA Vice Chancellor, Ankerson, Barefield, the UNL Chancellor, Chambers, Hope and Pearce, writing that Doe email would be added to the "hearing packet".

01/24 (13:45): Doe replied to Fitzwater's email to Anaya (10:59), copying Fitzwater and the UNL SA Vice Chancellor, writing; "I would respectfully offer that all of the currently-SCCS-determined "not relevant" information that is", "relevant".

01/24 (13:55): Doe emailed Fitzwater, copying Anaya, the UNL SA Vice Chancellor, Ankerson, Barefield, the UNL Chancellor, Chambers, Hope and Pearce, writing that Doe was reaching out to catalog his recent communication regarding his Monday hearing, and that another email was to come later in the day.

01/24 (14:00): Doe replied to Shaver (10:36), writing; "On [2023/12/04], I had requested faculty emails under FERPA that are contained within my educational record", "so my thought was that there might be a way for me to grant you general educational record access to [Doe], so that" Shaver could have remote access.

01/24 (16:22): Doe email Fitzwater, copying Anaya, Schmidt and the UNL ASUN Representative, writing; "I am sending this statement of intent to present witnesses and evidence at my SCCS hearing", Doe provided the content from his FERPA fulfillments, a chronology of emails that spanned fall semester of 2024 that Doe wrote, PDFs of Doe's notifications from IEC, a link to the share word from the client course with reviewable iteration of the work, a client course slide deck that denoted when the course was split into teams, and other course materials, Doe reiterated his list of intended witnesses.

01/24 (17:17): Cochran emailed Fitzwater, writing; "I spoke with [Barefield] last week (or maybe a few weeks back?) and hope that she relayed that I am not feeling comfortable participating in any capacity that would allow the student to address me in person/over Zoom or even to see any additional materials that I submit", "I am too concerned about the personal and professional risks of participating", "I also think my (and other witnesses') absence may be telling in and of itself-as we're feeling intimidated and, ultimately, unsafe continuing to interact with the student".

01/25 (08:00): Doe emailed Shaver inquiring if his investigation would continue even if he was suspended/expelled. (08:54): Shaver replied stating that it would continue even if he was suspended/expelled, Shaver also noted regarding Doe's 01/24 (14:00) email; "I also understand your request about me accessing your records better after your last email", "I will look into it and see what I can accomplish, and be in touch with you about it".

01/25 (12:20): Doe emailed the NU Records Director, requesting to have a "chance to review [his] entire student record".

01/25 (13:25): Doe email Shaver, copying Schuldeis, writing; "[a]fter reviewing the contents of my second records request from the records director", "I got the distinct impression that [] Cochran was

attempting to discredit my professionalism as a researcher", "[a]s well, worth noting, and keeping with Cochran's observed pathology of overtly whisper champagning among faculty, she made efforts to seed the notion among faculty members that she was concerned I would harm the integrity of her research". (13:48): Doe forwarded the email to Ankerson, copying the UNL Chancellor, Hope and Pearce, writing; "[a]fter reviewing the contents of my second records request from the records director", "I got the distinct impression that [] Cochran was attempting to discredit my professionalism as a researcher", "[a]s well, worth noting, and keeping with Cochran's observed pathology of overtly whisper champagning among faculty, she made efforts to seed the notion among faculty members that she was concerned I would harm the integrity of her research"

10/25 (unknown): Shaver interview Wood regarding Doe's investigation with IEC. Wood said that "[Wood] is an Equal Employment Opportunities Specialist in IEC and oversees ensuring that departments know the university's best practices and policies for hiring", "[Wood] first had contact with Complainant when they attended a search training", "[Doe] asked questions during that training, but other than that the communication between them has only been through email", "[Doe] asked about the search process for student positions initially", "[Doe] got more specific, and asked what the process was for a graduate student position", Wood "told [Doe] that she and IEC do not oversee that, and she could not answer their questions because she did not have the answers", "[i]n the eight years Jody has had her role, she has never been involved in the process for filling any assistantship or student worker position", "[w]hen [Doe] reached out to [Wood], [Wood] talked to [] Walker to learn more about how the hiring process for student workers and assistantships works", "[s]he learned that the hiring person can pick whomever they want, and there is not a process", "[i]t is based on the individual's need, relationship with the students, knowledge, and what they can get from the students by having them work for them", "[a]ssistantships might be publicized or posted, but they do not have to be", "[t]hey are not being advertised the way a faculty or staff position would be".

10/25 (unknown): Shaver interview Schuldeis regarding Doe's investigation with IEC. Schuldeis is transcribed as saying that "[Schuldeis] is an Equal Employment Opportunity/Affirmative Action Specialist in IEC", "[s]he investigates complaints about discriminatory treatment in employment. [Schuldeis] has not had any contact with [Doe]", "Kuenning first submitted a report to IEC, and [Schuldeis] accessed it and then passed it on to [] Reed for outreach", "[t]he report was received on [2023/11/10], alleging that [Doe] was bullying [Julie] because of her gender. [Schuldeis] called Kenning to learn more about the report and was told she needed to talk to [Cochran]", "[Schuldeis] called [Cochran]", "[t]hat was the last time [Schuldeis] talked to anybody regarding this matter", "[Schuldeis] continued getting emails from [Cochran] but sent them to [] Reed and then to [SCCS]", "[Schuldeis] participated in a Zoom meeting with [Wood] and [] Walker, who was the Associate Vice Chancellor for Faculty Affairs at the time, to learn more about how assistantships are formed and selected", "[s]tudents are chosen by the professor who may be better in a particular area, and it will be offered", "[s]ome departments have an internal posting board where they may place them", "[t]here is no documentation or

tracking of applications", "[t]here usually is not even competition for a position because the professor offers it".

01/25 (16:30): Walker emailed Hope, writing; "[y]ou probably know that [Ankerson] asked me to stay involved with the [Doe] situation, rather than handing it off to [Marks]", "I was talking with [Wymelenberg] this afternoon and he mentioned that you said it had been 'taken over by general counsel'", asking "[c]an you please help me understand the background for that statement", and asking "[w]ho in general counsel's office is handling this", and asking "[h]ow did they get involved". (16:47): Hope replied to Walker, writing; "[t]here was an email from the general councils office last week that said not to respond as individuals that they are coordinating the response", "I have been getting cc by the student and have not been directly involved", going on to write "I hope Berkeley is going well", to Doe's knowledge University of California Berkeley is one of the institutions that Cochran had graduated from.

01/26 (03:51): Ankerson forwarded Walker Doe's 01/24 (13:55) email.

01/26 (09:00): Doe emailed Shaver, writing; "[i]ncluded here are my notations from my second FERPA records request", "[a]s well as a thread with [] Tang from [2023/11/08]", "[s]ome thoughts: [t]here was a big meeting on [2023/11/08]", "Cochran didn't get exactly what she wanted and went to SA later that day", "Kenning seemed receptive to Cochran's histrionics", "I don't know what exactly is going on with Schuldeis", "[m]y assumption is that once Cochran knew what offices she could interact with she started seeking someone who was immediately sympathetic", "[Barefield] was that person", "[n]one of the other Faculty or the Dean seemed to take Cochran's histrionics as seriously as Cochran wanted", "Cochran demanded a lot of time of other faculty and had bold expectations as to what could happen when she demanded it to happen", "Cochran encouraged [Morgan] to break the rules regarding working outside of students' assigned sections", "Cochran is a bad-faith actor". Doe included his annotation related to his second FERPA fulfillment for CRP faculty members' email regarding Doe.

01/26 (13:51): Anaya emailed Doe, copying Fitzwater and Barefield, writing; "[t]hank you for your patience as I worked through the case file and submitted documentation", "[i]n preparation for Monday's hearing, I wanted to share not only my decision on the hearing packet materials and witness list, but also some directives to help us have a productive, respectful and focused hearing", "Scope of Hearing", "[t]he scope of this hearing is to determine if your alleged actions in [Cochran's client course] in Fall 2023 were in violation of the Student Code of Conduct", "[r]eferences to activities and assignments not related to this course will not be considered such as participation in student organizations, other courses or professional development events", "Hearing Packet and Supplemental Documents", "[a]fter review of the submitted materials, the following documents will not be included for review in the hearing packet", "[t]he files included in the supplemental documents provided by the respondent have been provided to the hearing panel", "Presentation of Information", "[p]lease offer

summaries of the material being presented", "[c]omplete word-for-word reading of the material included in the hearing packet will not be permitted", "[s]creen sharing will not permitted for demonstration of material included in the hearing packet", "[i]f respondent would like for the board to review or pay particular attention to a document, please be prepared to share document title/identifier from the hearing packet or supplemental materials", "Witness List", "[b]ased on the scope of this hearing, the following witnesses will not be called to testify", supposing Anaya's email was written by Anaya, then Anaya went on to list many of Doe's intended witnesses as "witnesses" that "will not be called to testify", "Hearing Structure", "[d]uring Part One of the hearing, you will be asked to offer an opening statement to the board", "[t]his statement should be a summary of the incidents in question", "[a]fter your opening statement is offered, you will be allowed to present non-witness evidence and then call witnesses who are present", "[n]on-witness evidence can include materials submitted for consideration such as emails, assignments, memos, etc.", "[w]itnesses will be placed into waiting rooms until they are called", "[d]iscussion should focus only on the violation allegations included in the complaint presented by the student conduct officer", "[a]ll parties will be allowed time to ask questions related to the evidence presented", "[o]nce both sides have presented their evidence, you will be invited to offer a closing argument", "[c]losing arguments are for summary (new information cannot be introduced at this point) and urging action by the board", "[t]he board will then retire to deliberate", "[t]he deliberation will result in a finding of", one, "RESPONSIBLE or", two "NOT RESPONSIBLE for each charge", "[d]epending on the decision, the hearing may proceed as follows"; "If RESPONSIBLE: Hearing Proceeds to Part Two and receives advice from the parties on sanctions", "If NOT RESPONSIBLE: Hearing ends with the announcement of the decision and the hearing adjourns". (14:38): Doe replied to Anaya, copying Fitzwater, writing; "[a]s a point of clarification, I would respectfully ask which portion of the code allows chairpersons to prohibit respondent's intended evidence and/or witnesses", "[a]dditionally, as there is overlap in the intended witnesses' affiliations, and as your list of 'following witnesses (that) will not be called to testify'", "I am seeking clarification regarding the witnesses listed below". Doe offered a list of specific intended witnesses that Doe was seeking to potential have attend the hearing with written rationales as to their inclusion.

01/26 (unknown): This was the IEC interview that Shaver conducted with CARL, wherein CARL revealed to Shaver that Julie was slandering Doe at a key prospective employer within Doe's field, i.e. CRP, or, the civil service. Julie is a full-time employee of the city, and during fall semester of 2023 and spring semester of 2024, CARL was a part time intern with the city. At the time of Julie's slandering of Doe to CARL while on the clock and within the offices of the city, CARL worked for a department that was managed by a high-ranking elected official within the state chapter of the professional organization associated with the CRP discipline. CARL said; "[CARL] was in one class with [Doe] in the fall 2023 semester", which was not Cochran's client course, "[CARL] is not involved in the program's social activities", "[h]e does not go to [CRP RSO] meetings", "[CARL] is a co-worker of [Julie] at the City", "[Julie] discussed at one point that she was considering a Title IX investigation regarding [Doe]", "[Doe] also told CARL that they wanted to initiate a Title IX investigation into what they saw as unfair

treatment towards them", "[CARL] enjoyed the class he had with [Cochran], but he had a few issues with her in which he felt she was overly critical regarding a presentation", "[CARL] has had one extended interaction with [Doe]", "[Doe] emailed [CARL] a couple times over the fall semester", "[Doe] had some questions about [CARL]'s historic preservation work", "[a]ll interactions over email were related to planning and class", around "[2023/11/21], Julie came to speak to [CARL] in his cubicle" at the city, "[Julie] said that a [RSO] meeting had been canceled because of [Doe]", and "that [Doe] had been 'bullying' [Cochran] in the class because of a writing credit [Doe] was after, and [Doe] had also been mean to [Julie]", "[Julie] did not explain how [Doe] was 'bullying[]'", "[CARL] felt a greater responsibility to get involved", "[o]ther people in [Willa] and [Morgan] [], both mentioned to [CARL] that [Doe] was 'acting up[]'", "[n]either [Morgan] nor [Willa] said that they thought [Doe] was sexist or prejudiced", "[CARL] wanted the program to be healthy and he does not want to live in a misogynistic world", "[Morgan] and [Willa] tried to discourage [CARL] from getting involved", "[CARL] decided he was going to speak to [Doe]", "[t]he last class period of [the course taught by CRP faculty member who graduated from the same institution as Cochran]", "[CARL] caught up with [Doe] after class", "[Doe] asked [CARL] for a copy of a presentation via email", "[CARL] said he would send [Doe] the presentation, but he wanted to talk to [Doe] about concerns that their behavior was misogynistic and sexist", "[Doe] never said anything to indicate that women need to 'stay in their place'", "[Doe] told [CARL] during that conversation that they were considering launching a Title IX investigation because they were researching with [Cochran] and were led to believe they would get a full research position and it was given to someone else", "[CARL] does not know the timing of it", "[Doe] felt unfairly treated", "[Doe] implied that the decision not to give them the position was nepotism due to marriage", "[Doe] also said that whoever got the position got it because of their international student status and gender", "[CARL] does not see people like [Doe] as being discriminated against", "[Julie] had previously shared with [CARL] that [Doe] was doing data analysis for [Cochran] and wanted a writing credit for it", "[CARL] did not know that [Cochran] was doing any research with [Cochran]", "[d]uring the conversation [CARL] had with [Doe], [Doe] said they have an active part of [Cochran]'s project, and it would be reasonable to get a writing credit", "[Doe] mentioned that they previously received writing credits doing other work as an undergraduate", "[CARL] does not know about how co-authorship or writing credits work", "[i]n the class [CARL] had with [Doe] in the fall 2023 semester", "[Doe] was long-winded", "[i]t was a professional practice class, and the class was structured around having planning professionals visit and discuss their positions", "[t]here was no group work or interpersonal interactions", "[CARL] did not notice [Doe] being misogynistic towards female speakers", "[CARL] also described Julie as being long-winded", "much like [Doe]", "[CARL] was not in the [the client course] to see how they interacted with each other or others", "[o]ther than [Morgan], [Julie], and [Willa], nobody has spoken to [CARL] about [Doe]".

01/26 (16:58): Doe emailed Shaver, citing IEC non-discrimination policy and writing; "I formally request to expand my existing case to include SCCS Director [] Barefield", "[i]t is reasonable to conclude that Barefield knows that the SCCS process is being used to harass [Doe] due to his protected

statuses based on the contents of [Doe]'s student conduct case file", "which facilitates an environment of harassing discrimination created by Cochran's misuse of [SCCS], and which intensifies [Doe]'s harassment, and will likely cause [Doe] professional harm".

01/26 (19:00): Anaya replied to Doe's email (14:38), copying Fitzwater and Barefield, writing; "[t]hanks for asking for clarification", "[t]he relevant sections are below", "[t]he [] Code of Conduct [specific citation] states that 'The Hearing Officer or Chair must conduct the hearing in a manner that facilitates the presentation of relevant evidence by both the Conduct Officer and the Respondent'", "[specific citation] states that", "[t]he Hearing Officer or Chair will be solely responsible for determination of the admissibility of evidence[]", "[s]ince the scope of this hearing is to determine if your alleged actions in [Cochran's client course] in Fall 2023 were in violation of the Student Code of Conduct, the remaining faculty and students included in the witness list will be called to testify if present", Anaya reference to "the remaining faculty and students included in the witness list" referred to the list that Doe emailed regarding at 14:38.

01/28 (01:45): Doe emailed CRP faculty member who graduated from the same institution that Cochran had. Doe requested his presence as a witness at Doe's hearing.

01/28 (08:00): Doe's email sent to Tang. Doe requested his presence as a witness at Doe's hearing.

01/28 (08:00): Doe's email sent to Doe's faculty advisor. Doe requested his presence as a witness at Doe's hearing.

01/28 (15:00): Doe's email sent to Shaver. Doe sent his most recent notation of his CRP faculty email FERPA fulfillment. Doe block quoted Cochran's email to Morgan on 12/05 (09:34) wherein Cochran told Morgan to "keep up with [his] revisions", "I appreciate your trying to make the charts follow a coherent aesthetic", "[i]f [Doe] sends anything else, feel free to pass it along", "[o]therwise, I recommend trying to work collaboratively on Chapter 4".

01/28 (15:00): Doe's email sent to Pearce, blind copied was Shaver, Doe wrote; "I did make a formal complaint to Nielsen regarding IEC employee [] Reed on [2024/01/15], wherein I provided Nielsen context and evidence", "please remind Nielsen of my sincere complaint", "[i]f you need any additional documentation from me regarding Reed for Nielsen let me know".

01/28 (15:33): Doe's email sent to Julie. Doe requested her presence as a witness at Doe's hearing.

01/28 (15:33): Doe's email sent to Xavier. Doe requested his presence as a witness at Doe's hearing.

01/28 (15:33): Doe's email sent to George. Doe requested his presence as a witness at Doe's hearing.

01/28 (17:05): The CRP faculty member who graduated from the same institution as Cochran replied to Doe's email (01:45), writing; "I am unavailable tomorrow but thank you for relaying this information".

01/28 (17:43): Xavier replied to Doe's email (15:33), writing; "I unfortunately will be unable to attend the Zoom", "[b]est of luck".

01/28 (20:28): Doe's faculty advisor replied to Doe's witness request email (08:00), writing; "I have a prior engagement at that time and won't be able to attend the hearing", "I appreciate your understanding in this matter".

01/29 (08:21): Tang replied to Doe's witness request 01/28 (08:00) email, writing; "[t]hank you for sharing the information", "I won't be able to participate in the meeting".

01/29 (08:54): Shaver emailed the NU Records Director, writing; "[Doe] has indicated to me that the contents of the records that he has been able to are relevant to my ongoing investigation", asking "[i]s there a way I may be given access to the links he has been provided", "[i]f it requires him to sign a waiver, he has indicated he is willing to do so". (09:19): The NU Records director replied to Shaver, writing; "I can provide you with access to the documents [Doe] has requested", asking "[d]oes he have a list of relevant documents or is he requesting that IEC have access to all of the documents provided in response to his FERPA requests". (09:30): Shaver replied to the NU Records Director, writing; "[Doe] requested that I have access to all of the documents in response to his FERA requests". (~10:30): The NU Records Director provided Shaver with remote access to the contents of Doe's FERPA request fulfillments for his SCCS case file and CRP faculty emails which regarded Doe and were sent or received between 2023/10/10 to 2023/12/05.

01/29 (10:40): Pearce forwarded Nielsen Doe's 01/28 (15:00) email requesting that Pearce "please remind Nielsen of my sincere complaint" about Reed. Pearce wrote to Nielsen; "I am forwarding along a message from [Doe]", and that "[i]n dismissing" Doe's IEC complaint against Reed IEC communicated to Doe that IEC chooses "not to investigate discrimination claims against one of [its] staff members", and that "IEC encouraged [Doe] to submit that claim to you for review if he wished to pursue it", "[Doe] asked me to send along a reminder that you have his complaint".

01/29 (11:05): Pearce replied to Doe's 01/28 (15:00) email, writing; "I am writing to confirm that I sent along a reminder of your complaint about [Reed] over to [] Nielsen", "I hope you will continue to relay to IEC all reports of conduct that could violate the nondiscrimination policy", "[a]pplying the rules and procedures to reports that we receive, IEC will investigate any matters that fall within our scope of responsibility".

01/29 (unknown): Shaver interviewed Lisa for Doe's IEC investigation. Lisa said "[Lisa]'s first year in the Masters of Community and Regional Planning Program was 2023", "[Lisa] was in a class with [Doe] taught by [the CRP faculty member who graduated from the same institution as Cochran] in fall 2023", that "Lisa was not in [Cochran's client course] with [Doe] and [Cochran]", "[Lisa] found [Doe] to be interesting, intelligent, and well-spoken", "[a]s class went on, it became clear to [Lisa] that [Complainant] cared a lot about the efficiency of the class", "[t]here were occasional comments that they made that 'bristled' [Lisa]", "[Doe] did not bother her, but she had interactions with them as [the CRP RSO] president that were odd", "[Lisa] does not have a relationship with [Doe] other than being a peer", "[Lisa] was the president of [the CRP RSO]", "[i]n fall 2023, [Doe]" sent Lisa emails "about research positions and rights for student researchers", "[Doe] raised questions about compensation for students based on projects that they were doing", "[Doe] had individual email communication with her about [the CRP RSO]", "[S]he told [Doe] that she was trying to create a webpage for better management of [the CRP RSO] activities but was doing so as time permitted", "[the CRP RSO] held meetings since then and [Doe] has been in attendance without issue", "[Cochran] was a new faculty member when [Lisa] was a new student", "[Lisa] worked with her in an hourly research position and has always had good interactions with her", "[a]s [Lisa] understands it, there were disagreements and just general unhappiness with [Cochran's client course]", "[Lisa] finds [Julie] to be educated and informed", "[s]he is well-spoken" "[Julie] speaks up", "[Lisa] described [Doe] as a 'know it all' and Julie is a 'prove your point' kind of person", Lisa said "[t]he two could potentially butt heads", "[t]owards the end of class [Morgan] mentioned he was frustrated about changes made to a project and there was a question of whether he should be able to edit something that [Doe] had produced, or vice versa", "[Lisa] said the implication was that someone called [Doe] confrontational, and [Doe] responded that [he] did not appreciate it", "[a]ny time [Morgan] and [Julie] spoke about [Cochran's client course], they appeared distraught", "[a]t no other time has [Lisa] seen them act that way", "[t]hat led to conversations about [the CRP RSO]", "[Doe] had not done anything to the [CRP RSO] members or during [CRP RSO] meetings", "[t]he [CRP RSO] board members talked as a group, and [Lisa] wanted to do nothing and remain neutral, which the group did", "[w]hen [Lisa] was working with [Cochran] in the summer of 2023 on the research, [Cochran] informed [Lisa] that she might have additional research positions available for the research work coming up", but Cochran was "still in the recruiting stage", "[o]ne of the individuals was a woman from [an exact foreign country], [Lisa] does not remember her name", "[Cochran] said, 'Maybe you could talk to her[]'", "[Lisa] never ended up speaking to the student", when "[Lisa] spoke to [Cochran] who was" Lisa's "advisor", "[Cochran] shared that she was dealing with issues with [Doe] related to her [client course]", "[Cochran] said that if anything was making [Lisa] uncomfortable regarding [Doe]'s interactions with her, she could speak to the Title IX office", "[Lisa] had another conversation with [Cochran] in December in person and told [Cochran] she was just trying to avoid it", "[Lisa] is not aware of other students raising concerns with [Cochran] about [Doe]".

01/29 (~13:00): Doe had his conduct hearing with the UNL SA SCCS University Conduct Board. In attendance were Fitzwater, Anaya, Schmidt, the UNL ASUN Student Representative, and Chambers.

The hearing last for approximately 5 hours. The attendees were introduced by the Chair of the hearing, Anaya. The hearing panel consisted of Anaya, Schmidt, and the UNL ASUN Student Representative. The conduct officer was Fitzwater. Chamber's introduced himself when prompted by Anaya, Chambers stated; "I'm [] Chambers, uh, Deputy General Counsel for the University here to advise the board". Anaya asked Fitzwater to read the charges. Fitzwater read the single academic charge and two conduct charges (see 2023, 11/21 (~11:00)). Anaya asked Doe if he did or did not admit responsibility to any of the charges. Doe did not admit responsibility for any of the charges. Then Anaya said there would be two parts to the hearing. One, establishing whether the violation occurred and, which required "closed door" deliberation after hearing both sides, e.g. Fitzwater and Doe, followed by the board's verdict, and then, two, provided the board found there to be violations, conversation about appropriate sanctions against Doe between Fitzwater and Doe, followed by a "closed door" deliberation by the board about the outcomes to impose on Doe. Anaya went on to state that if witnesses entered the Zoom they would be introduced when time permitted and that Doe, Fitzwater and the Board could ask them questions. Doe noted that he did not see it stated in the code that Fitzwater and the Board could ask Doe's witnesses questions. Anaya said that it would necessarily be a hearing if witnesses could not be questioned. Chambers injected citing the section of the code that states the Chair has the authority to determine the question-and-answer format of the hearing. Fitzwater gave his opening statement, saying that SCCS was first contacted by Cochran on 2023/11/08 by way of a phone call. That Cochran made an SCCS report on 2023/01/13 of misconduct on part of Doe. That Cochran's report said he may have violated the code due to "concerning behavior". That Doe had a meeting with Fitzwater. That Doe submitted information to Fitzwater. That based on Doe's meeting with Fitzwater, Fitzwater's a phone call with Cochran, and Cochran's written complaints to SCCS, that Fitzwater sent Doe a resolution. Fitzwater read the rationale that he had written on the administrative resolution almost verbatim (see 2023, 12/20 (~14:00)). Doe made a comment in the Zoom chat that Anaya had previously said that they were not to read documents exactly as they were written. Anaya noted Doe commented and confirmed she had stated that. Anaya responded that Fitzwater had just offered an opening statement. Doe asked Fitzwater if he had confirmed the veracity of the supposed student email transcription within Cochran's written complaint. Fitzwater answered that the documentation Cochran provided documented her interactions with other students. Doe asked if SCCS had received the student email or if SCCS only had Cochran's written version of the supposed student email. Fitzwater answered that Cochran wrote Cochran's written complaint. Doe noted that Fitzwater had stated at Doe's 'informal meeting' that Fitzwater would be conducting interviews with students regarding Cochran's complaints about Doe to SCCS and Doe wanted to know if Fitzwater had interviewed any of the students mentioned in the SCCS complaint. Fitzwater answered, "ah, I did not". Doe had mentioned that there were leaders of Doe's RSO that were in Cochran's client course. To which Fitzwater said matters regarding the CRP RSO were not relevant. Doe noted that within Cochran's written complaints that were part of the hearing packet that Cochran mentioned the RSO. Anaya asked how the RSO was relevant. Doe offered that he thought that leaders within the RSO were upset with Doe because he took issue with the RSO canceling a general meeting. Anaya called the Board's attention to specific segments of Cochran's written complaint. She noted that the Board had a redacted version, so

they did not know who Cochran was making reference to, such that Doe would be the one that would have to disclose said information. Doe asked Fitzwater why the case file noted that the transcription of Doe 'informal meeting' and Cochran's phone interview with Fitzwater had timestamps denoting that each entry was separately edited in mid-December of 2023. Fitzwater said that he believed it was for the sake of adding a direct quote to the administrative resolution. Doe then offered his opening statement. Doe said that he made an exhaustive effort to be helpful and supportive of classmates, that he documented many examples of doing so, and provided said documentation to the Board. He said that tension in Cochran's client course was related to her instructional disengagement, and that Doe made multiple efforts to include Cochran on his team's communications in the hopes that she would be a more engaged instructor, and that he provided documentation of that to the Board. He said that the reason that he added slides to his team's presentation the night before the team's presentation, was due to Julie not doing that when she had been insistent on being the one to do that, and that even though a different teammate had volunteered before Julie, that Julie had insisted on being the teammate that would add that section of the presentation. Doe said that teammates were not graded individually during that portion of the course, nor were they given individualized assignments during that portion of the course, that Doe had told his team on multiple occasions after adding the slides that they should change what he had done if they wanted to, and that no one in Doe's team changed the work back to it prior state, even though doing so was easy to do, and even though the team had about an hour of class time before the presentation to do that. Doe said that he thought there was a lack of due diligence on part of SCCS because he had been told that student witnesses would be contacted, but that Fitzwater had stated for the record that did not occur. Doe said that he did not think Cochran's claims qualified as evidence. And Doe said that he distrusted the veracity of the supposed student email transcription within Cochran's written complaint to SCCS, and that he had expressed that concern to Fitzwater at his 'informal meeting' at SCCS. Anaya asked if Doe had any other non-witness evidence that Doe wanted to present. Doe told the Board that he provided them a them a link to his team's client-course slide deck that one could use the link to access the deck, and that within the deck one could access the work history and see who made what changes and at what time they made those changes. Anaya asked Fitzwater if he had questions for Doe. Fitzwater said that Doe said that the course syllabus did not prohibit changing the group work, asking if that was accurate. Doe that was accurate. Fitzwater asked if every specific expectation of the students was listed in the syllabus. Doe said that during the portion of the course that the hearing regarded that the only expectation was that the team would work toward giving a presentation. Fitzwater asked Doe how the submission of the slide deck worked. Doe explained that the presentation of the stakeholder was effective the team's submission of their work. The UNL ASUN Student Representative asked how much time classmate would have had to make the changes. Doe said that would have been the night prior to, up until the afternoon of the following day, and added that there was about an hour of class time before the team gave the presentation, that he told teammates to change the deck if they wanted to, and that undoing changes to the deck was as easy as clicking a button in the work history of the shared document. The UNL ASUN Student Representative asked what the benefit of Doe's change was to the team's presentation. Doe said that the survey results had not been added that the team had

planned on adding the results, and so the benefit was the inclusion of that content. Schmidt asked who was in charge of submitting the presentation, Doe said that he had mentioned at a team Zoom meeting that he may format the deck before they presented, but that teammates had that chance to whatever may want to before to presenting, and no one in the team did that. Schmidt asked if Doe could see how a teammate might see the formatting changes that Doe had made as deleting their work. Doe said no, and the reason was the ease with which Julie could have changed the slide deck with the work history feature. Schmidt asked if Doe knew for a fact that Julie was the one that was upset. Doe said that the identity could be inferred because Cochran had mentioned in her written complaint that the person in Doe's group that was upset about the presentation was the same person that was at a RSO social function, and the only person that would fit that description would be Julie. Schmidt stated that it was ultimately unknown to Doe, and asked Doe if that was correct. Doe repeated his prior answer. Schmidt said, "either you know or not, I guess that's my question". Doe said that he could not answer Schmidt's question because Doe fundamentally disagreed with the idea that Cochran's claims were evidentiary, but Doe's were not. Anaya directed the Board to a portion of Cochran's written complain that regarded the RSO gathering. Schmidt asked Doe if he could understand the teammate's feeling. Doe said no, and that were Doe in that situation he would have taken the small amount of time necessary to restore a previous version, or Doe would have thanked the teammate if they had improved the team's work. Schmidt said that Doe had made the comment somewhere in the materials that Doe provided the Board, that Doe had done most of the team's work, and Schmidt wanted to know what evidence Doe had to prove that. The hearing participants spent some time reviewing iterations of the slide deck with screenshare. Schmidt noted that names were sometimes associated with the same day. Doe noted that if one pressed the dropdown arrow by the date one could see names beside specific times on that date, and then one could click those timestamps to see that iteration of the deck. When Schmidt did that the hearing participants could see that it was primarily Doe's name appearing beside individual times. Schmidt stopped sharing screen with the hearing. Then Schmidt reworded his prior questions to Doe, and received reworded versions of the same answers Doe had previously given. A meaningful amount of time was spent on that line of questioning, during which Schmidt interjected multiple conclusory statement based on Cochran's written claims, all of which Doe disagreed with for the previous reasons that Doe had offered. Eventually, Anaya said that the hearing should spend some time on the two conduct charges. Anaya wanted to know how much time there was between when Cochran had made comments to Doe that he was being confrontational on 2023/10/24 and when the course stopped working in teams and started working on individual assignments. The hearing reviewed some of Doe's reference materials, and Anaya noted that it was the last few class sessions that were remote. The UNL ASUN Student Representative wanted to know if Doe was the leader of the group project. Doe said that no one was assigned that role, and that was a reason that Doe had made efforts to have Cochran be more engaged with his team's work by including her on the team's messages. Doe evidenced that claimed with copies of emails and group messages about virtual team meeting that Cochran was copied to. The UNL ASUN Student Representative said, "thank you for the very specific answer". Anaya asked about how the team was graded. Doe referred the Board to the syllabus, which said that the course was collaborative. Schmidt

asked Doe why the other students in the class felt that Doe was being aggressive toward them. Doe reiterated that claims are not evidence. Schmidt said that in Doe's opening Doe had said that he had said something to the effect that Doe felt he had to fill the role of an instructor. Schmidt wanted to know if Doe could see how other student might be put off by that. Doe said that he was trying to help other students by furnishing them subliminal reference material, and that Doe research regarded the topic that the course was about. Schmidt asked Doe if Doe felt like Doe was combative with the faculty member, Doe said that he did see things that way. Doe said that he was trying to help other students find a way to contribute because they were struggling to do that due to a lack of curriculum on part of Cochran. Doe gave multiple examples and asked the Board what more he could have done to be proactively inclusive of his classmates. Anaya asked Fitzwater if he wanted to rebut any of the information that Doe had offered. Fitzwater said, "not at this time". Anaya asked for closing statements. Fitzwater asked the Board to focus on the alleged violations and mentioned that Doe said that he changed the deck. Anaya asked Doe if he had a closing statement. Doe said he had to change the deck because a teammate did not do their work, that no one was graded individually on the presentation, that no one changed the deck even though there was the necessary time and easily accessible means, that claims are not evidenced without evidence, that Doe provided evidence, that Cochran did not come to the hearing that was occurring on her behalf, that Cochran was a bad faith actor, that instruction that is not offered cannot be disrupted and Cochran had not been an engaged instructor, which Doe noted was evidenced by the majority of the class being slated on the syllabus as to occur outside of class time and among teammates. The Board, e.g. Anaya, Schmidt, and the UNL ASUN Student Representative went into their "closed session" to deliberate the outcome of the hearing. They deliberated for approximately 1 hour. Then the Board returned. Schmidt was smiling, the UNL ASUN Student Representative was frowning, and Anaya was neither smiling nor frowning. Anaya stated that the Board found Doe not in violation of the academic charge, which was harmful academic action toward others. However, Anaya stated that the Board did find Doe in violation of both of the two conduct charges, which both pertained to disrupting class. The exact, and entire, rationale stated by Chair Anaya was: "Class is more than just the class environment, it includes, um, all meetings, all interactions associated with that class, and based on the evidence that we have received, it does show that, um, the behaviors exhibited by [Doe] in class and reported to multiple people by several individuals, um, did create a tension, and in the course itself, and did, um, substantially contribute to people not wanting to go to class in order to engage with him, um, and despite, you know, a claim of, of aversion by Dr. Cochran to confrontation, responsibility for behavior in class, um, was not the responsibility of the professor, but of the student". Anaya asked Fitzwater for his outcome recommendation. Fitzwater said Doe had no prior conduct history, but that SCCS would recommend the four prior outcomes stated in Fitzwater's administrative resolution (see 2023, 12/20 (~14:00)). Anaya asked Doe if he had any recommendations. Doe said that he impoverished, so he did not think that paying an administrative fee was appropriate. Doe said that he should not have to complete an intervention program at his expense because Doe already understood the issue and because he was impoverished. Doe asked for more information regarding what 'probation' met in the context of an SCCS conduct violation. Anaya said that he was to be on "disciplinary probation". Anaya clarified

that disciplinary probation related to conduct charges, and that academic probation was different, because academic probation was based on Doe's academic performance, Anaya stated "there's the two different types". Doe asked if he could continue to serve as a GSA at-large graduate representative when in a state of disciplinary probation. Schmidt read the portion of the GSA by-laws that state that a graduate student could not serve as a member of the assembly when in a state of academic or disciplinary probation. Doe said that he thought his energies would be more well spent focusing on being a GSA representative than being in a state of disciplinary probation, so Doe recommended that he not be put on disciplinary probation. However, Doe said that he would write a letter regarding what he learned from his experience. The Board went back into their "closed session" to deliberate sanction against Doe. The Board was in "closed session" for approximately 15 minutes. When they returned Anaya told Doe that the Board was to impose the following outcomes, which was upholding all the Fitzwater's recommendations. Anaya said that if Doe repeated the violation during probation that Doe would be subject to further disciplinary action. Anaya also said that the probation was, "disciplinary probation, just disciplinary, not at all academic, it's not on your transcript, it's not on your record, it's disciplinary". Anaya went on to say that "all this information will be in your letter, the office of student conduct and community standards complies all of this information and will provide you with a letter outlining the outcomes and any timeline for completion" and "you may appeal a decision of the University Conduct Board in writing within 10 university days of the date the decision is emailed to you".

01/29 (14:32): Shaver emailed Doe asking if he would like to Zoom on 01/31 at 13:30.

01/30 (08:00): Doe replied to Shaver's 01/29 (14:32) email confirming that Zoom session. (08:23): Shaver replied sending the Zoom link. (13:26): Shaver replied to Doe's 01/26 (16:58) email, writing; "[j]ust wanted to confirm that I received this", regarding Doe's request to include Barefield in Doe's IEC investigation. (15:06): Doe replied to Shaver, writing; "[t]hough I know the timing of my formal request to expand the case to include Barefield may have seemed imprudent due to my pending hearing, I want to reaffirm its sincerity", "I don't think Barefield should have considered my internship-related contractual aspirations", "as being germane to SCCS's consideration of [Doe]", "I don't think that Dr. Cochran's purported internship issues ever qualified as something that a reasonable person would consider beyond the pale", "I know that I was mistreated in a discriminatory manner by Cochran, and it's quite egregious considering I had made a good-faith effort to communicate with Cochran", "Priming expectation of a student/student-worker as being a concerning, confrontational and aggressive threat among faculty and fellow students only to subsequently orchestrate a provocative moment is not ok", "Cochran noticeably went on the offensive after [2023/10/24]".

01/30 (unknown): Shaver interviewed Willa for Doe's IEC investigation. Willa said, "[Doe] started the program last fall", "[Willa] had been in the program for about a year prior to that", "[Willa] was a board member for [the CRP RSO], and [Doe] was a member", "[Willa] has not had any classes with [Doe]",

"[h]er only interactions with [Doe] are related to [the CRP RSO]", "[Willa] had [Cochran] as a professor for a couple of classes now and she is also [Willa]'s faculty advisor", "[Willa]'s interactions with [Doe] have not been negative and have been brief", "[Doe] is engaged and open to asking questions", "[Willa] is not aware of an assistantship but is aware that [Doe] was helping [Cochran] with some research work but does not know the scope of that research was or what the goal was", "[Willa] does not know about [Cochran]'s available research or assistantship positions", "[Willa] knows that professionals within the program do have assistantship opportunities for students, but they are specific to each professor", "[Willa] remembers co-authorship being a topic of conversation but does not remember if [Doe] was part of it", "It was regarding what qualifies as sufficient to have a name published within a work of research", "[Doe] was also part of the Graduate Student Assembly and may have been working on that during this time", "[Willa] was not aware of issues between [Doe] and [Cochran]", "[Willa] knows [Julie] [], another student in the planning program and a board member for [the CRP RSO]", "[Willa] described [Doe]'s interactions in [the CRP RSO] as 'normal[]'", "[t]here have not been any points of contention", "[t]hey have been very engaged", "[s]imilarly, she has not noticed anything negative or 'off' about Julie's interactions with others".

01/30 (unknown): Shaver interviewed Mike for Doe's IEC investigation. Mike said, "[Mike] was [Doe]'s classmate in [Cochran]'s [client] course and in another course with [] [Doe's faculty advisor]", "[t]hey were not friends outside of the classroom", "[Doe] is a 'normal student' who participated well", "[Mike] never saw anything 'different or bad behavior[]'", "In [Cochran's client course] all the classmates participated together", "[Mike] was part of' the other team that Doe was not on, "[Mike] does not remember any issues with the presentations", "[a]t the end of the semester everyone worked together on the report", "[Mike] had discussion with [Doe] about topics in the report, like population in the future", "[Doe] explained ideas they had, and it was a normal discussion between team members", "[Mike] does not know whether other students changed [Doe]'s work or vice versa", "[Mike] described" Doe "as a 'regular student[]'", "[s]tudents always had the opportunity to ask or discuss topics", "[Mike] did not see anything different with [Doe]", "[Mike] remembered students and [Cochran] being respectful", "[t]he interaction between [Cochran] and [Julie] was a 'good relationship'", "[Mike] does not remember [Cochran] telling [Doe] they were being 'confrontational[]'", "[Mike] is not aware of any students raising concerns about [Doe] to [Cochran]", "Near the end of the fall semester, [Cochran] talked to [Mike] about a potential opportunity to work together on a project, but [Mike] was in his last semester, so was not going to be around to work with [Cochran]", "She was looking for a student who was newer to the program", "[Mike] thought she talked to a few other students about it, as well".

01/30 (15:45): Doe emailed Anaya, copying the UNL SA Vice Chancellor, writing; "[p]ending my letter of notification regarding the board's 'decision(s) and response(s),' I am asking to know my in-limbo status", asking "[s]pecifically, while I await said letter, am I in an active state of disciplinary probation, or is it the case that I am not in an active state of disciplinary probation". Going on to write; "I ask this question because there is a Graduate Student Assembly meeting on [2024/02/06] that could fall within

the (7) University days within which I may receive said letter". (16:03): Anaya forwarded Doe's email to Fitzwater and Barefield, asking; "I am assuming that probation started but is it official when he actually receives his letter". (16:58): Fitzwater replied to Anaya and Barefield, writing; "[h]ere is the information from the Code", and pasted some of the textual body from the code of conduct. (17:03): Anaya replied to Doe's emal (15:45), writing; "I can answer this one", "[i]t can be found in the code", the operative portion of the pasted code stated that "[t]he response to a violation takes effect on the day when the letter of decision is sent". (17:07): Doe replied to Anaya, writing; "[t]hank you very much".

01/31 (13:30): Doe had his IEC Zoom meeting with Shaver to review the contents of his most recent FERPA fulfillment for CRP faculty emails regarding Doe. At the onset of the Zoom session Shaver informed Doe that she had been granted access to Doe's FERPA request fulfillments. Doe asked what Shaver's thought about the contents of the emails. Shaver asked "what in particular". Doe said that this harassment allegations against Barefield were based in large part on the contents of the emails in his FERPA fulfillment. Shaver said that she was processing that with her supervisor, who Shaver said was Counley. Doe asked for clarification from Shaver as to what, exactly, a student's "educational record" was, and how it was that items were added to it, where it was located, etc.. Shaver said she wasn't an expert, but her understanding was that "different areas" can "create different kinds of documents", offering grades and an example of a kind of record, and noting that there is a particular part of campus that is responsible for grades, whereas IT would have access to emails. Shaver said it depended on the record that was being sought and where it was housed, Shaver said "that's my understanding". Doe said "that does help", as Doe was uncertain if there was a "big master file". Shaver apologized and told Doe that she was recording, saying that she assumed that she would be "information gathering". Doe asked "in terms of, um, ah information gathering, was there, was there something that you had wanted". Shaver "no", and that she thought Doe might have something particular he wanted to point out. Doe asked if Shaver had interviewed anyone yet. Shaver said she had in "no particular order". Shaver said people were responsive. Doe said "that's good to hear". Shaver said "that it's always possible" that "some might not". Doe said "regarding Schuldeis, if I'm, I'm saying that name correctly, um, my inference was, you know, er, that week, of kind of like the 6th through, I think, the, the 10th [2023/11] my assumption was, um, [] Cochran was reaching out to a lot of different SA offices, and that was maybe one person that had been spoken to, I'm not sure if it's the case that's in regards to the class or the internship". Shaver said, "so she, what happen is, our system is such that we receive, um, reports any number of ways, and so one of those ways is through this program called [the formal notification system], so when, when some sort of report comes in, um, it can be assigned to different people, or, or not, or we see in there, and we, we respond, so there was a particular report that came through via [the formal notification system] that she saw, and, and reached out regarding, and so I think she maybe spoke with [] Cochran, um, I can't remember the details of what exactly it, that first thing, the first meeting was about, but she spoke with her once and realized, so [Schuldeis] does a very particular thing in our office, so she usually does, um, more equal employment opportunity types of things, and so when she realized it wasn't necessarily her baby, then she handed it off to, to [Reed], which is when [Reed] got

involved, so she happened to be the first point of contact, so she received some contact from [] Cochran, but at some point was no longer involved, and no longer was engaging with her, so that's kind of, in a nutshell, what happened with Schuldeis". Doe said, "ok, well, good to know". Doe and Shaver moved on. Doe noted that the email records fulfillment contained emails from before the timeframe that Doe had requested, but in terms of what Doe found noteworthy within Doe's expanding chronology, that seemed to start in late 2023/09 to early 2023/10. Doe said that Cochran was corresponding with Tang about a potential student worker and that she was considering two people, and that Tang told Cochran that they were both good choices for employment. Doe said that he thought the other person was Mike. Shaver asked if that was about the internship or assistantship. Doe said the internship, but that it had been discussed between Tang and Doe that Cochran would have an assistantship coming up later. Doe said that based on the interactions that Doe observed in class between Mike and Cochran, that Mike's understanding that Cochran had an upcoming assistantship was the same as Doe's. Shaver asked if Cochran ever mentioned someone else filling that role, before she ended up filling it. Doe said that he told Cochran that Tang told him that she would have an assistantship opening up. Doe said that it was late October of 2023 when Cochran had told Doe that she had filled the assistantship. Shaver circled back around to Doe's by-name acknowledgement on published work and mentioned that Cochran had declined to sign the MOU in an email to Doe. Doe said "I took umbrage to that, because, you know, because when I asked the answer I got was 'yes', and also my understanding was that a memorandum of understanding wasn't a legally binding contract, thus not prohibited by, by the university". Doe moved on saying "my integrity as a researcher was being libeled, um, because, and this will come up later in my chronology, but Dr. Cochran was emailing people and saying that she felt, like, I was going to harm the integrity of the research". Doe took issue with this, saying "I had never given her any cause whatsoever to think that, you know, I would engage in any sort of misdoings regarding the research, so when I saw that later on in the, in the chronology of the emails that really distressed me". Doe said, "that deeply offended me". Doe moved on regarding Cochran's transcription of email within her written complaint to SCCS, saying that "I was not able to triangulate it". Doe said "my skeptical perception is that [] Cochran had taken a disliking to me" and "being as she is a very writerly, textually oriented person, um, is perhaps the type to create these documents, to proactively create these types of documents, just in case". Doe said that as he was not able to triangulate the veracity of the email in Cochran's written complaint within his FERPA email fulfillment and he thought that "lends validity to that worry on my part". Shaver asked if Doe was skeptical that the email with Cochran's written complaint was real, Doe said "yes". Doe went on saying "I argue in no uncertain terms" it was "intended to what I was worried would happen, which is stigmatize me, you know, as being a confrontational mean person". Doe said "it distresses me because that was, you know, after October 24th [2023], that's when the tone and characterization of me become noticeably more negative". Doe said, "I think that the October 24th email freaked [] Cochran out and that's when she, she went on the offensive in terms of creating a lot of documentation that would create the perception of me in the minds of others that I am some crazy agro maniac, um, and then played upon other things that were unrelated, ah, specifically the RSO politicking, um, to orchestrate this provocative moment [2023/11/21], I think they're, you know, and [] Cochran is a

very intelligent person, you know, ah, ah, well and their, their research mainly revolved around interacting with other people, so I don't put it past [] Cochran to have this level of social sophistication, to attempt to stigmatize and subsequently provoke a reaction that would, ah, confirm other people's negatively primed perceptions of me". Doe went on to speak to Shaver about the RSO social function that Cochran made mention to in her written complaint, saying "regarding what's, what's written about, like, this, this notion that I posed ethical questions, which I did do, that is so silly, I mean, good grief, um, and, ah, I think, the, the really stigmatizing framing around what is claimed to have ever happened at any given point is so cartoonish". Doe said "it does strike me as peculiar that Kuenning was so heavily involved within this process", "regarding these issues with the internship and the classroom", "or supposed issues on part of Cochran", "Cochran's noticeably involving [] Kuenning early on, and my impression, and this is my impression, is that, you know, ah, Kuenning is a very sympathetic person", "once [] Cochran realized that, um, [] Kuenning was very receptive, ah, to what she was saying, that like both, um, well [] Cochran, and potentially [Julie] too, where going to [Kuenning], like really trying to impress upon her that I was this evil angry man", "I think that was part of the whisper campaign", "I think what [] Cochran is trying to do is bandwagon", "she wants [] Kuenning to say negative things about me", "she's trying to get other people to say what she wants to say, I think, I think she's bandwagoning, in a very strategic manner". Doe said that he thought Tang thought there was bandwagoning occurring too, saying that at his 2023/10/27 meeting with Tang that "he really, really made a strong effort to impress upon me, that I should feel welcome as well" within the CRP program. Doe said that at the 2023/10/27 Zoom work meeting with Cochran wherein Doe noticed that Cochran was covertly recording, "my impression when I noticed she was covertly recording, was that, that she was trying to get me", "that this was, like, trying to push me out of the program, and she's like trying to build up documentation to do that, which, um, I wish, I wish that recording, I assume that recording is out there somewhere, like, on [] Cochran's hard drive, or, um, within her cloud, her university associated cloud, because it would be so helpful to just have that video recording, which I assume she saved, because the manner in which she conducts her research is somewhat archival in nature, um, so I do, I do believe it is more likely than not that she saved it, unless she though 'oh this isn't going to help me, so why bother saving it', but I certainly think it could help me if we could get that video recording". Doe said that he'd noticed that in a 2023/11/01 email from Cochran to Kuenning Cochran had brought up the notion that Doe might be dismissed form the program, noting "I mean, wow, to circulate that notion behind my back". Doe told Shaver that at his University Conduct Board Hearing that he was not found in violation of the academic charge against him, and that if he got disciplinary probation, which Doe said he was not technically in until he received his letter from SCCS, that his intent was to appeal said letter to the UNL SA Vice Chancellor. Shaver asked for clarification about Doe's probationary status prior to receiving his formal letter from the Board, "you're not on probation in the interim". Doe said, "yeah, yeah, I'm not in the interim, and once I get my letter, I'm going to appeal it, and I believe as long as the appeal exist within the ether, I'm not technically either". Doe read through more of the chronology and noted it did not seem that Tang perceived Doe was a threat at the time that Cochran was pressing the CoA to suspend Doe around 2023/11/07, "because the next day on November 8th, you know, I, I email,

um, I think I included this email, um, is included within my documents, ah, [] Tang for NCard access, you know, and he, like, proactively gets me NCard access", so if people "are in dire need of reaching out to, like, the Title IX office, and, like, [] Tang is in sincere belief of this, why in the world is he, like, proactively getting me access to the building, you know, I mean, it just does not make sense to me". Doe said, "anyhow, there's, there's this meeting, I guess on the 8th, and then, you know, Cochran goes to SA, she's corresponding with Schuldeis", "she's getting the dominoes all lined up, right, she successfully made her paper trail, she's got her bandwagon, um, you know, [] Kuenning's primed to think all the terrible things". Doe said, "there's so much false light framing, going, going on here", "due to bad faith actors, doing what bad faith actors do", "I was worried she was doing this by the way", "I tried to nip this in the bud early on by using communication". Doe continued through the chronology, "then I get this SA SCCS letter, like, in the middle of class, I, I got that [formal notification], um, at one o' six", "and then like ten minutes later [] Cochran emails Barefield asking Barefield not to send it out until after class, because it might make me react poorly, so it's like she knew she didn't pull it off, right, she, she successfully stigmatized me, she successfully bandwagoned, and then she successfully orchestrated, you know, this like provocative moment, because then I would have blown my lid, right, and yelled, and then I would have, like, validated this angry man idea she had been, like, cultivating in other people's minds, but I didn't blow my lid, and I think it's, its evidenced that she realized she had, like, not successfully executed her plan, ten minutes later after the fact, well she, she's trying to maintain the paper trail, of looking like she's totally in the right", "she knew she didn't, didn't quite pull it off, I didn't lose my marbles". Doe kept on with his chorology by talking to Shaver about the email that Cochran sent to Morgan, 2023/12/05, "regarding my complaints to IEC, that very last entry, right, um, with, with redacted, which is obviously Morgan, right, because he was the one that I had that spat with about not messing with my sections in chapter four, you know, the night prior, when he was editing and I complained, the, the next morning he reaches out to [] Cochran, um, and then [] Cochran responds by essentially egging him on", "'I recommend trying to work collaboratively on chapter four', that wasn't the shtick though, like, we'd been assigned to specific sections". Doe did not know at this point in time that he would eventually get access to unredacted versions of his records request fulfillments. Doe ended by noting to Shaver, "Barefield, much like Kuenning, seemed immediately sympathetic with [] Cochran". Shaver said she would be in touch.

02/01 (08:20): Shaver emailed Cochran, writing; "I hope you're doing well", "[Doe] has indicated that they believe a particular meeting with you via Zoom was recorded", "I believe it was a meeting that occurred at the end of October ([2023/10/27])", "I just wanted to check to see if you have a recorded meeting", asking "[a]nd if so, would you be willing to provide that". (09:21): Cochran replied to Shaver, writing; "I see on my calendar that I did meet via Zoom with [Doe] on [2023/]10/27", "[f]or one of our regular research meetings", "I did not record the meeting, nor any of our other, one-on-one research- or office hours/class-related meetings", "I do have some recordings from [the client course], however", "I'll share those in case they're of help", going on to provide three links to video recording of class sessions,

as well as a block quote from Cochran's written complaint regarding Doe attempts at attain co-authorship.

02/02 (14:38): Shaver sent Doe an email with the from the formal notification system, it linked to a dismissal of Doe's 2024/01/26 complaint of harassment on part of Barefield. Shaver wrote; "[y]ou allege that [] Barefield knows that [] Cochran is using the Student Conduct process to harass you due to your protected status", "which facilitates an environment of harassing discrimination created by [] Cochran's misuse of [SCCS]", "I certainly understand the stressful and negative impact that the student conduct process has had on you; however, the facts alleged do not support a reasonable inference that [] Barefield's actions, specifically, were based on or because of your sex".

02/02 (16:19): Doe emailed the NU Records Director, writing; "[b]ased on my amended understanding that a student's educational record is a patchwork of documents in many different places", "I am writing to ask that you disregard my request made on [2023/01/25] to review my entire student record", "[h]owever, as of today, [2024/02/02], I am formally requesting under FERA to remotely review digital copies of emails sent to or received by the following university emails that are included in my educational record; that were not sent to nor received by [Doe's email]; from and including the day of [2023/10/01] to and including and day of [2024/01/01]", Doe listed the four senior CRP faculty member's emails and Wymelenberg's.

02/05 (08:00): Doe emailed Pearce, writing; "I have some context and questions for you", "[o]n [2023/11/14], [] Cochran corresponded with [] Schuldeis, by way of email and over the phone, regarding []", "[o]n [2024/01/31], [] Shaver told [Doe] that [] Schuldeis's Nov 14 correspondence was due to nothing more than [] Schuldeis being the first IEC employee in the queue to respond to [] Cochran", Doe asked "[i]s it the case that [Doe] is currently (or previously) being (or been) investigated by [] Schuldeis or any other IEC employee", Doe also asked "[i]s it the case that IEC employees share evidence between one another regarding separate cases that involve the same people". (08:40): Pearce replied to Doe, copying Shaver, writing; "I am referring your questions to [Shaver]". (08:50): Shaver emailed Doe, reply to Pearce, writing; "[i]n response to you questions", "there's no other investigation in IEC involving you", "[i]f at any point an investigation is initiated, you will receive a notice of allegation like the notices that were sent at the initiation of your current case", "IEC employees have access to information/evidence in other cases involving the same people and can utilize it if relevant".

02/06 (13:35): SCCS sent Doe a formal notification. Included within the was the University Conduct Board's letter from SCCS. The cover letter featured Barefield's signature, while the body of the featured Anaya's signature. The letter stated that Doe was not found in violation of two counts of disrupting class. The letter stated: "The Board considered the following facts in making their determination: The Faculty and other students reported disruptive behavior from the respondent in class, which disrupted class and made in-person meetings hostile. Additionally, the Faculty member reported that the

respondent's actions made her feel "threatened and otherwise upset". Based on these reported behaviors and concerns expressed to Faculty by other students, the format of the class was changed." Doe was confused by the rational offered in the letter, as it did not seem to him to match what Anaya has said at his hearing (see 2024, 01/29 (~13:00)) wherein Anaya had stated the rationale as: "Class is more than just the class environment, it includes, um, all meetings, all interactions associated with that class, and based on the evidence that we have received, it does show that, um, the behaviors exhibited by [Doe] in class and reported to multiple people by several individuals, um, did create a tension, and in the course itself, and did, um, substantially contribute to people not wanting to go to class in order to engage with him, um, and despite, you know, a claim of, of aversion by Dr. Cochran to confrontation, responsibility for behavior in class, um, was not the responsibility of the professor, but of the student."

02/06 (14:34): Doe emailed Anaya and the UNL SA Vice Chancellor, copying Shaver, writing; "[h]ello Conduct Board Chair [] Anaya & [UNL SA Vice Chancellor], [b]ased on University Code of Conduct [exact citation]", "I am requesting that the sanctions prescribed in the letter that I received from the Conduct Board today, [2024/02/06], be suspended while I compose a formal letter of appeal for [UNL SA Vice Chancellor], to be submitted for consideration no later than [17:00]", "on [2024/02/20]", "I make this formally permitted request for a temporary suspension of sanctions to you because the implementation of said sanctions today, [2024/02/06], will harm me by hampering my civic inclusion as an at-large graduate student representative within the Graduate Student Assembly (GSA) at the assembly's general meeting this evening, of which event I whole-heartly intend on attending, and of which event I have been happily looking forward to attending as a member of the GSA", "[a] temporary suspension of sanctions pending my appeal letter will not adversely affect the University nor any other persons", "I have been dutifully attending courses this semester and submitting assignments amongst my peers and to my professors without any issues of any sort", "[t]hat conduct-appropriate participation within my scholastic advancement at the University has occurred without the imposition of sanctions on my person", "[m]y intention in attending the GSA meeting tonight is not for the sake of harming the University, but rather for the sake of being part of a greater civic body of which, by majority vote, elected me to hold the position of at-large representative", "As required by University Code of Conduct [exact citation]", "I am attaching to this email the letter I received today from the Conduct Board", "I humbly ask that my earnest request for a temporary suspension of sanctions pending my appeal letter be promptly reviewed and granted before [17:00]", "today, [2024/02/06], by the [UNL SA Vice Chancellor], or the Vice Chancellor's designee, Conduct Board Chair [] Anava". (15:04): The UNL SA Vice Chancellor emailed Barefield, writing; "[Doe] has requested to suspend his sanction pending his appeal so he can attend the GSA meeting", "[r]eviewing his outcome letter I don't see anything in there that would prevent him from attending", asking "[w]hat are your thoughts on this". (~16:50): Doe called UNL SA. The SA secretary answered. Doe gave context about his situation and then explained that, procedurally speaking, he could not attend the evening GSA meeting as a serving member without the UNL SA Vice Chancellor suspended his sanctions pending his appeal letter. The secretary told Doe to get a pencil, and that she was going to give him the contact information for the UNL SA Vice

Chancellor. Doe got a pencil, then the secretary gave him an email, Doe asked before finishing something to the effect, 'is that the generic SA email'. The secretary said something to the effect, 'the UNL SA Vice Chancellor occasionally checks it'. Doe thanked the secretary, then hung up. (16:58): Barefield replied to the UNL SA Vice Chancellor, writing; "[t]he GSA Bylaws state that a person cannot serve as a representative if they are on 'disciplinary probation'". (17:24): Anaya forwarded Doe's email to Fitzwater and Barefield, writing; "I'm not going to respond until tomorrow".

02/08 (10:14): Nielsen emailed Doe, responding to Doe's 2024/01/15 complaints of unprofessional behavior by Palser and Reed, writing; "I recently received your complaints against [] Paler and [] Reed", "[r]egarding your allegations of unprofessional behavior from [] Paler: I have reviewed your complaint and find no basis for your assertions [] Paler was unprofessional or violated University policy", "Regarding your allegations of unprofessional behavior from [] Reed: I have requested that [] Pearce, as [] Reed's supervisor, review, and if appropriate, address these claims with [] Reed".

02/08 (unknown): Shaver interviewed Julie for Doe's IEC investigation. [Julie] said that "[Julie] was in the [client course] class in the fall 2023 semester", "[w]hen it came time for group work, [Julie] was put in [Doe]'s group", "[Doe] kept trying to push things in a certain direction", "[t]hey were supposed to edit an existing survey, but [Doe] kept saying they had to write a new survey and would not believe [Julie] until they confirmed it with [Cochran]", "[Doe] said, 'Why are you upset? We're doing it your way[]'", "[i]t felt confrontational", "[s]he was uncomfortable but tried to let it go", "[s]imilar incidents just kept happening", "[t]hey were required to add a few questions to the survey that was generated by a professional survey company", "[Doe] suggested to the group that they rewrite the entire survey", "[Julie] was not going to spend time doing that", "[a]gain, they had to confirm with [Cochran] that they were not rewriting the entire survey", "[t]he next week, [Doe] brought an entirely rewritten version", "[Julie] pushed back and said, 'We're not going to rewrite it all'", "[i]t was not what they were supposed to be doing", "[i]t felt to Julie that she continually had to push [Doe] back on track", "[e]very time [Doe] was unhappy it was because they were being told what to do", "[Cochran] said she put the two in the same group so they would balance each other out", "[Julie] did not appreciate that, but it has happened her entire school career", "[Julie] met with [Cochran] a couple of times", "[Cochran] asked her after class on [2023/10/10] how things were going", "[Julie] said she was still having difficulties", "[Cochran] emailed [Julie] on [2023/10/10] to follow up on their discussion after class", "[s]he provided a couple of options to [Julie]", "[t]he other group did not have any issues", "[b]oth [Julie] and [Doe] are okay with being the leader of the group", "[t]hey both have 'strong personalities,' and [Julie] was the only one in the group who pushed back against the [Doe]", "[Doe] was being mean to her", "[e]ventually the group started working on the presentation and had Zoom meetings", "[b]efore the presentation [], a few of the [CRP RSO] members went to an informal gathering", "[Doe] went", "[Julie] works for the City []", "[t]owards the end of the evening, [Doe] began to ask really pointed questions that [Julie] found offensive", "[Doe] asked if since there are so many different documents from so many different departments, someone could find a way to do whatever they wanted in the city [] because the

departments do not speak to each other", "[Julie] said, 'absolutely not' and was furious", "the insinuation was that the City was not doing everything it could to follow the rules and regulations", "[Julie] did not want to see [Doe] after that because he insulted her colleagues", "before the presentation on [2023/11/07], [Julie] found out that [Doe] had changed her slides", "[a]t that point, [Doe] was not present in the classroom", "[Julie] had laid her slides out in a way so that she could read them properly", "[s]he was working all day prior to the presentation", "[Doe] did not ask if they could change anyone's work, they just did it", "[Julie] asked why and [Doe] said they made it more 'concise'", "and pointed out that [Julie] did not do part of the assignment that she said she would", "[Julie] said it was true", "[Cochran] had not said they could not change each other's work", "[a]fter the presentation, when [Julie] spoke to [Cochran], [Cochran] brought in [] Kuenning", "[i]t was decided that the groups would be split up", "[l]ater in the class, [Julie]'s friend, [Morgan], also had issues", "[Morgan] is the only other person who [Julie] is aware of that raised issues with [Doe] to [Cochran]", "[t]he second part of the class was a big report", "[i]t was compiled by the entire class", "[i]f one person was going to change somebody's work, [Cochran] told them they had to use the 'track changes' function", "because Xavier was formatting it", "[Julie] only knows what [Morgan] told her", "[Morgan] changed some of [Doe]'s work", "[Julie] thinks [Morgan] was allowed to do so", "[Doe] then sent a vitriolic email to [Cochran], copying [Morgan]", "[Julie] and [Morgan] had to be around [Doe] in [CRP RSO], and [Doe] would just pretend like nothing had happened", "[Julie] was copied on [] emails by [Doe], most of which she forwarded to [] Tang", "[o]ne email asked her to participate in a hearing".

02/09 (unknown): Shaver interviewed Tang for Doe's IEC investigation. Tang said that "Tang is the program director for [CRP]", "[Doe] transferred into the program in fall 2023", "[Cochran] asked [] Tang in early fall 2023 about a student research assistant position and said she had the money and asked for [] Tang's input on potential options", "Tang mentioned a student named [Freddie] and [Doe], and said both are good", "Tang encouraged her to give [Doe] a try", "[t]he week of October 24,[] Tang learned from [Cochran] that [Doe] behaved inappropriately in class", "[Doe] disagreed", "Tang felt he needed to step in and attempted to schedule a meeting with [Doe]", "[Doe] asked whether it was a formal or informal meeting and what the purpose was", "Tang explained he just wanted to learn about how things are going", "[Doe] was busy so they met [2023/10/27]", "Tang clearly emphasized the expectation for respect", "Tang did not provide any specific examples or names", "[Doe] listened very carefully, and it was a friendly environment", "Tang also told [Doe] they are a good student and the faculty like him", "[o]n [2023/10/31], [] Tang purchased doughnuts and went to [Cochran]'s class, and he talked to the class about being respectful to students and colleagues", "[Doe] was present for that", "Tang did not mention anyone's name", "[o]n [2023/11/07], there were group projects in [Cochran]'s course", "[t]he group had to report to the stakeholders virtually", "Tang offered to sit in the room in the event there was any conflict", "[t]here was a faculty meeting on [2023/11/08]", "[Kuenning] attended the meeting", "[t]hey had a long discussion about the issues regarding [Doe]", "Tang explained that if a question is academically related, then a student has the freedom to ask challenging questions", "[t]hey discussed senior faculty sitting in on [Cochran]'s classes to make sure no further conflict arose",

"[Kuenning] explained they had the right to file a report", "Tang had another meeting on [2023/11/10], that included [] Wymelenberg. [Kuenning], and [Cochran]", "[Wymelenberg] agreed with the mitigation measures that the senior faculty would help", "[Kuenning] may have called other university offices, like UNLPD, to discuss safety measures around that time", "[o]n [2023/11/30], [] Tang was asked to accompany [Doe] to an informal meeting with [SCCS], along with someone from [SAS]", "Tang met with Complainant and SAS for about 10-15 minutes", "[t]hey all went to [SCCS] and [] Tang sat outside", "[i]t lasted more than an hour", "[Angie]'s husband, who was in [] engineering had contact with [Cochran] inquiring about Angie being hired as a graduate assistant", "but she did not have money at that time", "[t]he [assistantship] project was awarded, but it took several months to receive the funding", "Tang told [Cochran] that whenever she had money, she could proceed", "[a]t that time, [Angie] had to prepare her paperwork and visa because she was an international student", "Tang discussed [Freddie] as another option for [Cochran]'s assistantship because [] Tang knew [Freddie] needed funding as well, but [Cochran] said no", "Tang asked [Cochran] to not attend [CRP RSO] meetings", "Tang only briefly observed the class and did not observe a class from start to finish, so he did not observe issues with [Doe] in class".

02/12 (unknown): Shaver interviewed Milly for Doe's IEC investigation. Milly said that "[Milly] was in [Cochran]'s [] class with [Doe]: "[Milly] did not have a lot of one-on-one interactions with [Doe]", "She talked to [Doe] three or four times and never had any direct confrontation or issues with them". "[Milly] was also in [another course] with Complainant", "[t]here is something "different" about the way that Complainant interacted", "[p]eople have different ways of expressing themselves", "[Milly] does not know [Julie] that well", [Julie] was in a different group in [the client course]", "[Milly] was also in other classes with [Julie]," "[i]n general, Julie got really into her classes and participated a lot", "[t]here were times when [Julie] spoke where Milly felt like, 'Okay, we've discussed this enough, it's time to move on to the next topic[]'", "[Julie] and [Doe] both are passionate", "[b]oth stand their ground and want to get to the bottom of things", "[Milly] knows of issues [Morgan] had with [Doe] with the final project", "[t]here was a document with people making comments on it", "[Milly] was focused on her part", "[Doe] commented minor edits on [Milly]'s part of the project, nothing inappropriate", "[t]hey were useful comments", "[Morgan] and [Doe] had a lot of back and forth", "[Morgan] and [Doe] had some kind of conflict, but [Milly] does not know the details", "[Milly] thinks they used the function in word to 'track changes[]'", "She remembers going through and hitting 'accept' or 'reject' when someone made a change", "[Milly] heard the name '[Doe]' more than she wanted to", "She cannot remember who said what", "[i]t was in the context of 'drama'".

02/12 (unknown): Shaver interviewed Kuenning for Doe's IEC investigation. Kuenning said that "[Kuenning] serves as the Director of Advising and Student Success in the College of Architecture", "[s]he has had little face-to-face contact with Complainant", "[Kuenning] first heard from [Cochran] via email on [2023/10/25]", "[Kuenning] thinks [Cochran] reached out to her because she wanted to know whether other faculty had encountered any issues or if [Doe] was on Stephanie's radar", "[n]o one else

had raised any issues at that point", "[Cochran] explained [Doe] reached out to her after they had an incident in class, a tense exchange", "[Cochran] explained [Doe] reached out to her about the confrontation and [Cochran] had written a response and was asking for some advice because she was 'shaken' by the email she had received from [Doe]", "[Kuenning] met with [Cochran] on [2023/10/27], via Zoom", "[Doe] was an hourly paid worker for [Cochran]", "[i]n the Zoom meeting, [Cochran] updated [Kuenning] after having her usual one-on-one meeting with [Doe] and having sent her email response", "[Kuenning] also referred [Cochran] to meet with [] Tang and went over resources that were available to [Cochran], including Student Affairs", "[Kuenning] thinks [Cochran] elaborated more with [] Tang about how things were going", "[t]he next interaction was after there was an incident in class that involved [Julie] on [2023/11/07]", "[Kuenning] was asked to come into a meeting with [Cochran] and [Julie] in [Cochran]'s office", "[Cochran] was in need of some assistance with Julie", "[i]t is in [Kuenning]'s wheelhouse to help students who need to be connected to resources", "[Julie] explained to [Kuenning] what happened in class and more incidents that suggested this was the 'cherry on top' for her regarding the group work with [Doe]", "[Julie] was upset", "[Kuenning] worked with [Julie] to connect her with resources", "[t]hey also talked about Title IX", "[Cochran] was more of an observer during that meeting", "[o]n [2023/11/08], [Kuenning] attended a [CRP] faculty meeting", "[i]t is normal for her to attend those because recruiting and class schedules are always topics discussed", "[t]hey also talk about any Student Affairs related matters", "[a]t that meeting, [Doe] came up", "[Kuenning] does not remember specific incidents being discussed in the meeting, but [Cochran] was trying to decide to which upper-level administrative unit she was going to take her concerns", "[t]here was no decision made in that meeting", "[Kuenning] said that it would be appropriate to discuss the matter with Title IX or Student Affairs", "[i]n that meeting, [Kuenning] said that if that was the course that was going to be taken, to elevate it to the next level, then they needed to stop talking about it", "[Kuenning] elevated the concerns to her direct supervisor, [Wymelenberg]", "Wymelenberg requested to meet with [Kuenning], [] Tang, and [Cochran], which occurred on [2023/11/10]", "Wymelenberg reiterated all the same support and resources that [Cochran] could utilize", "[d]uring that meeting", "[Cochran] felt unsafe", "[she] asked about safety measures because she was concerned about retaliation", "Tang and [Wymelenberg] talked about how a senior faculty could attend her class to help monitor her classroom or the potential for a plainclothes officer or increased patrols", "[Kuenning] called UNLPD to ask about what their recommendation would be", "[t]hey did not think a plainclothes officer was warranted if someone else was going to be attending her classes", "[t]hey also did not have other reports of alarming behavior about [Doe], but mentioned they may increase patrols around the building", "Kuenning was worried about the safety of the staff and students in the building", "[Kuenning] did not know of any physical threats".

02/15 (unknown): Shaver interviewed Barefield for Doe's IEC investigation. Barefield said

"[Barefield] is the Director of Student Conduct and Community Standards (SCCS)", "Initially, [Cochran]", "reached out to [SCCS] by phone" [2023/11/08] "and spoke to the [Secretary] about their

concerns about the situation in the classroom", "[Barefield] found out about it the next day", "[b]efore moving forward with a case, [Barefield] looks at the facts and whether what has been outlined would be considered a student conduct violation", "[w]hen she looks at a case like this where there was a disruption and allegation of academic misconduct, she wanted to see if the disruption was enough for other people in the class to be impacted", "[i]f the answer to that is yes, then no matter the level of impact, they would move forward with a charge", "[t]he same is true about academic misconduct", if "there enough to suggest there might be a violation", "proceed with an investigation", "[Barefield] and [Cochran] communicated via email and then at some point had a conversation on the phone", "[Barefield] does not remember the date", "[m]ost of their conversations were about the information that [Cochran] was reporting and how the process would proceed", "[Barefield] asked for a copy of the syllabus because one of the concerns that was raised was whether there was an impact in the class", "[t]he syllabus helped [SCCS] to understand the format of the class", "[Cochran] did not ask questions about how she should engage with [Doe]", "[Doe] was an employee of [Cochran]'s at the time, and [Cochran] said they were having Zoom conversations once a week", "[m]ost of the communication between [Doe] and [Cochran] was by email", "[t]oward the end of the semester, [Barefield] learned that", "[the CRP faculty member graduated from the same institution as Cochran], Tang, and [Doe's faculty advisor] were in one of [Cochran]'s classes to observe", "[i]nformation was reported to both IEC and [SCCS]", "[SCCS] waited to hear from IEC to move forward with the information that had been reported to [SCCS] so that it would not impact any investigation being conducted by IEC", "[Barefield] communicated that to [Cochran]", "[t]here was one exchange where [Cochran] asked when [SCCS] would be notifying [Doe] of the allegations", "[SCCS] does not look at class schedules to determine when a letter is going to be sent because they are usually sending multiple letters at a time", "[Barefield] found out after she had sent the notice to [Doe] that she had received an email from [Cochran] asking for it not to go out while they were in class, but it was already sent, and [Doe] had opened it", "[p]art of [Barefield]'s role is to provide guidance to program chairs and others for how to handle a disruption, to check in, and make sure they are doing everything they're supposed to be doing and not interfering with an investigation", "[Fitzwater] had a conversation with [Cochran] to understand the impact on the class", "Tang and [Wymelenberg] reached out separately to ask questions and inquire about what was happening", "[t]hey would ask for guidance on how they address concerns from the program's perspective", "[Barefield] learned from [] Tang that [Cochran]'s course had moved to Zoom for the rest of the semester", "[Doe] had asked [] Tang to serve as an advisor in their conduct meeting, and [] Tang was not comfortable doing so", "[Barefield] told [] Tang and [Wymelenberg] about the role of an advisor and explained they are not required to serve as one, but the student has the right to an advisor of their choice", "[h]e also inquired about whether the program could address potential misconduct within the program", "[Barefield] told them to wait until the conduct process concluded to see if they felt they still needed to follow up", "[Wymelenberg] worked with [Barefield] and [] Hope to draft a letter to [Doe]", "[t]o [Barefield]'s knowledge, [Cochran] did not report any other students to SCCS in the fall 2023 semester", "[Barefield] is aware of [Doe] raising concerns about other students in the class engaging in similar behavior that [Doe] had been referred for, but the circumstances were different, and [Cochran]

109

chose not to refer them", "[SCCS] spoke to [Julie] after [] Reed in IEC suggested they reach out to her", "Julie's input supported the information Respondent had submitted but it was not substantial enough to rely on regarding the outcome", "[Doe]'s desire for co-authorship on the project they were working on also became a struggle for [Cochran]".

02/20 (15:33): Doe emailed the UNL SA Vice Chancellor his appeal of the University Conduct Boards findings of being in violation of two conduct charges related to disrupting class. The appeal letter was offered as a link to a large university cloud hosted file and below the textual component of the letter was Doe's current iteration of his chronology of email screengrabs. Doe wrote; "[b]ased on University Code of Conduct [exact citation] I am formally appealing to [the UNL SA Vice Chancellor] that the decision of the University Conduct Board that found me in violation of University Code of Conduct [exact citation] be nullified, due to that response being excessive", "[t]hat response was clearly excessive in light of all the circumstances offered at the hearing", "[t]he University Conduct Board knowingly based their determination on", "discriminatory hearsay", "I provided documentation to the University Conduct Board of said discrimination, testimony as to the reporting bad-faith faculty member's false light framing of myself and meticulously pointed out how the [SCCS] only pondered the evidentiary weight of a narrow", "selection of documents", "[t]he internal disciplinary processes of this University that have been used abusively against me by a discriminatory bad-faith faculty member cannot be an enduring condition of my continued enrollment", "[t]he Office of Conduct and Community Standards has long been aware of the discrimination within my case and has decidedly labored to make the University a discriminatory environment for the benefit of shielding a bad-faith faculty member", "[t]hat is prohibited by the University's non-discrimination policy", "[c]ondoning the sanctions against me stemming from a finding of being in violation of University Code of Conduct [exact citations] would continue making the University an environment of discriminatory harassment for me".

02/22 (unknown): Shaver interviewed Wymelenberg for Doe's IEC investigation. Wymelenberg said that "[Wymelenberg] is the Dean of the College of Architecture and first came to know about issues with [Doe] and [Cochran] after a series of concerns were expressed by [Cochran] to [] Tang and [] Kuenning", "[Wymelenberg] received the first email on [2023/11/01], from [Kuenning]. [Kuenning] and [Wymelenberg] discussed it on [2023/11/08]. On November [2023/11/10], [Kuenning], [] Tang, [Cochran], and [Wymelenberg] met and discussed the situation", "[t]hey discussed options for making [Cochran] feel more comfortable in the classroom and resources available for raising concerns related to [Doe]'s behavior, whether that was IEC or [SCCS]", "[t]hey discussed having a plainclothes police officer sit outside the class for the following two class periods", "[Kuenning] called UNLPD to see if they would be willing to do so. UNLPD did an assessment and determined that it was premature", "[Wymelenberg] agreed that there would be ongoing check-ins with [Cochran] and [] Tang and that [] Tang and [Doe's faculty advisor] would sit in on the courses", "[t]here was discussion about [Doe] being removed from the program", "[Cochran] was initially not comfortable filing any complaints", "which was what led to discussion about UNLPD", "[Cochran] witnessed an escalation in October, which,

combined with odd behavior, was why she had concerns for her safety", "[Wymelenberg] told her that the decision was hers", "[s]he has his support whatever she decides to do", "[s]oon after, when checking in with [Cochran], [Wymelenberg] learned that she had decided to file the complaint with [SCCS]", "[g]raduate students should be inquisitive and have the academic freedom to explore ideas", "[Wymelenberg] was trying to discern whether that was what was happening or if it was something more substantial", "[h]e was convinced it was something more substantial", "[Wymelenberg]'s only perception of [Cochran]'s motive in raising issues related to [Doe] is that [Cochran] wants to have a productive classroom", "[Wymelenberg] has seen email threads related to an assistantship but has not had direct conversations with [Cochran]", "[h]is understanding is that [Doe] is frustrated about not being given the assistantship that [Doe] feels they deserve", "[Wymelenberg] does not have any concerns related to how the assistantship was assigned", "[t]here is no prescribed process for awarding assistantships", "[i]f a faculty member thinks someone has the skills to fill the need to meet the outcome, and the timeline is tight, it might be identifying a person and having a discussion to move forward", "[a]t other times, there may be the opportunity to use it as a recruitment tool, for doing a national search, or for looking through current candidates", "[i]t is always skill-set driven, as well as time and urgency driven", "[Wymelenberg] is aware of issues that pertain to the publication acknowledgment", "[Wymelenberg] was aware of [Doe]'s request for a formalized agreement of acknowledgement with [Cochran]", "[Wymelenberg] advised [Cochran] not to sign it", "[Wymelenberg] had never seen anything like it before", "[Wymelenberg] sent a letter to [Doe] on [2023/12/21]", "[h]e had been working on that letter for several weeks, given that multiple cases were occurring", "[Doe]'s feedback was that they had never been told that any behavior was inappropriate", "[t]hat was not how [Wymelenberg] viewed the information received from [Cochran] and [] Tang", "[Wymelenberg] asked [] Tang to start the letter, and [Wymelenberg] consulted with [] Walker and [] Barefield about the best timeline for sharing that information with [Doe]", "[t]hey wanted to deliver it in the least disruptive way to [Doe] but indicate that corrective behavior was needed", "[t]hey felt it best to wait until finals were done", "[Wymelenberg] had conversations with [Barefield] to learn about the timeline and updates about decisions made", "[Wymelenberg] never had any conversations with [Doe] but received many emails beginning in November 2023".

02/23 (07:50): Doe emailed Pearce, copying the UNL SA Vice Chancellor, Ankerson, the UNL Chancellor, Hope and Shaver, writing; "[o]n [2024/01/15] [] Nielsen informed me that you had been requested by Nielsen to review, and if appropriate, address my allegations of unprofessional conduct with [IEC] Case Manager Reed", Doe asked "[h]ave you reviewed my allegations of unprofessional conduct of Reed", and "[i]f so, what did your review determine".

02/26 (17:19): Pearce emailed Doe, replying to Doe's 02/23 (07:50) email, writing; You may recall that I mentioned in my letter to you of [2024/01/26], that I reviewed your report that Reed engaged in deceptive behavior, misled you deliberately, and made an error in a letter that he wrote to you; and that I was satisfied that your report was addressed from a management perspective", "I want to clarify that

when I wrote those words, I meant that I personally reviewed the matters you reported, and that I was (and still am) satisfied that they have been addressed appropriately", "I would also like to take the opportunity to emphasize that I appreciate it very much when I receive feedback about members of my staff, positive or negative, so that I can help foster improvement when needed and optimize our office's functioning", "[b]eyond the foregoing, it is not appropriate for me to answer your specific questions", "Your questions", "probe into personnel information that is protected from disclosure and that I am not free to share", "[t]hank you for bringing forward your concerns", "[t]hough I cannot elaborate, I appreciated receiving your report".

02/27 (18:19): The UNL SA Vice Chancellor emailed Doe, writing; "I received and reviewed your complaint regarding [] Frankel-Russell", "[t]he review is complete but because this involves a personnel matter, I am unable to share with you the resolution", "[n]o additional information will be forthcoming".

02/28 (11:05): Doe emailed the UNL SA Vice Chancellor, copying Shaver, writing; "I am proactively communicating to you that [IEC] has germane evidence that you ought to consider when deciding whether or not to nullify my in-violation statuses as well as deciding whether or not to nullify my sanctions", "[t]hat germane evidence is in the form of four audio recorded interviews between [Doe] and [Shaver]", "[a]ll of which were referenced within my formal appeal letter to you, [the UNL SA Vice Chancellor]", "[b]ased on that documented communication, there shouldn't be any issue in your ability to listen to said recordings", "[o]f which, I am requesting", "you do", "[a]s well, I would like to take this opportunity to respectfully reiterate that the discriminatorily provoked and continued misuse of this University's internal disciplinary processes, based on sex", "is harassing me", "[a]nd that the continuation of my in-violation statuses as well as my state of being within Disciplinary Probation is a condition of my continued enrollment that any reasonable person would find to be an intimidating, hostile and abusive process".

02/29 (09:00): Doe emailed Walker, copying the UNL SA Vice Chancellor, and blind copying Shaver, writing; "I am reaching out to you to respectfully inquire if you accessed the confidential attachment", "I had sent to [UNL SA Vice Chancellor] and other specifically-addressed-to parties on [2024/02/20]", Doe attached a screen grab of the metadata drop down screen for his large university cloud hosted file of his appeal letter to the UNL SA Vice Chancellor. The metadata denoted who had viewed the document, and Walker was listed as having view it on [2024/02/20].

03/01 (16:59): Doe emailed Anaya, writing; "I am reaching out to confirm the veracity of authorship of the letter I received from the University Conduct Board", "[s]pecifically, within the letter that I received on [2024/02/06] it is stated under the 'Rationale for the Decision'", "'[t]he Faculty and other students reported disruptive behavior from the respondent in class, which disrupted class and made in-person meetings hostile", "[a]dditionally, the Faculty member reported that the respondent's actions made her feel threatened and otherwise upset", "[b]ased on these reported behaviors and concerns expressed to

Faculty by other students, the format of the class was changed[]'", Doe asked, "[d]oes that text reflect what [Anaya] had authored".

03/02 (12:12): Anaya forwarded Doe's 03/01 (16:59) email to Fitzwater and Barefield, asking; "[d]o I need to respond to him". (09:41): Barefield replied to Anaya, copying Fitzwater, writing; "[n]o, you don't have to respond to him", "[i]f you'd like I can share this request for confirmation with [the UNL SA Vice Chancellor] have her address this in her response to the appeal", "[i]f you want to confirm language from your letter, you can", "I would recommend making sure it matches the letter you signed to ensure you are being completely accurate".

03/03 (09:30): Anaya replied to Barefield's 03/02 (09:41) email, copying Fitzwater, asking; "[c]an you please just have [the UNL SA Vice Chancellor] address it". (11:43): Barefield forwarded Anaya's email to just the UNL SA Vice Chancellor, writing; "[Doe] has reached out to the chair for his Hearing and requested verification that the language below reflects what was authored in the letter he received", "[Anaya] has requested to not respond and rather to defer the request to confirm the letter language", "I'm not sure if this will come up in the conversation you have with [Doe]", "I have compared the language to the letter the chair signed as the outcome of the hearing, and the language is the same", "[o]ur process for developing the language from a hearing is to have the chair submit a fillable Decision form after the hearing", "[t]he Decision form includes outcomes for findings, rationale for their decision, and any sanctions the Board outlined", "[t]he Conduct Officer responsible for the case then drafts the decision letter based on the information provided in the Decision form by the chair", "[t]he Conduct Officer then shares the letter draft with me to review, and I then send the letter on our electronic letterhead to the chair as a draft for them to review, edit, and sign before sending back to me".

03/04 (10:12): Doe emailed Shaver asking if Barefield had actually gotten approval from IEC to issue Doe charges on 2023/11/21.

03/04 (unknown): Shaver interviewed Angie for Doe's IEC investigation. Angie said that "[Angie] [was] a student", "in [an exact foreign country] before coming to the United States", "[w]hen she first came to the US, she spent time learning to speak fluently in English", "[a]fter being in the US for a year, she was curious about [a] master's program", "[Angie]'s husband", is" in "[e]ngineering", "[i]n April 2023, [Angie's husband] was in a meeting with [Cochran]", "[he] told [Angie] that [Cochran] was nice", "[Angie] was interested in working", "so her husband sent an email introducing [Angie] to [Cochran]", "[Angie] expressed an interest in working as a research assistant for [Cochran]", "[Cochran] told Angie then that she did not have a project or financial resources to support [Angie] at that time", "[Angie] was only interested in [Cochran]'s work, so she did not apply for the program and decided to wait until [Cochran] had an opportunity available and could fund [Angie]".

03/05 (08:52): Shaver replied to Doe's 03/04 (10:12) email, answering; "TIX Coordinator Meagan Conley communicated with Barefield that Student Conduct could proceed with their process".

03/07 (09:37): Walker emailed Doe replying to Doe 02/29 (09:00) email, writing; "Yes", "when high-level administrators at the university receive a message such as this, they pass it along to the appropriate individual", "[a]s I wrote you previously, I have been designated by [Ankerson] as your point of contact".

03/11 (09:10): Doe emailed Walker, replying to Walker's 03/07 (09:37) email, asking; "[h]ave you made a determination on how you will proceed regarding my formal allegation", regarding Doe's allegation of profession misconduct on part of Cochran.

03/13 (11:15): Doe emailed Walker, stating that he was following up on his 03/11 (09:10) question, going on to ask; "[h]ave you made a determination".

03/13 (12:30): Doe emailed the NU Records Director, asking that the FERPA requestion he made on 02/02 (16:19) be fulfilled.

03/14 (08:00): Doe emailed Shaver, writing; "I have been digging into the rules" based "literature(s) of NU and UNL (bylaws and policies)", "and I am baffled by what, if any, governs any clear delineating of responsibilities between the many, seemingly, overlapping roles of so many administrators", Doe wrote on; "[f]or instance, I just realized that there is a 'GRADUATE COLLEGE Bylaws and Policies' document, and based on that I am of the mind that Gold is the one to complain[] to about Cochran. There is no intended criticism toward you for referring me to Marks, there just seems to be so many redundant rules' documents". At this point in time Jeffery Gold (Gold) was the Executive Vice President of the NU Graduate College, it was Doe's tentative interpretation that based on said college's bylaw that said body was the highest authority regarding contested matters concerning graduate students.

03/15 (09:20): Shaver replied to Doe's 03/14 (08:00) email, writing; "[y]ou are right that it can be complicated".

03/15 (~10:30): Doe had an over the phone screening with Legal Aid of Nebraska (LAN). Previously LAN had been listed as a resource in an IEC notification that Doe received. Doe was following up on that, to seek representation for employment discrimination due to a failure to promote. The paralegal said that the staff lawyer decline, potentially due to it not sounding as though the failure to promote was not in retaliation for complaining about a protected status, as much was Doe understanding. Doe clarified that it was due to complaining. The paralegal check again then told Doe LAN still would not represent Doe, but that based on what Doe said he might consider filing a complaint with the Nebraska

Equal Opportunity Commission (NEOC). Doe asked if the paralegal could send a link. (11:06): The LAN paralegal sent a link to NEOC.

03/15 (14:20): Walker emailed Doe, writing; "[t]hank you again for sharing your concerns", "[w]e will look into this at the appropriate time", "[t]here is no need to communicate further on this matter".

03/18 (15:57): The NU Records Director emailed Doe a link to his FERPA records request fulfillment for emails sent or received by CRP faculty members and the CoA Dean from 2023/10/01 to 2023/01/01.

03/19 (08:00): Doe email the NU Records Director requesting the emails of IEC employees and SCCS employee between the November of 2023 and March of 2024 that were contained within his educational record. (09:37): The NU Records Director confirmed receipt.

03/19 (11:57): Doe emailed Shaver, asking if they could Zoom to review the contents of his third records request fulfillment. (13:11): Shaver replied asking if tomorrow afternoon would work. (13:26): Doe replied, confirming the Zoom.

03/19 (15:00): Doe received a formal notification from the UNL SA Vice Chancellor, it contained a link to the determination of Doe's appeal of the University Conduct Board's determination. Of the four charges, two were dropped. Doe was still on probation, and still had to pay a fee. But Doe did not have to complete a reflection letter, nor did Doe have to complete a behavioral intervention program at his expense.

03/19 (16:21): Doe emailed Fitzwater, blind copying Shaver, seeking clarification about the term "university probation" that featured in the University Conduct Board appeal response letter. Doe had been told at his hearing that he was on "disciplinary probation". Doe also asked who could see his disciplinary status, Doe was concern about how it might affect job applications or graduate program applications, which Doe stated.

03/20 (14:00): Doe had his IEC Zoom meeting with Shaver regarding the contents for Doe's third FERPA request fulfillment for CRP faculty-member emails that regard Doe (see 2024, 03/18 (15:57)). Doe asked Shaver if she knew whether Pearce had discussions with Counley prior to Counley telling Barefield that SCCS could begin a case against Doe on 2023/11/21. Shaver said she did not know. Doe asked if Schuldeis had the covert video recording that Doe alledged Cochran took on 2023/10/27. Shaver said that she was not able to uncover a recording of that work meeting between Doe and Cochran. Shaver said she was going to speak generally for a moment. Shaver told Doe that sometimes conduct complaints may contain issues related to what IEC investigates, and in those instances SCCS will defer to IEC, and will wait until IEC has made a determination regarding its involvement, "they wait to hear from us". She said that was the interplay between those offices. Shaver said that she though

Schuldeis's initial contact with Cochran was just gather some initial context and not evidence. Shaver asked if Doe care if she recorded their conversation, "I started recording because we'd be, I'd be gathering information from you about the FERPA stuff", Doe said that was fine.

Doe said, he had another quick question, "I've been going through the rule-sy documents of NU and UNL, just to get a sense of what, what like, the authoritative flow tree is, because, you know, come to find out", "I guess all of the campuses, are just campuses of NU, and it's just, NU is 'the' university, and UNL is not, it's just a campus". Shaver said, "so, I mean, I probably know just enough about this to be dangerous, but yeah, there's like, there's like the NU system, and so that's like, when we say, central administration, or like general counsel, it's, general counsel for like the whole university, right, or like, the, the system is like the president is, is works at like the system, like NU, like the NU system, and then you're right, and that like each of these are just like campuses, so like there's UNL, UNK, UNO, and they each have their, kind of like their operations that way, but um, but I don't know it that was a question or not, but you're right in what you said in far as like there's the system, and then separate campuses". Doe said that he had come across some by-laws "specifically for the graduate college", "and my understanding based on that is that graduate students within this NU greater university are, are part of a distinct college, is that correct?" Shaver said, "I don't know", "I'm not familiar with that, to be perfectly Freddie with you, I don't know about that, I don't, I read that in your email, but I haven't looked into it", "I don't know". Doe said, "my impression reading through the regents' bylaws was that, um, you know, thee, thee authority statutorily, and I looked up the state statute too, so the state statute confers authority to the regents, and then it seems to me, you know, in terms of like the enabling legislation, if I might refer to it as such, like flows down from the regents, and my reading of the regents' by-laws, is, you know they delegate that to the chancellors and so on, and so on, so it's like this, this sort of like trickle down of like authority that is delegated from the top down, um, and so in terms of thee, UNL, this campus, you know, is it the case that IEC is under the SA umbrella, or are you guys a separate, do, do you guys derive your, ah, authority, I guess, well and I, that's not intended to be pointed, but does that come to you from the chancellor, and separate from SA?" Shaver said, when you say SA are you referring to student affairs?" Doe said, "yeah". Shaver so, "so, I do not believe our authority comes from student affairs, so Marc [(Pearce)] our, the, the, essentially the main boss of our, our office reports directly to the chancellor, so I believe our, it probably is delegated from, the authority derives from the chancellor, but I'm not entirely certain about how exactly that works, like how, where our authority comes from specifically". Doe said, "it seems as though there's a lot of ambiguity, um, regarding that". Shaver said, "I'm not trying to be evasive, I just, you're asking good questions, that I honestly, I honestly don't know the answer to, so I'm sorry". Doe said, "I was trying to get a handle on non-discrimination related complaints about Cochran, and then I was trying to figure out if the EVC", "was the right, or not necessarily the right or wrong body, to make that complaint to, but maybe not like the most acutely precise body, or set of officials to make that to, and you know, it strikes as this sort of thing that would be denotationally, like very, you like this is 'this is person the person', because there, there is that for some things". Shaver said, "there is ambiguity, you're right, I understand your

frustrations, you haven't said you're frustrated, I just understand the, the ambiguity of it, um, and I wonder, I don't know if you've, I don't know if whether or not they'd be able to help answer that question better or not, and I know had briefly, briefly had some kind of interactions with that [] Frankel-Russell I student advocacy and support, um, I don't know whether she'd be better suited to pro- provide better direction as far as like non-discrimination stuff, but, um, if you were still curious she might be somebody you could ask some of those questions to, to see if she's got a better handle on, because that's what their suppose to, to do, so might be something you'd consider". Doe said, "I don't think I'll be considering that, considering she lied to me". Shaver said, "I'm not telling you, ha, ha, ha, I'm not trying to say you have to, or anything, I just, that's just an office that I know of that's generally geared toward providing assistance, so, I'm sorry you had that experience". Doe and Shaver moved on to talk about the contents of the third FERPA fulfillment. Doe said there wasn't too much new information but that there were a few things, and that he wanted to talk about that. Doe said that he had expanded the timeframe for the emails that he had requested, that he had pushed the start date back, and the end date forward in time. Doe mentioned that the NU records director had included some of the same emails that she had included previously that related to Doe transferring into the CRP program. Doe and Shaver reviewed the entire content of the fulfillment together. Doe mentioned that within the most recent FERPA fulfillment, much like the prior fulfillment, that Doe was not able to find the email that Cochran had supposedly transcribed within her written complaints to SCCS and IEC from Morgan wherein he was written as complaining about Doe belittling other students, saying "I believe that is a forgery". Doe noted that said email transcription from Cochran featured almost exclusively as the basis of SCCS's case against Doe at his SCCS hearing. Doe and Shaver were scrolling through entire email threads, so they were able to see how forwarded and replied-to emails could start at different entries to different parties, and thus create wholly different email threads between different parties. Doe took issue with the manner in which Cochran would use that feature of emails to forward her correspondences with one party to another while subsequently adding more prescriptive characterizations of what a previous different party had supposedly said about what other parties should do regarding Doe. Doe said, "she's making these characterizations about supposedly what any given person said", "it's like she's trying to use the idea of there being other people, to like, create this idea that there's, like, this hoard of people that are concerned about me". Doe said that was a tactic on part of Cochran to bolster her ethos to others. When Doe and Shaver were reviewing the email that Cochran sent CRP faculty stating that Barefield had been given permission by IEC to investigate Doe; Doe asked Shaver if Counley had gotten permission from Pearce before giving Barefield said permissions. Shaver said, "I don't think she has to have the go ahead from Pearce, but I don't know whether or not she did". Later when Doe and Shaver were reviewing the email that Barefield sent Cochran stating Barefield had been given "approval" to investigate Doe by IEC, Shaver said, "I wasn't part of that". When Doe and Shaver review the emails between Barefield and Cochran regarding Doe's complaints to Cochran about Morgan changing Doe's working in the draft of the final report in the client course, Doe said, "this was interesting, this was new, this was something I wanted to talk about". Doe said of Cochran's correspondences with Barefield, "she's getting all this coaching from Barefield". Doe said, "when I complained about [Morgan], Cochran reaches out to

Barefield, and, and um, she's looking for advice, and this is just so peculiar to me". Doe said, "evidentially faculty and staff have all the support they could ever what, and I am just like banging my head against the wall trying to get people to do what they're suppose to do the way they're suppose to do it, anyhow, so she's, her and Barefield, they seem to have this, you know, it's like they're on the same team I guess". Doe said, "they're helping her craft her communications to me, I don't know if that's the way it's typically done, this seems so creepy to me, it's like, you know, it's not just that they have their own process with doing their investigation [(SCCS)], it's like they're actively orchestrating, like the communications between faculty and staff, which, I don't know, that doesn't seem ok to me, it's, it's weird, it's weird, it's like they're a team now, I guess". Doe said of Barefield's emails to Cochran, "so they're offering affirmation to her too, about everything she's [(Cochran's)] doing, I guess, but I guess she's doing maybe what they're telling her to do". Doe said, "maybe this is why Barefield was so invested in keeping the case going, because, it's like, Barefield has cake on her face if it all gets overturned". Doe said, "I kind of think that was Cochran's plan, right, like deferring to other people, because then they're invested in it, invested in it too". As they continued to review the emails, Doe said that when Doe pressed the point with Cochran that Doe did not want Morgan to edit Doe's work, and that Cochran had previously given written and verbal instruction that wasn't to happen, "she reaches out to Barefield again". Shaver replied, "oh, this is what Andie [(Barefield)] was talking about in the email, ok, about the examples and whatnot, ok". Doe said, "it's so creepy, like all of this dialoguing behind the scenes, it's so creepy, especially between SCCS and Cochran, because then, it's like, that, they're not an impartial third party within that situation, as soon, as soon as they start their case they're invested in not losing their case, right, because 'they never would have started a case unless there was a case there', and so they're all on the same team at that point, and it's, there's no impartiality there, in the adjudicating process". On multiple occasions within the Zoom session, Doe and Shaver had encountered the same set of emails within the third FERPA fulfillment that the NU Records Director provided to Doe. Doe said, "I never asked for correspondences from this far back, and it, I'm confused as to why [the NU Records Director] keeps including this whole, you know, all these correspondences about me transferring into the program, I don't know what's being intimated with that, I'm not sure if she's trying to telegraph something with that, I, you know, maybe she's trying to telegraph that other people are, like, requesting how it was that I was able to transfer in", "I can help but think this is part of something else as well, that, that isn't necessarily what I'm asked for, but is something that people are interested in". Doe and Shaver worked through the rest of the emails, and Doe told Shaver, "those are the new points I wanted to stress to you, was that, there's, there's like what is collusion between Barefield and Cochran, as opposed to the of- office of conduct just evaluating their, like singular instance of conduct, you know, you know and Cochran's claiming that Barefield is encouraging other people to like traffic complaints about me to Barefield's office and, and so, you know, I don't know, it's like the 'office of Cochran' essentially, I mean, ah, that's, that's, I, I don't know, I just think it's inappropriate how the, Barefield was, provided Cochran's words are to somewhat be taken seriously, just, kind of, essentially just in collusion with Cochran".

03/21 (12:07): Fitzwater replied to Doe's 03/19 (16:21) email, copying Barefield, the UNL SA Vice Chancellor, Anaya and Shaver, writing that "University" and "Disciplinary" probation were interchangeable. And in regard to the retention of Doe's probationary status, Fitzwater wrote, "[SCCS] will maintain the outcome of your case as part of your University Conduct Record. After [2024/07/29], you will no longer be on University Probation, but record of the outcome will be maintained according to UNL record retention policies ([NU records retention policy link]) for a period of 6 years from the date of resolution, after which time the record will be destroyed." (12:44): Doe replied to Fitzwater, copying Barefield, the UNL SA Vice Chancellor, Anaya and Shaver, citing federal FERPA regulatory code and noting that there were a number of organization types and circumstances that allowed for access of a student's educational record without the student's permission, in particular educational institutions. Doe asked if potential doctorate programs would see Doe's University Conduct Record by default. (12:44): Fitzwater replied, copying Barefield, the UNL SA Vice Chancellor, Anaya and Shaver, writing that non-consensual sharing of Doe's University Conduct Record would require a request by a qualifying entity. (12:50): Doe replied to Fitzwater, copying Barefield, the UNL SA Vice Chancellor, Anaya and Shaver, asking what the types of cases were wherein a student was not made aware that a conduct record check had occurred as part of their application process.

03/25 (10:38): Doe emailed Fitzwater, copying Barefield, the UNL SA Vice Chancellor, Shaver and Anaya, asking; "If you were in charge of hiring someone at SCCS and you saw what one would see on my record, would you hire them".

04/01 (17:52): The NU Records Director emailed Doe, writing that she "will be in touch when the production is ready to coordinate a location for you to review the records" from Doe's FERPA records request.

04/02 (08:00): Doe filed complaints with the NEOC for sex-based employment discrimination on part of Cochran.

04/04 (~12:00): Doe call SAS and spoke with Frankel-Russell, Doe said that Shaver had suggested that he reached out to Frankel-Russell. Doe asked "is there anything that you think is important that I ought to know". Frankel-Russell answered, "I don't think so". Doe thanked Frankel-Russell and they said goodbye.

04/15 (~11:00): Doe attended the public forum at the Swanson Auditorium, on UNL City Campus Union. NU priority choice to be NU's next president was to speak and then take questions from the audience. Seated on stage were an NU regent, the head of a state-level regulator agency who inhabits a meaningful and longstanding public profile, and the student president of UNL ASUN. The audience in attendance seemed to number over 100, and included the UNL Chancellor, and an armed and uniformed police officer. Standing on stage was, at that point in time, the Executive Vice President of the NU

Graduate College Jeffery Gold. During Gold's speech he said that he had many titles, and he said one of the was being the Executive Vice President of the NU Graduate College. During the question-and-answer portion of the public forum, before Doe was able to asked his question, Gold received a question from a former UNL Graduate Student Assembly President. The former UNL GSA president said that he had heard from his GSA counterparts at the University of Nebraska Omaha campus that they had made multiple attempts to have Gold come and speak with them, but that despite that effort Gold had not yet engaged with them. Gold commended to the former GSA president thanking him for his service, and saying that Gold had inhabited many elected educational leadership positions over the years, and that often it is the person that doesn't take a step back when a leader is asked for that ends up being a leader. Then Doe asked his question to Gold. Doe offered a number of rules-based citations, citing state statute, regents' by-laws, and university policies, and asking Gold if the interplay between those rules were such that the profession well-being of a graduate student was ultimately vested in said student's graduate program director. Gold answered Doe, saying that Gold's leadership philosophy was one wherein authority was "delegated" and not "conferred", but that Gold felt that as he was the Executive Vice President of the NU Graduate College that ultimately he felt he was the one with authority over contested issues with graduate students. Doe recalls that comment by Gold provoking a surprised facial expression by the head of a state-level regulator agency who inhabits a meaningful and longstanding public profile.

04/22 (08:00): Doe emailed Gold, Hope, the NU Records Director, Marks, Pearce, Shaver, Tang, and Walker, copying the UNL Chancellor. Doe sent a very lengthy document. The document went into meticulous detail, recounting the discriminatory and retaliatory issues that Doe felt he was encountering, and articulating, with citations, what Doe believed was the statutory and procedural basis upon with Gold could grant Doe's request. Doe requested that Gold invalidate Doe's university probation.

05/24 (~10:00): Doe went to the office that the UNL SA Vice Chancellor had specified. Doe was required to review his fourth FERPA records request fulfillment in person. When Doe reached the office, he found out that he was to review his documents at the office for Services for Students with Disabilities. Doe was made to lock his belonging into a lock before entering the review room, and Doe was informed that there was a digital camera in the room that was being watched by the campus police department. Doe reasonably inferred that the choice of venue for Doe's in-person review of his fourth records request fulfillment was done in retaliation against Doe for complaining to Gold about discrimination at the university.

05/26 (15:34): Doe emailed the NU Records Director, Doe requested; "under FERPA I request all information on file regarding [Doe] with the Office of Student Advocacy and Support[], including, though not limited to, information about [Doe] with the Behavioral Intervention Team[]".

07/09 (14:25): Doe received a formal notification from IEC that linked his final investigation report, which included transcriptions of the interview's Shaver had conducted. There was also a link to an electronic filing cabinet, within which Doe was able to review all the deanonymized FERPA request fulfillments, i.e. there were no redactions.

07/09 (17:12): The NU Records Director sent Doe his SAS and BIT case file, (see 2024, 01/17 (15:24)).

07/10 (08:00): Doe emailed the NU Records Director, asking if she would clarify to Doe if the email "Response to [Doe]" actually exists.

07/16 (09:10): The NU Klintoe replied to Doe's 07/10 (08:00) email, regarding the veracity "Response to [Doe]", writing; "[t]he University has not identified any of your education records matching the description you provided".

07/23 (23:58): Doe emailed Shaver his formal response to the IEC investigation report. Doe offered the conclusion the report did support his claim of retaliation by Cochran and other university officials.

08/01 (10:00): Doe emailed Ankerson at the EVC, alleging that Cochran fabricated an email posing as a student, Doe provided a copy of the 07/16 (09:10) email he received from the NU Records Director.

08/23 (17:41): Walker emailed Doe, writing; "I am no longer a member of the Office of the Executive Vice Chancellor and do not have any additional involvement in the matters you continue to raise", "direct your inquiries on these and any related matters to", "the Office of the Vice President and General Counsel".

08/08 (16:11): Doe received a formal notification from Shaver with IEC. It contained her determination in his discrimination complaint against Cochran with IEC. Shaver concluded that the weight of the evidence was not enough to concluded that Cochran engaged in discrimination or harassment based on protected statuses. Shaver never formally recognized Doe's allegation of sex-based retaliation.

08/20 (23:11): Doe sent an email appealing IEC's dismiss of his complaints. Doe's basis was that IEC gave approval to SCCS to launch an investigation of Doe on behalf of Cochran even though IEC was aware that Doe had complained about sex-based discrimination to Cochran. That the SCCS investigation of Doe was sex-based retaliation on part of Cochran, which IEC was complicit in facilitating. And that IEC refused to investigate sex based-based retaliation due to being complicit in the very sex-based retaliation that Doe complained to IEC about.

09/21 (10:37): Doe received an email that upheld IEC's dismissal of Doe's discrimination complaint to IEC. It stated that the investigator conducted a thorough investigation, reported the facts, and based her decision on those facts.

10/08 (NA): NEOC mailed Doe a form he was to file to "AMEND[]" his complaint form "to correct the Respondent name". Initially the respondent in Doe's NEOC case had been listed as the NU board of regents, but the amended form changed that to IEC.

12/11 (~12:00): Doe interviewed with an NEOC investigator. This was Doe's chance to respond to the rebuttal from the "Respondent" in Doe's case of sex-based employment discrimination. During the call Doe asked for clarification as to who, exactly, the "Respondent" was. Doe said he filed the complaints about Cochran, that NEOC had recognized the "Respondent" as the NU board of regents, but then NEOC amended the "Respondent" to be IEC, Doe asked why that happened. The investigator said that IEC was the "Respondent", and after some follow up questions from Doe the investigator confirmed that the reason the Respondent had been changed was because the NU board of regents directed NEOC to IEC. The rebuttal that IEC had offered NEOC was brief, which was essentially; that Cochran choose Angie for the salaried assistantship for a non-discriminatory reason, that Cochran had filed misconduct charges against Doe with the university, that Doe was found guilty for misconduct by the university, and that Doe's hourly internship ended and that Doe was not re-hired for a non-discriminatory reason. Doe offered a very thorough explanation about now the university misconduct charges were discriminatory retaliation against Doe, claiming to NEOC that those misconduct charges Cochran had made against Doe were used, in part, to inhibit Doe from obtaining the salaried assistantship, and Doe said that the academic charge had been dropped by the university, but that the two conduct charges had been upheld. After a while the investigator said that he had let Doe go on about the misconduct issues for some time, and that those issues were not relevant to Doe employment discrimination investigation. Doe offered a robust list of potential witnesses, and asked the investigator if he would contact them. The investigator told Doe that NEOC would be in touch with Doe about witness outreach if it were to occur. NEOC never reached out about contacting Doe's potential witnesses.

2025

2025/01/31 (NA): Doe received NEOC's dismissal of his employment discrimination complaint in the post. The reason given my NEOC was brief; "Respondent provided a legitimate, non-discriminatory reason for not selecting Complainant for [sic] Research Assistant position". The dismissal said that Doe could request for NEOC's dismissal to be reviewed by the U.S. Equal Employment Opportunity Commission (EEOC).

2025/02/05 (07:00): Doe requested the EEOC review NEOC's dismissal of Doe's employment discrimination complaint.

2025/03/13 (NA): Doe received the EEOC's conclusion of its review of Doe's employment discrimination complaint dismissal by NEOC in the post. It concluded that the NEOC's reason for dismissing Doe's complaint was sound. The letter also informed Doe of his right to file suit against the employer in federal court for employment discrimination. The document stated that EEOC conclusion had been sent to Schuldeis at IEC.

05/12 (NA): Doe received a rejection email letter for a community engagement position with the city after Doe's first round interview. Initially when Doe had applied to the position he had received an emailed rejection that from the generic human resources email, with a specific HR representative copied. But then he received an invite for a Zoom interview, and Doe subsequently had said interview, which Doe thought went well. Then Doe received another rejection email on 05/12 for the position, copied on the rejection letter to Doe were two specific HR representatives, as well as an employee with the specific department that Doe had interviewed with, but who was not one the individuals that conducted that interview and who is a member of the state chapter of the professional organization associated with the CRP discipline, which was known to Doe, because Doe had attended CRP related professional development events wherein said person was present as another attendee.

## **CAUSE OF ACTION**

Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688

Plaintiff brings this action under Title IX, which prohibits discrimination on the basis of sex in any education program or activity receiving federal financial assistance. Defendant University of Nebraska receives such assistance and is subject to Title IX.

In *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992), the Supreme Court confirmed that monetary damages are available for intentional violations of Title IX. Plaintiff was subjected to intentional sex-based discrimination in employment and subsequent retaliation after reporting such discrimination.

Under *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), an educational institution is liable under Title IX when an official with authority to institute corrective measures has actual notice of discrimination and responds with deliberate indifference. Here, multiple university officials, including Title IX administrators, compliance officers, and the University President, received detailed notice of discrimination and retaliation but failed to take corrective action, allowing the misconduct to continue.

Under *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), an institution may also be liable for deliberate indifference to peer or third-party harassment that is so severe and pervasive as to deny the victim equal access to educational opportunities. The University had actual knowledge of

retaliatory and defamatory conduct by a fellow student that harmed Plaintiff's reputation with a key prospective employer, yet took no action to prevent or remedy the harm.

In *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), the Supreme Court held that retaliation against an individual for complaining of sex discrimination constitutes sex-based discrimination under Title IX. After Plaintiff raised concerns through internal and external complaints, the University and its officials engaged in coordinated retaliation, including fabricated disciplinary actions, concealment of evidence, and professional sabotage.

As a foreseeable result of Defendant's conduct, Plaintiff has suffered loss of back pay, loss of future earnings, emotional distress, reputational harm, and professional exclusion. Plaintiff seeks all remedies available under Title IX, including compensatory damages for lost wages (back pay), anticipated future earnings (front pay), and non-economic damages for emotional distress and reputational harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant, and award the following to the extent permitted by law:

Back Pay: Including lost wages and associated benefits for the period Plaintiff would have served as a salaried research assistant. Had Plaintiff been lawfully promoted, he would have received approximately $25,000 in salary and $10,000 in tuition remission annually, over three academic semesters. This totals approximately $52,500 in back pay.

Front Pay: Plaintiff is currently 39 years old. The median annual salary for Plaintiff's intended profession is $83,720, per the U.S. Bureau of Labor Statistics. Assuming retirement at age 67, Plaintiff faces a loss of 28 working years, amounting to an estimated $2,344,160 in future lost earnings.

Compensatory Damages for Emotional Distress and Reputational Harm: Plaintiff seeks compensation for severe emotional distress, alienation from his profession and academic community, and reputational injury resulting from the university's misconduct. As a reasonable and symbolic valuation, Plaintiff requests $1,062,573, the approximate annual salary of the University President.

Attorney's Fees and Costs: Pursuant to 42 U.S.C. § 1988 and other applicable law, Plaintiff seeks an award of reasonable attorney's fees and litigation costs.

Such Other and Further Relief as the Court Deems Just: Including relief or injunctive orders as warranted by the facts and law.

Respectfully submitted,
s/John Doe
John Doe, Pro Se
Dated: 11/06/2025